**THE ROSEN LAW FIRM, P.A.**
Phillip Kim, Esq.
Laurence M. Rosen, Esq.
275 Madison Avenue, 40th Floor
New York, New York 10016
Telephone: (212) 686-1060
Fax: (212) 202-3827
Email: philkim@rosenlegal.com
Email: lrosen@rosenlegal.com

*Counsel for Plaintiff*

## UNITED STATES DISTRICT COURT
### SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ANNIE CHANG, Individually and on Behalf of all others Similarly Situated,<br><br>       Plaintiff,<br><br> vs.<br><br>NEUMORA THERAPEUTICS, INC., HENRY O. GOSEBRUCH, JOSHUA PINTO, MICHAEL MILLIGAN, PAUL L. BERNS, KRISTINA BUROW, MATTHEW FUST, ALAA HALAWA, MAYKIN HO, DAVID PIACQUAD, J.P. MORGAN SECURITIES LLC, BOFA SECURITIES, INC., STIFEL, NICOLAUS & COMPANY, INCORPORATED, GUGGENHEIM SECURITIES, LLC, RBC CAPITAL MARKETS, LLC, and WILLIAM BLAIR & COMPANY, L.L.C.,<br><br>       Defendants. | CASE NO:<br><br>__CLASS ACTION__<br><br>**COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>__JURY TRIAL DEMANDED__ |

## I.   INTRODUCTION

Plaintiff Annie Chang ("Plaintiff"), by and through her attorneys, alleges the following upon information and belief, except as to allegations concerning Plaintiff, which are alleged upon personal knowledge.  Plaintiff's information and belief are based upon, among other things, her counsel's investigation, which includes, without limitation: (a) review and analysis of public filings made by Neumora Therapeutics, Inc. ("Neumora" or the "Company") with the U.S. Securities and Exchange Commission (the "SEC"); (b) review and analysis of press releases and other publications disseminated by Defendants (defined herein) and other parties; (c) review of news articles, shareholder communications, conference calls, and postings on the Neumora website concerning the Company's public statements; and (d) review of other publicly available information concerning the Company and the Individual Defendants (defined herein).  Plaintiff believes that substantial additional evidentiary support exists for the allegations set forth herein, which evidence will be developed after a reasonable opportunity for discovery. [1]

## II.   NATURE OF THE ACTION AND BACKGROUND

1.      This federal securities class action asserts strict liability claims under the Securities Act of 1933 (the "Securities Act") relating to Neumora's initial public offering (the "IPO"), commenced on or about September 15, 2023, of 14,710,000 shares of common stock at a price of $17.00 per share.  This federal securities class action is brought on behalf of a class of all persons or entities who purchased or otherwise acquired Neumora common stock pursuant and/or traceable to the Offering Documents (as defined herein) issued in connection with the IPO, and who were damaged thereby (the "Class").

2.      Congress passed the Securities Act in the hopes of restoring investor confidence

---

[1] Unless otherwise noted, emphasis is added.

1

after corporate scandals and the stock market crash of 1929.  The Securities Act requires that those who sell securities to the investing public do so on the basis of accurate and fulsome disclosure. The Securities Act creates liability for false, misleading, and incomplete statements made in connection with public securities offerings in order to protect investors and maintain confidence in our public markets.

3.      Neumora is a clinical-stage biopharmaceutical company that was founded in 2019 by Arch Venture Partners, L.P. ("Arch").  The Company's "mission" is to "redefine neuroscience drug development by bringing forward the next generation of novel therapies that offer improved treatment outcomes and quality of life for patients suffering from brain diseases."  Neumora's therapeutic pipeline currently consists of seven clinical and preclinical neuroscience programs focused on treating neuropsychiatric disorders and neurodegenerative diseases.

4.      Navacaprant, Neumora's flagship therapeutic candidate, is a once-daily oral kappa opioid receptor ("KOR") antagonist aimed at treating major depressive disorder ("MDD").  The Company described Navacaprant as a "novel" treatment with "the potential to provide significant advantages relative to the standard of care, if approved."  Navacaprant is designed to modulate dopamine and reward processing pathways that regulate mood, cognition, reward and behavior.

5.      Neumora acquired Navacaprant in September 2020, including other therapeutic candidates, through its acquisition of BlackThorn Therapeutics, Inc. ("BlackThorn"), a privately held therapeutic development company.  Neumora paid an initial amount $37.4 million to acquire BlackThorn, and up to another $365 million contingent on certain development and regulatory milestones, with respect to Navacaprant (the "BlackThorn Acquisition").

6.      Before the BlackThorn Acquisition, BlackThorn had already begun a phase two clinical trial—which was double-blinded, randomized, and placebo controlled—to test

Navacaprant as a monotherapy for the treatment of mild to moderate MDD (the "Phase Two Trial"). Subsequently, Neumora decided to amend the Phase Two Trial inclusion criteria to include patients with moderate to severe MDD as this was the patient population the Company planned to focus on in its later phase three trials. Neumora also included a "prespecified analysis to the Phase 2 statistical analysis plan focused on the moderate to severe MDD population."

7.    In June 2023, as described in the Offering Documents, Neumora completed its "End-of-Phase 2" meeting with the U.S. Food & Drug Administration (the "FDA"), which purportedly showed Navacaprant to be an effective monotherapy in treating moderate to severe MDD, providing statistically significant improvements in depressive symptoms. Due to the Phase Two Trial results, Neumora initiated its "pivotal" phase three program, which included three efficacy studies: KOASTAL-1, KOASTAL-2, and KOASTAL-3 (collectively referred to as the "Phase Three Program"). The Phase Three Program's purpose was to further evaluate Navacaprant as monotherapy for moderate to severe MDD.

8.    On or about September 15, 2023, Neumora conducted the IPO and raised more than $250 million in proceeds for the shares of Neumora common stock offered to the public, while the underwriters collected over $17 million in fees. In other words, the IPO was a great success for Neumora because the proceeds generated from the IPO could be deployed to fund its ongoing Phase Three Program related to Navacaprant.

9.    Unbeknownst to investors, Neumora's Phase Three Program, including the KOASTAL-1 study, was riddled with risks and uncertainties that were well known by the Company at the time of the IPO. Specifically, the Offering Documents failed to disclose and/or misrepresented the following significant, then-existing material events, trends, and uncertainties regarding the prospects of Navacaprant as a monotherapy, including: (1) in order for Neumora to

justify conducting its Phase Three Program, Neumora was forced to amend BlackThorn's original Phase Two Trial inclusion criteria to include a patient population with moderate to severe MDD to show that Navacaprant offered a statistically significant improvement in treating MDD; (2) and to that same end, the Company also added a prespecified analysis to the Phase Two statistical analysis plan, focusing on patients suffering from moderate to severe MDD; and (3) the Phase Two Trials lacked adequate data, particularly in regards to the patient population size and the ratio of male to female patients within the patient population, to be able to accurately predict the results of the KOASTAL-1 study.

10.    Before the markets opened on January 2, 2025, the undisclosed adverse facts became known when Neumora issued a press release announcing the results from the KOASTAL-1 study of Navacaprant for the treatment of moderate to severe MDD.  The press release revealed that the KOASTAL-1 study failed to "demonstrate a statistically significant improvement on the primary endpoint of change from baseline in the Montgomery-Åsberg Depression Rating Scale ('MADRS') total score at Week 6 or the key secondary endpoint of a change from baseline in the Snaith-Hamilton Pleasure Scale ('SHAPS') scale."  In that same press release, Executive Vice President Rob Lenz ("EVP Lenz") stated, "We are disappointed by the results from KOASTAL-1 as they were not consistent with the body of evidence supporting this mechanism."  EVP Lenz also noted that there "is a lot to investigate from this study" due to the "contrast in drug and placebo responses in depressed mood and anhedonia in female compared to male participants."

11.    Analysts were stunned by the disappointing results of the KOASTAL-1 study.  For example, analysts at RBC Capital explained that the "***readout represents a worst-case scenario for the program***, as there were no MADRS improvements at all between the treated and placebo arms[.]"  RBC Capital analysts also noted:

The company did indicate that their KOR antagonist demonstrated improvements among females (a prespecified analysis), and there have been some scattered reports in the literature around gender differences in response to kappa opioid related drugs, ***but given that male participants actually did worse on navacaprant, we see this as more of a curiosity rather than anything that would necessarily inspire confidence this could enable a future path forward for the drug***.

12.    After markets closed on January 14, 2025, Neumora presented at the 43rd Annual J.P. Morgan Healthcare Conference.  During the conference, when discussing the failed results of the KOASTAL-1 study, EVP Lenz explained that the percentage of men in the KOASTAL-1 study's patient population was "one aspect of the trial we did not anticipate at the beginning of the trial," while also acknowledging that the KOASTAL-1 study "did not meet statistical significance" on its primary or secondary endpoints.  EVP Lenz further noted that female patients did show improvements relative to the placebo, but no such improvements were shown in male patients.

13.    At that same conference, an analyst at JP Morgan asked about the "differential response between males and females," and the presence of such "differences in [the] Phase 2 study between the 2 genders."   In response, CEO Gosebruch stated that "we were surprised by the different effects that we saw in males and females. Based on the totality of the data that we had going into the Phase III, that's not something we would have predicted."

14.    That same analyst followed up, asking, "And what about the prior data? Did you look in to see if the trends held there?"  In response, CEO Gosebruch explained that the patient population size of the Phase Two trial may have been too small to foresee the stark differences in improvement of symptoms between the sexes, stating:

Yes. So we did look at, obviously, in our Phase II study. ***When you start to dissect relatively small data sets, then you get into the problem of 2 small numbers***. *But what I will say is, **we did not see anything like consistent for -- to explain the difference that we saw here***. And again, when you look at aticaprant, either Phase II or the

FAST-MAS study done with aticaprant by the NIH, again, one doesn't see this sort of dramatically different treatment effects across females versus males.

15.     Since the IPO, the value of Neumora common stock has declined substantially from the IPO price of $17 per share to a closing price of $1.91 per share on February 5, 2025, an 88.7% decline from the IPO price).

16.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in market value of the Company's common stock when the truth was disclosed, Plaintiff and other Class members have suffered significant losses and damages.

## III.     JURISDICTION AND VENUE

17.     The claims asserted herein arise under Sections 11, 12(a)(2), and 15 of the Securities Act (15 U.S.C. §§ 77k, 77l(a)(2), and 77o).

18.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 22 of the Securities Act (15 U.S.C. § 77v).

19.     Personal jurisdiction and venue are proper in this District pursuant to Section 22 of the Securities Act (15 U.S.C. § 77v(c)) and 28 U.S.C. § 1391(b).  Many of the acts and transactions that constitute violations of law complained of herein occurred in this District.  Indeed, the IPO took place in this District.

20.     Because the Underwriting Defendants (as defined herein) marketed and delivered shares of Neumora common stock against payment in this District, each of them also submitted to the jurisdiction of this Court by directing acts within this District out of which this action arises.

21.     In connection with the acts, transactions, and conduct alleged herein, Defendants, directly and indirectly, used the means and instrumentalities of interstate commerce, including the U.S. Mail, interstate telephone communications, and the facilities of a national securities exchange.

## IV.   PARTIES

### A.   Plaintiff

22.    Plaintiff, as set forth in the accompanying Certification, purchased the Company's common stock pursuant and/or traceable to the IPO and was damaged thereby.

### B.   Defendants

#### 1.  Corporate Defendant

23.    Defendant Neumora is a Delaware corporation headquartered at 490 Arsenal Way, Suite 200, Watertown, Massachusetts.  The Company's common stock trades on the Nasdaq Global Select Market under the ticker symbol "NMRA."

### C.   The Individual Defendants

24.    At the time of the IPO, Defendant Henry O. Gosebruch ("Gosebruch") was the Company's Chief Executive Officer ("CEO") and served as a member of Neumora's board of directors (the "Board").  CEO Gosebruch signed the Registration Statement (as defined herein) in connection with the IPO, which was filed with the SEC.

25.    At the time of the IPO, Defendant Joshua Pinto ("Pinto") served as the Company's Chief Financial Officer ("CFO").  Defendant Pinto signed the Registration Statement in connection with the IPO, which was filed with the SEC.

26.    At the time of the IPO, Defendant Michael Milligan ("Milligan") served as the Company's Principal Accounting Officer.  Defendant Milligan signed the Registration Statement in connection with the IPO, which was filed with the SEC.

27.    At the time of the IPO, Defendant Paul L. Berns ("Berns") served as a member of Neumora's Board.  Defendant Berns signed the Registration Statement in connection with the IPO, which was filed with the SEC.

28.     At the time of the IPO, Defendant Kristina Burow ("Burow") served as a member of Neumora's Board.  Defendant Burow signed the Registration Statement in connection with the IPO, which was filed with the SEC.

29.     At the time of the IPO, Defendant Matthew Fust ("Fust") served as a member of Neumora's Board.  Defendant Fust signed the Registration Statement in connection with the IPO, which was filed with the SEC.

30.     At the time of the IPO, Defendant Alaa Halawa ("Halawa") served as a member of Neumora's Board.  Defendant Halawa signed the Registration Statement in connection with the IPO, which was filed with the SEC.

31.     At the time of the IPO, Defendant Maykin Ho ("Ho") served as a member of Neumora's Board.  Defendant Ho signed the Registration Statement in connection with the IPO, which was filed with the SEC.

32.     At the time of the IPO, Defendant David Piacquad ("Piacquad") served as a member of Neumora's Board.   Defendant Piacquad signed the Registration Statement in connection with the IPO, which was filed with the SEC.

33.     Defendants Gosebruch, Pinto, Milligan, Berns, Burow, Fust, Halawa, Ho, and Piacquad are collectively referred to herein as the "Individual Defendants."

34.     Each of the Individual Defendants participated in the preparation of the Offering Documents and in the making of the materially inaccurate, misleading, and incomplete statements alleged herein.  In particular, the Individual Defendants reviewed, edited, and approved the Offering Documents, participated in the IPO, and solicited the purchase of Neumora common stock in the IPO to serve their financial interests and those of Neumora.

35.     The Individual Defendants conducted the roadshow along with the Underwriter Defendants to solicit the purchase of Neumora common stock in the IPO.  The Individual Defendants each also reviewed, approved, and delivered to investors the IPO's roadshow presentation, talking points, and script.

### D.    The Underwriter Defendants

36.     Defendant J.P. Morgan Securities LLC ("JPMorgan") was an underwriter for the IPO, serving as a financial advisor for and assisting in the preparation and dissemination of the materially inaccurate, misleading, and incomplete Offering Documents.  JPMorgan also participated in conducting and promoting the roadshow for the IPO.  JPMorgan was allocated 4,265,900 shares in the IPO to sell to the investing public.  JPMorgan maintains an office and conducts business operations in this District.

37.     Defendant BofA Securities, Inc. ("BofA") was an underwriter for the IPO, serving as a financial advisor for and assisting in the preparation and dissemination of the materially inaccurate, misleading, and incomplete Offering Documents.  BofA also participated in conducting and promoting the roadshow for the IPO.  BofA was allocated 3,530,400 shares in the IPO to sell to the investing public.  BofA maintains an office and conducts business operations in this District.

38.     Defendant Stifel, Nicolaus & Company, Incorporated ("Stifel") was an underwriter for the IPO, serving as a financial advisor for and assisting in the preparation and dissemination of the materially inaccurate, misleading, and incomplete Offering Documents.  Stifel also participated in conducting and promoting the roadshow for the IPO.  Stifel was allocated 2,206,500 shares in the IPO to sell to the investing public.  Stifel maintains an office and conducts business operations in this District.

39.     Defendant Guggenheim Securities, LLC ("Guggenheim") was an underwriter for the IPO, serving as a financial advisor for and assisting in the preparation and dissemination of the materially inaccurate, misleading, and incomplete Offering Documents.  Guggenheim also participated in conducting and promoting the roadshow for the IPO.  Guggenheim was allocated 1,765,200 shares to sell in the IPO to the investing public.  Guggenheim maintains an office and conducts business operations in this District.

40.     Defendant RBC Capital Markets, LLC ("RBC") was an underwriter for the IPO, serving as a financial advisor for and assisting in the preparation and dissemination of the materially inaccurate, misleading, and incomplete Offering Documents.  RBC also participated in conducting and promoting the roadshow for the IPO.  RBC was allocated 1,471,000 shares to sell in the IPO to the investing public.  RBC maintains an office and conducts business operations in this District.

41.     Defendant William Blair & Company, L.L.C. ("William Blair") was an underwriter for the IPO, serving as a financial advisor for and assisting in the preparation and dissemination of the materially inaccurate, misleading, and incomplete Offering Documents.  William Blair also participated in conducting and promoting the roadshow for the IPO.  William Blair was allocated 1,471,000 shares to sell in the IPO to the investing public.  William Blair maintains an office and conducts business operations in this District.

42.     Defendants JPMorgan, BofA, Stifel, Guggenheim, RBC, and William Blair are collectively referred to herein as the "Underwriter Defendants."  Defendant Neumora, the Individual Defendants, and the Underwriter Defendants are collectively referred to herein as "Defendants."

43.    The Underwriter Defendants sold 14,710,000 shares of Neumora common stock in the IPO.  The Underwriter Defendants' failure to conduct adequate due diligence in connection with the IPO and the preparation of the Offering Documents was a substantial factor leading to the harm complained of herein.

44.    The Underwriter Defendants are investment banking houses that specialize, among other things, in underwriting public offerings of securities. The Underwriter Defendants' participation in and their solicitation of purchases of Neumora common stock in the IPO was motivated by their financial interests.  Collectively, the Underwriter Defendants received over $17 million in fees and commissions in connection with their sale of Neumora common stock in the IPO.

45.    The Underwriter Defendants determined that in return for their share of the IPO's proceeds, they were willing to merchandise Neumora common stock in the IPO.  The Underwriter Defendants worked with the Individual Defendants to prepare and arrange a roadshow prior to the IPO during which they, and the Individual Defendants, met with investors and presented highly favorable information about the Company, its operations, and its financial prospects.

46.    The Underwriter Defendants also demanded and obtained an agreement from Neumora that Neumora would indemnify and hold the Underwriter Defendants harmless from any liability under the federal securities laws.  They also made certain that Neumora had purchased millions of dollars of directors' and officers' liability insurance.

47.    The Underwriter Defendants assisted Neumora and the Individual Defendants in planning the IPO, and purportedly conducted an adequate and reasonable investigation into the business and operations of Neumora, an undertaking known as a "due diligence" investigation. The due diligence investigation was required of the Underwriter Defendants in order to engage in

the IPO. During the course of their "due diligence," the Underwriter Defendants had continual access to confidential corporate information concerning Neumora's operations and financial prospects.

48.    In addition to availing themselves of virtually unbridled access to internal corporate documents, the Underwriter Defendants had access to the Company's lawyers, management, and directors and top executives (including the Individual Defendants) to determine: (i) the strategy to best accomplish the IPO; (ii) the terms of the IPO, including the price at which the Company's common stock would be sold; (iii) the language to be used in the Offering Documents; (iv) what disclosures about the Company would be made in the Offering Documents; and (v) what responses would be made to the SEC in connection with its review of the Offering Documents. As a result of those constant contacts and communications between the Underwriter Defendants and the Company's lawyers, management, directors, and top executives (including the Individual Defendants), at a minimum, the Underwriter Defendants were negligent in not knowing of the materially untrue statements and omissions contained in the Offering Documents.

49.    The Underwriter Defendants caused the Offering Documents to be filed with the SEC and to be declared effective in connection with offers and sales of the Company's common stock pursuant and/or traceable to the IPO and the Offering Documents, including to Plaintiff and the Class.

## V.    SUBSTANTIVE ALLEGATIONS

### A.    BACKGROUND

#### 1.    Neumora and its Flagship Product Navacaprant

50.    Founded in November 2019 by Arch, Neumora (f/k/a RBNC Therapeutics, Inc.) is a clinical-stage biopharmaceutical company that was purportedly founded to "confront the global

brain disease crisis by taking a fundamentally different approach to the way treatments for brain diseases are developed."   To that end, the Company currently has a therapeutic pipeline consisting of seven clinical and preclinical neuroscience programs aimed at treating neuropsychiatric disorders and neurodegenerative diseases.

51.    Neumora's flagship therapeutic candidate, Navacaprant (NMRA-140), a once-daily oral kappa opioid receptor (KOR) antagonist, is in development as a monotherapy treatment for moderate to severe MDD.  The mechanism of action of Navacaprant targets the KORs in the brain to modulate dopamine and reward processing pathways that partake in the regulation of mood, cognition, reward, and behavior.

52.    In September 2020, Neumora acquired Navacaprant, among other therapeutic candidates, through its acquisition of BlackThorn, a private company that developed treatments for neurobehavioral disorders.   Neumora paid approximately $37.4 million in upfront consideration.  Pursuant to the BlackThorn Acquisition, former BlackThorn shareholders were also entitled to consideration of up to $365 million, which was contingent on development and regulatory milestones with respect to Navacaprant.

53.    Prior to the BlackThorn Acquisition, BlackThorn initiated the clinical Phase Two Trial of Navacaprant, which was a double-blind, placebo-controlled, randomized, multicenter trial of Navacaprant as a monotherapy for the treatment of patients with mild to moderate MDD.  The phase two trial implemented a 1:1 ratio where patients would either receive an 80 mg dose of Navacaprant or placebo once daily for eight weeks.

54.    After acquiring Navacaprant, Neumora amended the Phase Two Trial inclusion criteria to include patients with moderate to severe MDD, while keeping the dosage same.  The Company also added a "prespecified analysis to the Phase 2 statistical analysis plan focused on

the moderate to severe MDD population."

55.    At the time of the IPO, the Company relayed to investors that the results of the Phase Two Trial purportedly showed a significant statistical difference between Navacaprant and the placebo in treating depression and anhedonia (a reduced ability to experience pleasure) in the patient population (100) with moderate to severe MDD.    However, while the Phase Two Trial showed positive results in the treatment of depression using Navacaprant compared to the placebo at week four across the total patient population (171), which included mild MDD, improvements in depression did not achieve statistical significance compared to the placebo at week eight.

56.    Neumora also informed investors that it had completed its "End-of-Phase 2" meeting with the FDA in June 2023, and that the Company began its "pivotal" Phase Three Program for Navacaprant  as a monotherapy in patients with moderate to severe MDD, which included three efficacy studies: KOASTAL-1, KOASTAL-2 and KOASTAL-3.  The Company anticipated releasing results for the KOASTAL-1 study in the second half of 2024.

57.    As further alleged below, the Company mispresented and/or failed to disclose the material adverse events, trends, and risks that affected the prospects of the Company's KOASTAL-1 successfully meeting its primary and secondary endpoints, *i.e.*, Navacaprant showing a statistically significant improvement in symptoms related to moderate to severe MDD.

### B.  Neumora Conducts the IPO

58.    On or about September 15, 2023, Neumora conducted its IPO, in which the Company sold 14,710,000 shares of common stock at a price of $17.00 per share.  The IPO generated over $250 million in gross proceeds for Neumora, while the Underwriter Defendants collected over $17 million in fees.  Because the IPO was a great success, Neumora would be able to use the proceeds from the IPO to fund the Phase Three Program.

59.    The IPO was conducted pursuant to, and the sale of Neumora common stock was solicited by, several documents that were filed with the SEC and disseminated to the investing public, including (i) an August 25, 2023 registration statement on Form S-1, which following amendment on September 11, 2023 on Form S-1/A, was declared effective by the SEC on September 14, 2023 (the "Registration Statement"), and (ii) a September 18, 2023 final prospectus, which forms part of the Registration Statement, on Form 424(b)(4) (the "Prospectus" and, together with the Registration Statement, the "Offering Documents").

60.    The Prospectus states: "We have not, and the underwriters have not, authorized anyone to provide you any information or to make any representations other than those contained in this prospectus or in any free writing prospectus prepared by or on behalf of us or to which we have referred you. Neither we nor the underwriters take responsibility for, or provide any assurance as to the reliability of, any other information others may give you."

61.    The Prospectus also states: "The information contained in this prospectus is accurate only as of the date of this prospectus, regardless of the time of delivery of this prospectus or any sale of the shares of our common stock. Our business, financial condition, results of operations and prospects may have changed since that date."

### C. Defendants' Materially False and Misleading Offering Documents

#### 1. The Offering Documents Contained Materially False and Misleading Statements About the Prospects of Navacaprant

62.    The Offering Documents provided Phase Two Trial results that misleadingly represented the statistical significance and benefits of Navacaprant for the treatment of patients with moderate to severe MDD, which was the trial's primary endpoint.  The Offering Documents state, in pertinent part, as follows:

Business

15

* * *
Our Pipeline
* * *
Navacaprant (NMRA-140) (KOR)
* * *
Clinical Data
* * *

The original trial design, when initiated by BlackThorn, specified enrolling solely mild to moderate MDD patients (baseline HAMD-17 total score ranging from 14-22). Following our acquisition of BlackThorn, we amended the trial inclusion criteria to include patients with moderate to severe MDD (baseline HAMD-17 total score $\geq$ 22), which is the patient population we intend to evaluate in our pivotal Phase 3 program and more typically studied in MDD clinical trials. We also added a prespecified analysis to the Phase 2 statistical analysis plan focused on the moderate to severe MDD population.

The final efficacy population for the pre-specified analysis of moderate to severe MDD (baseline HAMD-17 total score $\geq$ 22) included 100 adult subjects. ***In this moderate to severe MDD patient population, once daily dosing with 80 mg of navacaprant resulted in statistically significant (meaning that the results of the study are unlikely to have occurred by chance) treatment differences compared to placebo in depression, as measured by the HAMD-17 total score, and anhedonia***, as measured by the SHAPS, each as demonstrated below.

63.    The Offering Documents misleadingly characterize the Phase Two Trials results as "positive," where Navacaprant failed to achieve statistical significance compared to placebo at week eight in patients with mild to severe MDD.  The Offering Documents state, in pertinent part as follows:

Business
* * *
Our Pipeline
* * *
Navacaprant (NMRA-140) (KOR)
* * *
Clinical Data
* * *

***Navacaprant also demonstrated positive results across the total population (n = 171), which included mildly depressed patients***

16

*with baseline HAMD-17 scores as low as 14*. Navacaprant demonstrated a statistically significant improvement in depression at Week 4 (HAMD-17 LSMD; -2.7, p = 0.003) *and continued to demonstrate numerical improvements but did not achieve statistical significance compared to placebo at Week 8* (HAMD-17 LSMD; -1.7, p = 0.121), *which was the primary endpoint of the original study designed by BlackThorn.*

64.    The Offering Documents misleadingly touted the prospects of Navacaprant successfully treating patients suffering from moderate to severe MDD, in connection with the KOASTAL-1 study, based on the purportedly successful Phase Two Trial.   The Offering Documents state, in pertinent part, as follows:

> Business
> * * *
> Our Strategy
> * * *
> Advance navacaprant towards commercialization. **Based on the results from the Phase 2 clinical trial, we believe navacaprant has the potential to provide significant advantages relative to the standard of care, if approved. We are initiating a pivotal Phase 3 program for navacaprant monotherapy in patients with moderate to severe MDD** and anticipate releasing topline results for the KOASTAL-1 study in the second half of 2024.

65.    The statements referenced above in ¶¶ 62, 63, and 64 were each materially false and misleading  statements of material fact when made because they failed to disclose and misrepresented the following significant, then-existing material events, trends, and uncertainties regarding the prospects of Navacaprant as a monotherapy, including: (1) in order for Neumora to justify conducting its Phase Three Program, Neumora was forced to amend BlackThorn's original Phase Two Trial inclusion criteria to include a patient population with moderate to severe MDD to show that Navacaprant offered a statistically significant improvement in treating MDD; (2) and to that same end, the Company also added a prespecified analysis to the Phase Two statistical analysis plan, focusing on patients suffering from moderate to severe MDD; and (3) the Phase Two

Trials lacked adequate data, particularly in regards to the patient population size and the ratio of male to female patients within the patient population, to be able to accurately predict the results of the KOASTAL-1 study.

### 2. The Offering Documents Contained Material Omissions About Navacaprant

66.    The Offering Documents were also materially false and misleading in context because they omitted the following material adverse facts, material adverse trends, material uncertainties, or significant risks that existed at the time of the IPO, including: (1) in order for Neumora to justify conducting its Phase Three Program, Neumora was forced to amend BlackThorn's original Phase Two Trial inclusion criteria to include a patient population with moderate to severe MDD to show that Navacaprant offered a statistically significant improvement in treating MDD; (2) and to that same end, the Company also added a prespecified analysis to the Phase Two statistical analysis plan, focusing on patients suffering from moderate to severe MDD; and (3) the Phase Two Trials lacked adequate data, particularly in regards to the patient population size and the ratio of male to female patients within the patient population, to be able to accurately predict the results of the KOASTAL-1 study.

### 3. The Offering Documents Failed to Disclose Significant Risks Concerning Navacaprant That Made the IPO More Speculative and Risky

67.    The Offering Documents contained materially misleading risk factors that failed to warn of significant, then-materialized risks posed by the possibility of the Phase 3 Program, including the KOASTAL-1 study, not meeting its primary and secondary endpoints, such as the negative impact on Neumora's ability to become profitable.  In other words, the Offering Documents contained materially misleading risk factors that purported to warn of various risks related to the clinical development of Navacaprant that "could" adversely affect the Company,

while failing to disclose that these very "risks' that had materialized prior to and at the time of the

IPO.

68.    The Offering Documents contain the following risk disclosure pertaining to the

development and clinical testing of the Company's products:

> Risk Factors
> * * *
> Risks Related to the Development and Clinical Testing of Our
> Product Candidates
> * * *
> In order to obtain FDA approval to market our product candidates,
> we must demonstrate the safety and efficacy of our product
> candidates in humans to the satisfaction of the FDA. ***To meet these
> requirements, we will have to conduct adequate and well-
> controlled clinical trials.*** Clinical testing is expensive, time-
> consuming and subject to uncertainty. Conducting preclinical
> testing and clinical trials represents a lengthy, time-consuming and
> expensive process. The length of time may vary substantially
> according to the type, complexity and novelty of the program, and
> often can be several years or more per program. Delays associated
> with programs for which we are directly conducting preclinical
> studies may cause us to incur additional operating expenses. The
> commencement and rate of completion of preclinical studies and
> clinical trials for a product candidate may be delayed by many
> factors, including, but not limited to:
>
> - ***inability to generate sufficient preclinical or other in vivo
>   or in vitro data to support the initiation of clinical studies***;
>
> * * *
>
> - failure by our CROs, other third parties or us to adhere to
>   clinical trial protocols; failure to perform in accordance with
>   the FDA's or any other regulatory authority's good clinical
>   practice (GCP) requirements, or applicable regulatory
>   guidelines in other countries;
>
> * * *
>
> - ***changes to trial protocols***;
>
> * * *
>
> - ***clinical trials of our product candidates producing negative
>   or inconclusive results***, which may result in our deciding, or
>   regulators requiring us, to conduct additional clinical trials
>   or abandon development of such product candidates;
>
> * * *

19

69.     The Offering Documents contain the following risk disclosure pertaining to the

predictability of future preclinical and clinical trials:

> Risk Factors
> * * *
> Risks Related to the Development and Clinical Testing of Our Product Candidates
> * * *
> Results of preclinical studies or clinical trials of any product candidates may not be predictive of the results of future preclinical studies or clinical trials.
> * * *
> Moreover, ***success in preclinical studies or early clinical trials does not ensure that later preclinical studies or clinical trials will be successful***. A number of companies in the biotechnology and biopharmaceutical industries have suffered significant setbacks in clinical trials, even after positive results in earlier preclinical studies. These setbacks have been caused by, among other things, preclinical findings made while clinical trials were underway and safety or efficacy observations made in clinical trials, including previously unreported adverse events. The design of a clinical trial can determine whether its results will support approval of a product, and flaws in the design of a clinical trial may not become apparent until the clinical trial is well advanced. ***In addition, clinical and preclinical data are often susceptible to varying interpretations and analyses. Notwithstanding any potential promising results in earlier studies, we cannot be certain that we will not face similar setbacks.*** In addition, the results of our preclinical animal studies, including our non-human primate studies, may not be predictive of the results of outcomes in subsequent clinical trials on human subjects. Product candidates in clinical trials may fail to show the desired pharmacological properties or safety and efficacy traits despite having progressed through preclinical studies.

70.     The Offering Documents contain the following risk disclosure pertaining to

material changes in released preliminary trial data:

> Risk Factors
> * * *
> Risks Related to the Development and Clinical Testing of Our Product Candidates
> * * *
> Interim, topline, or preliminary data from our clinical trials that we announce or publish from time to time may change as more patient

data becomes available or as we make changes to our manufacturing processes and are subject to audit and verification procedures that could result in material changes in the final data.

From time to time, we may publicly disclose preliminary or topline data from our preclinical studies and clinical trials, *which is based on a preliminary analysis of then-available data, and the results and related findings and conclusions are subject to change following a more comprehensive review of the data related to the particular study or trial. We also make assumptions, estimations, calculations and conclusions as part of our analyses of data, and we may not have received or had the opportunity to fully and carefully evaluate all data. As a result, the topline or preliminary results that we report may differ from future results of the same studies, or different conclusions or considerations may qualify such results, once additional data have been received and fully evaluated.* Topline and preliminary data also remain subject to audit and verification procedures that may result in the final data being materially different from the topline or preliminary data we previously published. As a result, topline and preliminary data should be viewed with caution until the final data are available

\* \* \*

71.     The statements referenced above in ¶¶ 68, 69, 70 were each inaccurate statements of material fact when made because while noting only potential negative impacts on Neumora's business, financial condition, and results of operation, the Offering Documents failed to disclose the following significant, then-existing material events, trends, and uncertainties regarding the prospects of Navacaprant as a monotherapy, including: (1) in order for Neumora to justify conducting its Phase Three Program, Neumora was forced to amend BlackThorn's original Phase Two Trial inclusion criteria to include a patient population with moderate to severe MDD to show that Navacaprant offered a statistically significant improvement in treating MDD; (2) and to that same end, the Company also added a prespecified analysis to the Phase Two statistical analysis plan, focusing on patients suffering from moderate to severe MDD; and (3) the Phase Two Trials lacked adequate data, particularly in regards to the patient population size and the ratio of male to

female patients within the patient population, to be able to accurately predict the results of the KOASTAL-1 study.

### D. Events Following the IPO

72.     Before the markets opened on January 2, 2025, Neumora issued a press release announcing the results from the KOASTAL-1 study of Navacaprant for the treatment of moderate to severe MDD.  The press released revealed the that its KOASTAL-1 study failed to "demonstrate a statistically significant improvement on the primary endpoint of change from baseline in the Montgomery-Åsberg Depression Rating Scale ('MADRS') total score at Week 6 or the key secondary endpoint of a change from baseline in the Snaith-Hamilton Pleasure Scale ('SHAPS') scale."  In that same press release, EVP Lenz stated:

> *We are disappointed by the results from KOASTAL-1* as they were not consistent with the body of evidence supporting this mechanism in MDD. *There is a lot to investigate from this study, in particular the contrast in drug and placebo responses in depressed mood and anhedonia in female participants compared to male participants*[.]

73.     Analysts were stunned by the disappointing results of the KOASTAL-1 study.  For example, analysts at RBC Capital explained that the "*readout represents a worst-case scenario for the program*, as there were no MADRS improvements at all between the treated and placebo arms[.]"  The same analysts at RBC Capital also stated:

> The company did indicate that their KOR antagonist demonstrated improvements among females (a prespecified analysis), and there have been some scattered reports in the literature around gender differences in response to kappa opioid related drugs, *but given that male participants actually did worse on navacaprant, we see this as more of a curiosity rather than anything that would necessarily inspire confidence this could enable a future path forward for the drug*.

Moreover, analysts at Wiliam Blair also expressed disappointment in the KOASTAL-1 study results, stating:

Despite the high-risk/high-reward setup (e.g., general challenges with MDD studies, switch of primary endpoint from Phase II to Phase III; see our KOASTAL preview note), *with a 0-point placebo adjusted delta on the primary week 6 MADRS endpoint and lack of anhedonia improvement on SHAPS, we are obviously disappointed the KOASTAL-1 study as shares trade down about 80% during market hours*. This is a clear miss for Neumora and *calls into significant question the KOR antagonism mechanism of action and whether navacaprant is an active drug in MDD*.

74.     On January 14, 2025, after markets closed, Neumora presented at the 43rd Annual J.P. Morgan Healthcare Conference.  During the conference, when discussing the disappointing results of the KOASTAL-1 study, which failed to meet its primary and secondary endpoints, EVP Lenz explained that percentage of men in the KOASTAL-1 study's patient population was unanticipated, and that there was a significant difference in the improvement of depressive symptoms using Navacaprant based on sex, stating:

> *One aspect of the trial that we did not anticipate at the beginning of the trial was overall, we saw 45% of the population were males, that is certainly larger than as what's been seen in typical and recent MDD trials*. Now *the trial did not meet statistical significance on the primary endpoint of change from baseline versus placebo on the MADRS at week 6*. On the left side, you can see those results over each of the time points. *The study did not meet its prespecified key secondary endpoint with statistical significance, the SHAPS at week 6*, as shown on the right, and the mean change from baseline in both navacaprant and placebo arms over time.
>
> In a prespecified subgroup analysis by sex, we did see some interesting effects, as Henry alluded to, I'll show those here. So this is showing the effects on the MADRS scale in the 2 subgroups of female on the left and male on the right. *And you can see in the females that there was a consistent improvement relative to placebo across all time points that tended to increase through the duration of the study. However, in males, you did not see the same benefit in the active arm relative to placebo*.

75.     At that same conference, a JPMorgan analyst asked about the "differential response between males and females," and the presence of such "differences in [the] Phase 2 study between the [two] genders."  In response, CEO Gosebruch, stated:

> *Yes. So I would say we were surprised by the different effects that we saw in males and females. Based on the totality of the data that we had going into the Phase III, that's not something we would have predicted.* When we looked across the totality of the clinical data, both in other -- with other approved therapies, there can be some differences, but they generally aren't sort of that significant.

76.     That same analyst followed up, asking, "And what about the prior data? Did you look in to see if the trends held there?"  In response, CEO Gosebruch explained that patient population size of the Phase Two Trial may have been too small to predict the difference between the sexes, stating:

> Yes. So we did look at, obviously, in our Phase II study. **When you start to dissect relatively small data sets, then you get into the problem of 2 small numbers**. But what I will say is, **we did not see anything like consistent for -- to explain the difference that we saw here**. And again, when you look at aticaprant, either Phase II or the FAST-MAS study done with aticaprant by the NIH, again, one doesn't see this sort of dramatically different treatment effects across females versus males.

77.     Since the IPO, the value of Neumora common stock shares has declined substantially from the IPO price of $17 per share to a closing price of $1.91 per share on February 5, 2025 (a 88.7% decline from the IPO price).

78.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's common stock, Class members have suffered significant losses and damages.

### COUNT I

### For Violation of Section 11 of the Securities Act
### Against Defendants

79.    Plaintiff repeats, incorporates, and realleges each and every allegation above as if fully set forth herein.

80.    This Count is brought pursuant to Section 11 of the Securities Act, 15 U.S.C. § 77k, on behalf of the Class, against Defendant Neumora, each of the Individual Defendants, and each of the Underwriter Defendants.  This Count does not allege, and does not intend to allege, fraud or fraudulent intent, which is not a required element of Section 11, and any implication of fraud or fraudulent intent is hereby expressly disclaimed.

81.    The Offering Documents issued in connection with the IPO were inaccurate and misleading, contained inaccurate and misleading statements of material facts, omitted to state material facts necessary to render the statements therein not misleading, and omitted to state material facts required to be stated therein.

82.    Neumora is the registrant and issuer of the common stock sold pursuant to Offering Documents.  The Defendants named herein were responsible for the contents and dissemination of the Offering Documents.  Each of the Individual Defendants signed or authorized the signing of the Offering Documents on their own behalf.  The Underwriter Defendants marketed and underwrote the IPO and sold the Neumora common stock issued in the IPO to the Class.

83.    As the issuer of the shares of Neumora common stock sold pursuant to the Offering Documents, Neumora is strictly liable to the Class for the Offering Documents' material misstatements and omissions.  Signatories of the Offering Documents, and possibly other Defendants, may also be strictly liable to the Class for such material misstatements and omissions.

84.    None of the Defendants named herein made a reasonable investigation or possessed reasonable grounds to believe that the statements in the Offering Documents were true, complete, accurate, without omissions of any materials facts, or not misleading.

85.     None of the untrue statements or omissions of material fact in the Offering Documents alleged herein were forward-looking statements.  Rather, each such statement concerned existing facts.  Moreover, the Offering Documents did not properly identify any of the untrue statements as forward-looking statements and did not disclose information that undermined the putative validity of those statements.

86.     Less than one year has elapsed from the time that Plaintiff discovered, or reasonably could have discovered, the facts upon which these claims are based to the time that Plaintiff filed this action.  Less than three years have elapsed between the time that the securities upon which this Count is brought were offered to the public and the time Plaintiff filed this action.

87.     Plaintiff and the Class have sustained damages.  The value of Neumora common stock has declined substantially subsequent to and due to violations by the Defendants named in this Count.

88.     At the time of their purchases of Neumora common stock, Plaintiff and other members of the Class were without knowledge of the facts concerning the wrongful conduct alleged herein and could not have reasonably discovered those facts prior to the disclosures alleged herein.

## COUNT II

### For Violation of Section 12(a)(2) of the Securities Act
### Against Defendants

89.     Plaintiff repeats, incorporates, and realleges each and every allegation above as if fully set forth herein.

90.     This Count is brought pursuant to Section 12(a)(2) of the Securities Act, 15 U.S.C. § 77*l*(a)(2), on behalf of the Class, against Defendant Neumora, the Individual Defendants, and the Underwriter Defendants.  This Count does not allege, and does not intend to allege, fraud or

fraudulent intent, which is not a required element of Section 12(a)(2), and any implication of fraud or fraudulent intent is hereby expressly disclaimed.

91.    Each of the Defendants named in this Count were sellers, offerors, or solicitors of purchases of the Company's common stock pursuant to the defective Prospectus that respectively formed in relevant part the Offering Documents.  The actions of solicitation by these Defendants include participating in the preparation of the false and misleading Prospectus and marketing the common stock to investors, including members of the Class.

92.    The Prospectus contained untrue statements of material fact, omitted to state other facts necessary to make statements made therein not misleading, and omitted to state material facts required to be stated therein.

93.    Each of the Defendants named in this Count owed Plaintiff and other members of the Class that purchased Neumora common stock pursuant to the Prospectus a duty to make a reasonable and diligent investigation of the statements contained in the Prospectus to ensure that such statements were true and that there was no omission to state a material fact required to be stated in order to make the statements contained therein not misleading.  By virtue of each of the Defendants' failure to exercise reasonable care, the Prospectus contained misrepresentations of material fact and omissions of material fact necessary to make the statements therein not misleading.

94.    Plaintiff and the members of the Class did not know, nor in the exercise of reasonable diligence could have known, of the untruths and omissions contained in the Prospectus issued in connection with the IPO at the time they purchased Neumora common stock.

95.    By reason of the conduct alleged herein, the Defendants violated Section 12(a)(2) of the Securities Act.  As a direct and proximate result of such violations, Plaintiff and the other

members of the Class that purchased Neumora common stock pursuant to the Prospectus issued in connection with the Offering Documents sustained substantial damages in connection therewith. Accordingly, Plaintiff and the other members of the Class that hold the common stock issued pursuant to the Prospectus issued in connection with the Offering Documents have the right to rescind and recover the consideration paid for their shares with interest thereon or damages as allowed by law or in equity. Class members that have sold their Neumora common stock seek damages to the extent permitted by law.

96.     Less than one year has elapsed from the time that Plaintiff discovered, or reasonably could have discovered, the facts upon which these claims are based to the time that Plaintiff filed this action. Less than three years have elapsed between the time that the securities upon which this Count is brought were offered to the public and the time Plaintiff filed this action.

## COUNT III

### For Violation of Section 15 of the Securities Act
### Against the Individual Defendants

97.     Plaintiff repeats, incorporates, and realleges each and every allegation above as if fully set forth herein.

98.     This Count is brought pursuant to Section 15 of the Securities Act, 15 U.S.C. § 77o, on behalf of the Class, against each of the Individual Defendants. This Count does not allege, and

does not intend to allege, fraud or fraudulent intent, which is not a required element of Section 15, and any implication of fraud or fraudulent intent is hereby expressly disclaimed.

99.     As detailed above, the Individual Defendants named herein committed primary violations of the Securities Act by engaging in conduct in contravention of Section 11 of the Securities Act.

100.    The Individual Defendants each were control persons of Neumora by virtue of their positions as directors, senior officers, and/or significant shareholders of Neumora.  The Individual Defendants each had a series of direct and/or indirect business and/or personal relationships with other directors, officers, and/or significant shareholders of Neumora.  Neumora also controlled the Individual Defendants, given the influence and control the Company possessed and exerted over the Individual Defendants and all its employees.

101.    By reason of the conduct alleged herein, the Individual Defendants violated Section 15 of the Securities Act, and Plaintiff and other members of the Class have suffered harm as a result.

## VI.    CLASS ACTION ALLEGATIONS

102.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23 on behalf of:

(a)     All persons and entities that purchased Neumora common stock pursuant, or traceable, or both, to the Offering Documents issued in connection with Neumora's IPO, which commenced on or about September 15, 2023, except those who are excluded below, against Defendants for violations of Sections 11, 12(a)(2), and 15 of the Securities Act.

103.    The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiff at this time and

can only be ascertained through appropriate discovery, Plaintiff believes that there are at least hundreds or thousands of members in the proposed Class.

104.    Plaintiff's claims are typical of the claims of the other members of the Class as all members of the Class were similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

105.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests that conflict with those of the Class.

106.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)    Whether Defendants violated the Securities Act by the acts and omissions as alleged herein;

(b)    Whether Defendants omitted or misrepresented material facts, including whether the Offering Documents misrepresented and/or omitted material information in violation of the Securities Act;

(c)    Whether Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

(d)    ; and

(e)    The extent to which the members of the Class have sustained damages and the proper measure of damages.

107.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy because joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this suit as a class action.

## PRAYER FOR RELIEF

108.    WHEREFORE, Plaintiff, individually and on behalf of the Class, prays for relief and judgment as follows:

(a)    Declaring this action to be a class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the Class defined herein;

(b)    Awarding Plaintiff and the other members of the Class damages in an amount that may be proven at trial, together with interest thereon;

(c)    Awarding Plaintiff and the members of the Class pre-judgment and post-judgment interest, as well as their reasonable attorneys' and experts' witness fees and other costs; and

(d)    Awarding such other relief as this Court deems appropriate.

## JURY DEMAND

Plaintiff demands a trial by jury.

Dated: February 6, 2025                    Respectfully submitted,

                        **THE ROSEN LAW FIRM, P.A.**

                        /s/ Phillip Kim
                        Phillip Kim, Esq.
                        Laurence M. Rosen, Esq.
                        275 Madison Avenue, 40th Floor

New York, New York 10016
Telephone: (212) 686-1060
Fax: (212) 202-3827
Email: philkim@rosenlegal.com
Email: lrosen@rosenlegal.com

*Counsel for Plaintiff*