**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ANNIE CHANG, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>vs.<br><br>NEUMORA THERAPEUTICS, INC., HENRY O. GOSEBRUCH, JOSHUA PINTO, MICHAEL MILLIGAN, PAUL L. BERNS, KRISTINA BUROW, MATTHEW FUST, ALAA HALAWA, MAYKIN HO, DAVID PIACQUAD, J.P. MORGAN SECURITIES LLC, BOFA SECURITIES, INC., STIFEL, NICOLAUS & COMPANY, INCORPORATED, GUGGENHEIM SECURITIES, LLC, RBC CAPITAL MARKETS, LLC, and WILLIAM BLAIR & COMPANY, L.L.C.,<br><br>Defendants. | Case No.: 1:25-cv-01072-JPC-JW<br><br>**AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>**DEMAND FOR JURY TRIAL** |

# TABLE OF CONTENTS

**Page**


I. INTRODUCTION ..... 2

II. JURISDICTION AND VENUE ..... 10

III. PARTIES ..... 10

A. Lead Plaintiff ..... 10

B. Defendants ..... 11

1. Neumora ..... 11

2. The Individual Defendants ..... 11

3. The Underwriter Defendants ..... 13

IV. SUBSTANTIVE ALLEGATIONS ..... 17

A. Neumora Is A Small, Clinical Stage Biopharmaceutical Company Whose Prospects Depended On The Approval Of A Single Drug, Navacaprant ..... 17

B. The FDA's Clinical Trial Process And Bedrock Trial Guidelines ..... 19

C. Neumora's Phase 2 Clinical Trial For Nava ..... 24

D. Neumora Conducts An IPO To Fund Its Phase 3 Nava Trials ..... 26

E. Developments After The IPO ..... 31

1. Nava's Phase 3 Trial Shows Nava Is Completely Ineffective In Men, And Neumora's Stock Price Plummets 80% ..... 31

2. In June 2025, Neumora Reveals The "Pivotal" Phase 2 Trial Findings Of "Statistically Significant" Improvements Included Virtually No Male Patients And Involved Post-Hoc Manipulations ..... 34

3. High-Ranking Former Neumora Employees Confirm Nuemora's False And Materially Misleading IPO ..... 39

F. Materially False And Misleading Statements And Omissions In The Offering Documents ..... 51

1. The Offering Documents Misrepresented The Phase 2 Trial As A Success While Omitting That Its Findings Of A "Range" Of "Statistically Significant Treatment Differences Compared To Placebo" Were Based On Virtually No Male Patients ..... 52

2. The Offering Documents Failed To Disclose Post-Hoc Manipulations To The Phase 2 Trial Data, Which Minimized The Likelihood Of A High Placebo Response ..... 56

3. The Offering Documents Falsely Asserted That The Phase 2 Trial Had To Be Amended To Include Moderate To Severe MDD Patients ..... 57

G. The Role Of The Underwriter Defendants In Connection With The IPO ............ 58
V. CLASS ACTION ALLEGATIONS ............ 60
VI. CLAIMS FOR RELIEF ............ 62
VII. PRAYER FOR RELIEF ............ 66
VIII. JURY DEMAND ............ 67

Lead Plaintiff Victor Otcheretko ("Lead Plaintiff" or "Plaintiff"), by and through the undersigned Lead Counsel, brings this federal securities class action asserting strict liability claims under the Securities Act of 1933 (the "Securities Act") relating to the initial public offering (the "IPO" or "Offering") of Neumora Therapeutics, Inc. ("Neumora" or the "Company"). Neumora's IPO commenced on or about September 15, 2023, and included 14,710,000 shares of common stock at a price of $17.00 per share, raising gross proceeds of over $250 million. This action is bought on behalf of a class of all persons or entities who purchased or otherwise acquired Neumora common stock directly in or traceable to Neumora's IPO pursuant to the Offering Documents (as defined herein), and who were damaged thereby (the "Class").

Lead Plaintiff alleges the following upon personal knowledge as to himself and his own acts, and upon information and belief as to all other matters. Lead Plaintiff's allegations based on information and belief are based upon the investigation by Lead Counsel. The investigation by Lead Counsel included, among other things, (i) a review of public filings made by Neumora with the U.S. Securities and Exchange Commission ("SEC"); (ii) press releases issued by the Company; (iii) public conference calls, media and news reports about the Company; (iv) reports issued by securities analysts; (v) publications by the U.S. Food and Drug Administration ("FDA") and other government and industry sources concerning clinical drug trials; (vi) publications in medical journals; (vii) interviews of former employees of Neumora; (viii) consultation with financial and industry experts; and (ix) publicly available trading data relating to Neumora common stock.

Lead Counsel's investigation into the factual allegations contained in this complaint is continuing, and many of the relevant facts are known only by Defendants or are exclusively within their custody or control. Lead Plaintiff and Lead Counsel believe that substantial additional evidentiary support will exist for the allegations after a reasonable opportunity for discovery.

## I. INTRODUCTION

1. Neumora is a clinical-stage biopharmaceutical company that seeks to develop novel therapies for depression and other mental illness. Since its founding, Neumora has had a small pipeline of drug candidates but no marketable products. Leading up to the IPO, Neumora's most advanced drug candidate was navacaprant or "Nava," a once-daily pill developed to treat major depressive disorder ("MDD"). Neumora acquired Nava through its 2020 acquisition of BlackThorn Therapeutics, Inc. ("BlackThorn"), a biotech startup, with the goal of breaking into the nearly $15 billion global market for antidepressants.

2. After acquiring BlackThorn, Neumora repeatedly touted Nava as a "novel" treatment for MDD with "the potential to provide significant advantages relative to the standard of care." In particular, the Company targeted patients who suffered common side effects or failed to respond to selective serotonin reuptake inhibitors ("SSRIs") such as Prozac and Zoloft, which were the existing standard of care for MDD and other types of depression. Unlike SSRIs, Nava is a highly selective type of opioid, known as a kappa opioid receptor ("KOR") antagonist. KOR antagonists have different mechanisms of action and effects in males and females. These sex-based differences, as well as high placebo rates in antidepressant trials among both males and females, were widely known and discussed in academic literature when Neumora acquired BlackThorn and took over its phase 2a clinical trial for Nava.

3. On or about September 15, 2023, Neumora successfully conducted the IPO, raising more than $250 million in proceeds from shares sold to the general public. The Underwriter Defendants (defined below) collected over $17 million in fees. The IPO proceeds were largely used to fund Neumora's planned Phase 3 clinical trials for Nava—the final step before obtaining FDA approval of the Company's flagship drug candidate.

4. The Offering Documents promoted Nava as a potential blockbuster antidepressant—in Defendants' own words, Nava had "the potential to be the first new mechanism of action approved in decades"—and the key to unlocking enormous profits from a "global brain disease crisis" that affected over 1.5 billion patients. In promoting the IPO to prospective investors, the Offering Documents touted Nava as a promising therapeutic candidate, affirming that the Phase 2 trial found "statistically significant" improvements across all MDD patients studied regardless of symptom severity. Moreover, and significantly, Defendants emphasized that Nava's Phase 2 trial demonstrated "statistically significant treatment differences" across a range of primary and secondary efficacy measures in patients with moderate to severe MDD—the "pivotal" patient population Neumora targeted for FDA approval. Indeed, the Offering Documents directed investor attention to the purportedly robust findings in this subgroup of patients with moderate to severe symptoms, claiming that after its acquisition of BlackThorn, Neumora "amended the trial inclusion criteria" and "added a prespecified analysis" for this subgroup of patients because they were the patient population Neumora "intended to evaluate in its pivotal Phase 3 program" and which were "more typically studied in MDD clinical trials."

5. Defendants' positive portrayal of Nava's Phase 2 clinical trial and its prospects for FDA approval were materially false and misleading, and omitted material facts. Significantly, the Offering Documents made no distinction between Nava's effectiveness in male versus female patients. This was a highly material omission, as FDA guidance long required sponsors of clinical trials "to include a fair representation of both sexes as participants in clinical trials so that clinically significant sex-related differences in response can be detected." In fact, decades of research indicated that KORs, Nava's class of opiate, had precisely such "sex-related differences" in both their mechanism of action and effects, including in patients with depression.

6. For example, the Offering Documents provided no information concerning the number of males versus females in the total trial population or the "pivotal" subgroup of patients with moderate to severe MDD. Nor did the Offering Document disclose how many patients of each sex in either group were treated with Nava versus placebo—or, for that matter, if sex had any import or consequence on the wide range of "statistically significant" treatment outcomes and other reported "improvements." Indeed, despite the fact Neumora was seeking approval of Nava as a treatment for both men and women, and the established differences between the sexes in KOR activation and effects, the Offering Documents did not disclose gender-related deficiencies of any kind concerning the Phase 2 trial design, composition, or findings.

7. The truth gradually emerged about sixteen months after the IPO, when Neumora was forced to disclose disastrous Phase 3 trial results demonstrating that Nava was completely ineffective in men. Before the markets opened on January 2, 2025, Neumora issued a press release announcing the results for its Phase 3 "KOASTAL-1" trial, the first of three planned Phase 3 trials for Nava as a treatment for moderate to severe MDD. The KOASTAL-1 trial, which included over 380 enrolled patients and a roughly equivalent female/male split (55/45%), was an unmitigated disaster. Not only did Nava fail to meet the Phase 3 trial's primary or secondary endpoints, the KOASTAL-1 trial found that Nava was so completely ineffective in treating males that ***men with moderate to severe MDD experienced worse outcomes when treated with Nava compared to a placebo***. In the same press release, Rob Lenz ("Lenz"), Neumora's Executive Vice President, Head of Research Development, acknowledged that there was "a lot to investigate from this study, in particular the contrast in drug and placebo responses … in female participants compared to male participants." In response, Neumora's stock price plunged ***80%*** in a single day, from a close of $10.60 on December 31, 2024, to a close of $1.97 on January 2, 2025, the following trading day.

8. Analysts were stunned and questioned how Neumora could not have disclosed the dramatically different response between males and females in the prior Phase 2 trial. For example, RBC Capital called the Phase 3 results a "***worst-case scenario***" for Nava's clinical development program, underlining that "***male participants actually did worse on navacaprant***" and openly questioned whether there was "***a future path forward for the drug***."

9. Approximately two weeks later, on January 14, 2025, Neumora presented at the 43rd Annual J.P. Morgan Healthcare Conference. Given the disastrous Phase 3 trial results, during the conference, analysts repeatedly questioned Neumora's basis for proceeding to Phase 3, including inquiries into the previously undisclosed details of the Phase 2 trial results. Specifically, a J.P. Morgan analyst peppered Neumora's CEO, Defendant Gosebruch, about the "differential response between males and females," the presence of such "differences in [the] Phase 2 study between the two genders," and asked incredulously whether Neumora "looked in" to the Phase 2 data "to see if the trends held there?" In response, Defendant Gosebruch conceded that the number of males included in the Phase 2 trial was inadequate and expressly acknowledged that it was a "problem," stating: "Yes. So we did look at, obviously, in our Phase II study. When you start to dissect relatively small data sets, then you get into the ***problem of two small numbers***." Even then, however, Neumora continued to hold back the Phase 2 study's specific gender demographics, including the shockingly low number of treated males who responded to Nava in the critical moderate to severe subgroup.

10. Then, in June 2025—nearly two years after the IPO—Neumora finally authorized the release of the Phase 2 trial's disparate gender demographics. In an article authored by Neumora consultants and employees and published in the *Journal of Clinical Psychopharmacology*, the market finally learned that the Phase 2 trial was wholly underpowered for males. The figures laid bare the materially misleading nature of the Offering Documents. According to data included in

the June 2025 article, the Offering Documents' assertion that the Phase 2 trial was successful and showed "statistically significant" improvements in the "pivotal" moderate to severe subgroup was ultimately based on the experiences of approximately ***four Nava-treated men***. Specifically, based on gender demographics disclosed in "supplemental digital content" hyperlinked in the June 2025 article, and efficacy statistics that did not differentiate between the sexes, the "pivotal" subgroup (i) included only 16 treated males, (ii) only approximately 6 of these 16 treated males experienced improvements that met the "prespecified" primary endpoint for the subgroup, and (iii) the results of approximately 2 of these 6 males were due to placebo effect. Thus, Defendants' proclamations about the purportedly successful and "statistically significant" Phase 2 trial results in the "pivotal" moderate to severe subgroup rested on the self-reported experiences of no more than ***four men***—a miniscule amount devoid of any statistical or clinical significance.

11. These highly material facts were available to Defendants before the IPO but omitted from the Offering Documents. The startlingly low number of men treated with Nava in the Phase 2 trial, and the miniscule number of men treated with Nava in the "pivotal" subgroup who demonstrated improvement compared to placebo, confirm that the Offering Documents' portrayal of the Phase 2 trial results as a success were blatantly misleading and omitted crucial facts. The dearth of males demonstrating a statistically significant and clinically meaningful response to Nava in the Phase 2 trial—in particular, in the "pivotal" moderate to severe subgroup—demonstrates that the Phase 2 trial results lacked adequate data for investors to draw any meaningful conclusions about Nava's likelihood of success in the Phase 3 trials and any eventual FDA approval.

12. Making matters worse, the June 2025 article also revealed that the Phase 2 results presented in the Offering Documents included post-hoc manipulations to the Phase 2 trial data that made the trial's results appear better than they actually were. This included the elimination of an

entire trial site in Oklahoma where nearly all patients received placebo and reported significant improvement, which erased false positives from the trial data and made Nava appear more effective than it was. Like the undisclosed Phase 2 study's gender demographics, Defendants also failed to disclose in the Offering Documents this post-hoc manipulation, which minimized the likelihood of a high placebo response—particularly in the "pivotal" cohort of patients with moderate to severe MDD that was the focus of Neumora's clinical development program.

13. Lead Plaintiff's independent investigation further confirms Neumora's materially misleading IPO. Lead Counsel interviewed multiple former high-ranking Neumora employees, including senior directors, vice presidents, and scientists. These former employees widely confirmed that the Phase 2 trial highlighted in the Offering Documents included an "absurdly" low number of males who demonstrated an improvement on Nava compared to placebo—a significant "***red flag***" undermining the integrity of the trial. As a former Neumora Vice President explained, the male population in the moderate to severe subgroup was so "***astonishingly small***" it was "almost Phase 1 size," adding that it was akin to "***running a pediatric study with no kids***." A former Neumora Senior Scientist advised that any attempt to draw conclusions from the trial regarding Nava's efficacy in men would be "***completely forfeit***," that "you can't make the conclusion that this drug works well in men" based on this "too small" population, and averred that Neumora's failure to disclose this extremely small male response rate constituted an "***incomplete report of relevant information***." A former Senior Director, Head of Pharmaceutical Development and Manufacturing declared that had she known how few men were treated in the Phase 2 trial, she "***would have sold her stock***" in the Company.

14. Multiple high-ranking former employees also confirmed Defendants' post-hoc manipulations of the Phase 2 trial data. As these employees explained, when Neumora first

analyzed the data after the Phase 2 study was completed and the data was "locked" and unblinded in February 2023—a full seven months before the IPO—the results were "nebulous," "unremarkable," and plainly inadequate to demonstrate efficacy or justify proceeding to Phase 3. Indeed, former employees described how Neumora jettisoned an internally expected Phase 2b trial to collect adequate data to support a Phase 3 trial, and was only able to report "statistically significant" improvements after excluding an entire trial site (the Oklahoma site) and "***slicing and dicing***" the remaining unblinded Phase 2a trial data—"***chopp[ing] it up 50 million ways until it looked good***"—with the assistance of two outside consulting firms. As the former employees put it, Defendants "used every remotely viable or murky way to chop up the data to make it look like there was a better signal or some signal that was meaningful," and "***taking that data out made it more robust and it moved the needle, so that the robustness was enough to take it to Phase 3 for moderate to severe patients***."

15. As for the excluded Oklahoma site, former employees likewise confirmed that all placebo patients: (i) were in the moderate to severe subgroup; (ii) reported favorable "treatment" outcomes; and (iii) had they not been excluded during the Company's lengthy post-hoc reanalysis of the unblinded Phase 2a trial data, the trial would have failed to demonstrate any statistically significant signal. Former employees underscored that post-hoc manipulation of the study to exclude the Oklahoma site was a "***vital piece of information***" that should have been disclosed in the Offering Documents as it "***moved the needle***" regarding the significance of on the Phase 2 results. However, the post-hoc exclusion of 90% of the patients at this site who responded to placebo, and the resultant increased likelihood of a high placebo response, was not disclosed to investors in the IPO.

16. Finally, former employees confirmed that, contrary to the Offering Documents, the Phase 2 study was never limited to patients with a particular degree of MDD severity, and that the addition of the "prespecified analysis" for a "pivotal" moderate to severe subgroup was pure fiction. As Neumora's former Director of Clinical Operations explained, the original Phase 2a study initiated by BlackThorn included patients with "all" levels of MDD, with the aim of "seeing what type of patient would generate the greatest results." Neumora pivoted to a smaller market of patients with more severe symptoms only when the Company realized, ***after*** unblinding the Phase 2a trial data, that it "could show more of a difference" in them. Likewise, a former Data Scientist advised that BlackThorn's original Phase 2a trial contained no limitations based on degree of MDD severity—it was "meant for everyone"—and that Neumora shifted its focus to more severe patients only after it unblinded the Phase 2 data and saw "***there's no statistically significant signal***" in the full patient population. The former employees' accounts of a results-driven shift rather than a "pre-specified" trial design is consistent with the National Library of Medicine's vast clinical trial database, which maintains archived records for over 20 versions of Nava's Phase 2a trial but which contain ***no*** indication whatsoever that the trial was ever limited to patients with a particular level of MDD severity.

17. In short, despite Defendants' statements in the Offering Documents proclaiming Nava's "statistically significant," across-the-board "treatment outcomes," "treatment differences," and "improvements" in MDD patients, the drug never demonstrated any statistically or clinically meaningful improvement in men compared to a sugar pill.

18. Since the IPO, Neumora shares have lost nearly all of their value. At the time this action was filed on February 7, 2025, the price of Neumora's common stock traded at $1.91 per share, representing a nearly 90% decline from the $17 Offering price.

19. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in market value of the Company's common stock when the truth emerged, Lead Plaintiff and other Class members have suffered significant losses and damages. This action seeks redress on behalf Lead Plaintiff and other aggrieved Class members.

## II. JURISDICTION AND VENUE

20. The claims asserted herein arise under Sections 11, 12(a)(2), and 15 of the Securities Act (15 U.S.C. §§ 77k, 77l(a)(2), and 77o).

21. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 22 of the Securities Act (15 U.S.C. § 77v).

22. Personal jurisdiction and venue are proper in this District pursuant to Section 22 of the Securities Act (15 U.S.C. § 77v(c)) and 28 U.S.C. § 1391(b). Many of the acts and transactions that constitute violations of law complained of herein occurred in this District. Indeed, the IPO took place in this District.

23. Because the Underwriting Defendants (as defined herein) marketed and delivered shares of Neumora common stock against payment in this District, each of them also submitted to the jurisdiction of this Court by directing acts within this District out of which this action arises.

24. In connection with the acts, transactions, and conduct alleged herein, Defendants, directly and indirectly, used the means and instrumentalities of interstate commerce, including the U.S. Mail, interstate telephone communications, and the facilities of a national securities exchange.

## III. PARTIES

### A. Lead Plaintiff

25. Lead Plaintiff Victor Otcheretko, as set forth in his PSLRA certification filed on April 7, 2025, purchased the Company's common stock pursuant and/or traceable to the IPO and was damaged thereby. *See* ECF 30-1.

### B. Defendants

#### 1. Neumora

26. Defendant Neumora is a Delaware corporation headquartered at 490 Arsenal Way, Suite 200, Watertown, Massachusetts. The Company's common stock trades in an efficient market on the Nasdaq Global Select Market under the ticker symbol "NMRA."

27. Neumora is a clinical-stage biopharmaceutical company that engages in developing therapeutic treatments for brain diseases, neuropsychiatric disorders, and neurodegenerative diseases. Neumora has never had any drugs approved for commercial sale. The Company's pipeline consists of seven clinical and preclinical programs for treating depression and other mental illness. Of those seven programs, Nava was one of only three programs in the pipeline that Neumora expected to be in clinical development by 2023. The Company has incurred net losses and negative cash flows from operations since inception and as of December 31, 2022, had an accumulated deficit of over $446 million, and cash and cash equivalents of $240 million. As of the IPO, Neumora had approximately 110 employees.

#### 2. The Individual Defendants

28. At the time of the IPO, Defendant Henry O. Gosebruch ("Gosebruch") was the Company's Chief Executive Officer ("CEO") and served as a member of Neumora's board of directors (the "Board"). CEO Gosebruch signed the Registration Statement (as defined herein) in connection with the IPO, which was filed with the SEC.

29. At the time of the IPO, Defendant Joshua Pinto ("Pinto") served as the Company's Chief Financial Officer ("CFO"). Defendant Pinto signed the Registration Statement in connection with the IPO, which was filed with the SEC.

30. At the time of the IPO, Defendant Michael Milligan ("Milligan") served as the Company's Principal Accounting Officer. Defendant Milligan signed the Registration Statement in connection with the IPO, which was filed with the SEC.

31. At the time of the IPO, Defendant Paul L. Berns ("Berns") served as the Executive Chairman of the Company and a member of Neumora's Board. Defendant Berns signed the Registration Statement in connection with the IPO, which was filed with the SEC.

32. At the time of the IPO, Defendant Kristina Burow ("Burow") served as a member of Neumora's Board. Defendant Burow signed the Registration Statement in connection with the IPO, which was filed with the SEC.

33. At the time of the IPO, Defendant Matthew Fust ("Fust") served as a member of Neumora's Board. Defendant Fust signed the Registration Statement in connection with the IPO, which was filed with the SEC.

34. At the time of the IPO, Defendant Alaa Halawa ("Halawa") served as a member of Neumora's Board. Defendant Halawa signed the Registration Statement in connection with the IPO, which was filed with the SEC.

35. At the time of the IPO, Defendant Maykin Ho ("Ho") served as a member of Neumora's Board. Defendant Ho signed the Registration Statement in connection with the IPO, which was filed with the SEC.

36. At the time of the IPO, Defendant David Piacquad ("Piacquad") served as a member of Neumora's Board. Defendant Piacquad signed the Registration Statement in connection with the IPO, which was filed with the SEC.

37. Defendants Gosebruch, Pinto, Milligan, Berns, Burow, Fust, Halawa, Ho, and Piacquad are collectively referred to herein as the "Individual Defendants."

38. Each of the Individual Defendants participated in the preparation of the Offering Documents and in the making of the materially inaccurate, misleading, and incomplete statements alleged herein. In particular, the Individual Defendants reviewed, edited, and approved the Offering Documents, participated in the IPO, and solicited the purchase of Neumora common stock in the IPO to serve their financial interests and those of Neumora.

39. The Individual Defendants conducted the roadshow along with the Underwriter Defendants to solicit the purchase of Neumora common stock in the IPO. The Individual Defendants each also reviewed, approved, and delivered to investors the IPO's roadshow presentation, talking points, and script.

**3. The Underwriter Defendants**

40. Defendant J.P. Morgan Securities LLC ("JPMorgan") was an underwriter for the IPO, serving as a financial advisor for and assisting in the preparation and dissemination of the materially inaccurate, misleading, and incomplete Offering Documents. JPMorgan also participated in conducting and promoting the roadshow for the IPO. JPMorgan was allocated 4,265,900 shares in the IPO to sell to the investing public. JPMorgan maintains an office and conducts business operations in this District.

41. Defendant BofA Securities, Inc. ("BofA") was an underwriter for the IPO, serving as a financial advisor for and assisting in the preparation and dissemination of the materially inaccurate, misleading, and incomplete Offering Documents. BofA also participated in conducting and promoting the roadshow for the IPO. BofA was allocated 3,530,400 shares in the IPO to sell to the investing public. BofA maintains an office and conducts business operations in this District.

42. Defendant Stifel, Nicolaus & Company, Incorporated ("Stifel") was an underwriter for the IPO, serving as a financial advisor for and assisting in the preparation and dissemination of the materially inaccurate, misleading, and incomplete Offering Documents. Stifel also participated

in conducting and promoting the roadshow for the IPO. Stifel was allocated 2,206,500 shares in the IPO to sell to the investing public. Stifel maintains an office and conducts business operations in this District.

43. Defendant Guggenheim Securities, LLC ("Guggenheim") was an underwriter for the IPO, serving as a financial advisor for and assisting in the preparation and dissemination of the materially inaccurate, misleading, and incomplete Offering Documents. Guggenheim also participated in conducting and promoting the roadshow for the IPO. Guggenheim was allocated 1,765,200 shares to sell in the IPO to the investing public. Guggenheim maintains an office and conducts business operations in this District.

44. Defendant RBC Capital Markets, LLC ("RBC") was an underwriter for the IPO, serving as a financial advisor for and assisting in the preparation and dissemination of the materially inaccurate, misleading, and incomplete Offering Documents. RBC also participated in conducting and promoting the roadshow for the IPO. RBC was allocated 1,471,000 shares to sell in the IPO to the investing public. RBC maintains an office and conducts business operations in this District.

45. Defendant William Blair & Company, L.L.C. ("William Blair") was an underwriter for the IPO, serving as a financial advisor for and assisting in the preparation and dissemination of the materially inaccurate, misleading, and incomplete Offering Documents. William Blair also participated in conducting and promoting the roadshow for the IPO. William Blair was allocated 1,471,000 shares to sell in the IPO to the investing public. William Blair maintains an office and conducts business operations in this District.

46. Defendants JPMorgan, BofA, Stifel, Guggenheim, RBC, and William Blair are collectively referred to herein as the "Underwriter Defendants." Defendant Neumora, the

Individual Defendants, and the Underwriter Defendants are collectively referred to herein as "Defendants."

47. The Underwriter Defendants sold 14,710,000 shares of Neumora common stock in the IPO. The Underwriter Defendants' failure to conduct adequate due diligence in connection with the IPO and the preparation of the Offering Documents was a substantial factor leading to the harm complained of herein.

48. The Underwriter Defendants are investment banking firms that specialize, among other things, in underwriting public offerings of securities. The Underwriter Defendants' participation in and their solicitation of purchases of Neumora common stock in the IPO was motivated by their financial interests. Collectively, the Underwriter Defendants received over $17 million in fees and commissions in connection with their sale of Neumora common stock in the IPO.

49. The Underwriter Defendants determined that in return for their share of the IPO's proceeds, they were willing to merchandise Neumora common stock in the IPO. The Underwriter Defendants worked with the Individual Defendants to prepare and arrange a roadshow prior to the IPO during which they, and the Individual Defendants, met with investors and presented highly favorable information about the Company, its operations, and its financial prospects.

50. The Underwriter Defendants also demanded and obtained an agreement from Neumora that Neumora would indemnify and hold the Underwriter Defendants harmless from any liability under the federal securities laws. They also made certain that Neumora had purchased millions of dollars of directors' and officers' liability insurance.

51. The Underwriter Defendants assisted Neumora and the Individual Defendants in planning the IPO and purportedly conducted an adequate and reasonable investigation into the

business and operations of Neumora, an undertaking known as a "due diligence" investigation. The due diligence investigation was required of the Underwriter Defendants in order to engage in the IPO. During the course of their "due diligence," the Underwriter Defendants had continual access to confidential corporate information concerning Neumora's operations and financial prospects.

52. In addition to availing themselves of virtually unbridled access to internal corporate documents, the Underwriter Defendants had access to the Company's lawyers, management, and directors and top executives (including the Individual Defendants) to determine: (i) the strategy to best accomplish the IPO; (ii) the terms of the IPO, including the price at which the Company's common stock would be sold; (iii) the language to be used in the Offering Documents; (iv) what disclosures about the Company would be made in the Offering Documents; and (v) what responses would be made to the SEC in connection with its review of the Offering Documents. As a result of those constant contacts and communications between the Underwriter Defendants and the Company's lawyers, management, directors, and top executives (including the Individual Defendants), at a minimum, the Underwriter Defendants were negligent in not knowing of the materially untrue statements and omissions contained in the Offering Documents.

53. The Underwriter Defendants caused the Offering Documents to be filed with the SEC and declared effective in connection with offers and sales of the Company's common stock pursuant and/or traceable to the IPO and the Offering Documents, including to Plaintiff and the Class.

## IV. SUBSTANTIVE ALLEGATIONS

### A. Neumora Is A Small, Clinical Stage Biopharmaceutical Company Whose Prospects Depended On The Approval Of A Single Drug, Navacaprant

54. Neumora is a clinical-stage biopharmaceutical company, founded in 2019 by venture capital firm, Arch Venture Management LLP ("Arch"), to develop new classes of drugs to treat mental illnesses. Neumora has never had any drugs approved for commercial sale.

55. At all relevant times herein, Neumora's most advanced product candidate was navacaprant, a once-daily pill developed as a potential treatment for depression. In particular, Neumora sought to develop Nava as a novel therapeutic for MDD, a chronic psychiatric condition characterized by low mood and impairment in functioning, including episodes where an individual experiences a numbing, loss of interest or pleasure in daily activities.

56. In developing Nava for commercial sale, Neumora sought to exploit a huge and growing global market opportunity for antidepressants. As Neumora proclaimed, the world is in the midst of a "global brain disease crisis with chronic, progressive neuropsychiatric disorders and neurodegenerative diseases affecting approximately 1.5 billion people globally," resulting in "a leading cause of disability worldwide." Exacerbated by the COVID-19 pandemic and its restrictions on ordinary in-person work and social interactions, the global antidepressant market grew from approximately $13.5 billion in 2020 as the pandemic began sweeping across the world, to over $17 billion by 2022 as the United States and other countries gradually emerged from COVID lockdowns and grappled with populaces suffering record levels of depression. At the time of the IPO, the growth trajectory of the global antidepressant market was expected to continue for years to come, with an estimated compound annual growth rate of 3% and a market value reaching $21 billion by 2030.

57. To address this huge market opportunity, Neumora quickly scaled its pipeline of candidates for treatment of depression and other mental illnesses. In September 2020, Neumora acquired BlackThorn, a start-up company also backed by Arch that similarly focused on developing therapeutics for mental health, for $37.4 million plus an additional $365 million in potential payments contingent on the achievement of certain milestones in Nava's development (the "BlackThorn Acquisition" or "Acquisition").

58. At the time of the BlackThorn Acquistion, Nava (then known as BTRX-335140) was BlackThorn's most promising drug candidate. BlackThorn was the sponsor of a Phase 2a clinical trial designed to test Nava's safety and efficacy in MDD patients, with a scheduled completion in the summer of 2022.

59. Nava's market potential was heightened by the limited number of safe and effective drugs for treating depression. The most commonly prescribed class of antidepressants and existing standard of care for the treatment of depression are selective serotonin reuptake inhibitors, or "SSRIs," such as Prozac and Zoloft. However, according to Neumora, of the over 21 million U.S. adults diagnosed with MDD, 85% either "did not receive treatment with a pharmacological agent or failed to achieve remission" with SSRIs.

60. Further, SSRIs are associated with a variety of side effects such as weight gain, drowsiness, nausea, insomnia and sexual dysfunction, which often lead to poor patient adherence. Approximately 30% of patients discontinued SSRI treatment due to these side effects, and nearly 70% of MDD patients failed to achieve remission with first-line SSRI treatment, thus necessitating a combination of drugs (adjunctive treatment) or switching to a different drug.

61. After the BlackThorn Acquisition, Neumora immediately placed Nava as the centerpiece of its small pipeline of seven clinical and preclinical programs for treating depression

and other mental illness, and began touting Nava's potential as a blockbuster antidepressant.[1] Neumora promoted Nava as a "novel" treatment with "the potential to provide significant advantages relative to the standard of care, if approved." In promoting Nava's enormous potential, Defendants underscored the lack of effective pharmaceutical treatment options for MDD and boasted that as an opiate-based treatment (rather than an SSRI), Nava had "the potential to be the first new mechanism of action approved in decades." Neumora touted Nava as a "fundamentally different approach" to treating MDD compared to the "one-size-fits-all" approach of SSRIs.

62. Securities analysts also reported favorably on Nava's potential as a huge money maker for Neumora, with Guggenheim highlighting Nava as "the only KOR antagonist in development for monotherapy MDD." The Company and securities analysts hailed Nava's "potential to target numerous disorders, including bipolar disorder, PTSD, ADHD and substance abuse," which numerous prominent analysts such J.P. Morgan, William Blair, and Guggenheim, cited in initiating coverage with "Buy," "Overweight," and "Outperform" ratings on the Company's shares.

**B. The FDA's Clinical Trial Process And Bedrock Trial Guidelines**

63. In order to obtain FDA approval of a new drug, a pharmaceutical company must conduct multiple phases of clinical trials to demonstrate that the drug is both safe and effective. The FDA's primary objective in considering approval of a new drug is to evaluate the balance between the drug's efficacy and its safety. In doing so, the FDA carefully considers the balance between the benefits that a drug can offer for its intended use, with any risks or negative side effects the drug may cause, in the intended patient population.

[1] Of these seven programs, Nava was one of only three programs in the pipeline that Neumora expected to be in clinical development by the end of 2023.

64. The sequence of clinical trials in connection with new drug applications typically proceeds in three phases. First, phase 1 trials are conducted to evaluate a drug's safety, including adverse events and proper dosage.

65. If the phase 1 trial is successful, phase 2 trials are conducted to evaluate the drug's efficacy and determine the optimal dosage. Multiple phase 2 trials may be needed—including, for example, where there is a limited number of trial participants to demonstrate safety, efficacy, or proper dosage. In this regard, phase 2 trials often include multiple substages. Namely, "phase 2a" studies are considered pilot or "proof of concept" studies focused on dosing requirements and safety in a limited number of patients, *i.e.*, to see if the drug works as intended. If the phase 2a study is successful, a larger and more focused "phase 2b" will be designed and conducted to assess the drug's effectiveness, determine the optimal dosage, and further investigate its safety profile in the specific population to be tested in a phase 3 trial.[2] Phase 2b trials often play an essential role in the broader context of drug development, by bridging gaps between early-phase trials and larger-scale phase 3 studies, which are necessary for regulatory approval.

66. Finally, if phase 2 trials are successful, phase 3 trials are conducted as the last step to obtaining FDA approval. Phase 3 trials are designed to demonstrate efficacy, optimal dosage and safety within an even greater expanded patient population. Phase 3 trials are not exploratory; they are used to confirm that a drug's benefits outweigh any adverse safety events before the FDA grants approval for commercial use.

67. For decades, the FDA has issued guidelines for best practices for designing clinical trials. Three of these best practices have particular relevance to this Action.

---

[2] In addition to efficacy and safety, phase 2b trials also focus on understanding how different groups of people respond to the treatment. Factors such as gender, age, and underlying health conditions can affect a drug's performance, making it essential to gather data across a diverse population. This stratification of data aids in identifying any demographic-specific responses, including between men and women.

68. First, it is critical that clinical trials be sized or "powered" to include a sufficient number of treated patients for the trial findings to be considered statistically significant, *i.e.* minimizing the likelihood of improvement in treatment outcomes due to chance. Both FDA guidelines and Good Clinical Practice instruct that the size of any clinical study or subgroup be dictated by the number of patients (N) needed to achieve a statistically significant difference in treatment outcomes, otherwise known as the study's "power," with due consideration to address key questions about drug efficacy. To "power" a clinical study means to design it with a large enough sample size (and appropriate design parameters) so that the study has a high probability of detecting a real effect—if that effect truly exists. In short, power is essential to provide a measure of confidence in results and to ensure the statistical validity of extrapolation to larger populations.

69. Notably, the FDA has issued guidance specifically addressing the appropriate size of clinical studies in development drugs for the treatment of MDD. According to revised guidance issued in June 2018 titled, "Major Depressive Order: Developing Drugs for Treatment Guidance for Industry," the FDA's Center for Drug Evaluation and Research instructed sponsors on the need to sufficiently power studies to address known issues arising in trials dealing with mental illness.

70. Specifically, the FDA instructed: "*Statistical Considerations*. Because of high placebo response and dropout rates that are commonly observed, sponsors should consider these factors in sample size calculations to ensure that the trial has sufficient statistical power to detect the anticipated treatment effect." Similarly, Good Clinical Practice dictates as a general consideration for clinical trials that patient populations, as well as subpopulation analyses (including for gender/sex), explore potential differences when biologically possible in intended patient populations. Specifically, Good Clinical Practice provides that "[t]he design of a clinical study should reflect the state of knowledge and experience with the drug; the condition to be

treated, diagnosed or prevented; the underlying biological mechanism (of both the condition and the treatment); ***and the population for which the drug is intended***."[3]

71. Second, beyond the bedrock requirement that a study be sufficiently powered to permit statistically significant findings for the intended patient population, FDA guidelines for best practices in clinical trial design have stressed the need for roughly equivalent numbers of female and male trial participants where, as here, a drug is intended to be used in both sexes. These guidelines recognize that years of research consistently shows that biological differences between the sexes can, and often do, result in efficacy and safety variations between women and men. For example, females may show greater efficacy for a given drug than males due to differing sex chromosomes or hormones. Due to these biological differences between the sexes, FDA guidance for clinical investigations expressly "***requires sponsors to include a fair representation of both sexes as participants in clinical trials so that clinically significant sex-related differences in response can be detected***."

72. Gender balancing is especially important in conducting clinical trials for KORs, Nava's class of opiate. The existence of sex differences in KOR function has been studied by neuroscientists for years. An extensive body of research into KORs, developed well before the Phase 2 Nava trial, established sex difference in the effects of KOR activation on affective states. Early research focused on KOR function in treating pain found biological differences in how males and females process KOR signaling, suggesting that these differences could also influence KOR function in brain circuits involved in reward and motivation. Since the late 1990's and early 2000's, sex differences have been reported not only in the perception of pain, but also in the efficacy of

[3] Abundant academic literature confirms the importance of adequately powering clinical trials at the study design stage for the patient population for which the drug is intended. In addition to failing to detect important effects of the drug, the academic literature warns that testing too few patients in the targeted population for a potential drug is also unethical, as underpowered studies do not contribute to the evidence-based field of medicine.

opiate-based analgesics. In the years leading up to Nava's Phase 2 trial, research expanded beyond pain systems to investigate KOR antagonists as potential treatments for depressive-like symptoms—including those associated with psychiatric disorders such as MDD—with increasing attention to sex-dependent effects. Similarly, an extensive body of research, developed well before Nava's Phase 2 trials, established high placebo response in both males and females in antidepressant clinical trials. In fact, by the time of Nava's Phase 2 trial, abundant literature demonstrated that placebo response in antidepressant clinical trials averaged 30-40%, with more mildly depressed patients typically showing greater placebo response compared to patients with greater severity who typically showed less placebo response.

73. Third, as a foundational principle to maintain the validity and integrity of clinical trial findings, it is imperative for the trial sponsor to finalize a statistical analysis plan ("SAP") before clinical trials begin. Such outlines are called "pre-specified" SAPs and the final determination of a drug's efficacy must be based on the clinical endpoints set forth in that pre-specified SAP because after-the-fact parsing of clinical trial data, or *post hoc* crafting of a SAP, can lead to unreliable assessments of efficacy. *Post-hoc* practices such as: (a) data dredging – a technique whereby multiple subgroup analyses are conducted until a statistically significant improvement is found; (b) altering endpoints or switching from one statistical test to another; and (c) selective data inclusion (a method in which outliers are excluded), are referred to in scientific research circles as "p-hacking."

74. One of the most important design techniques for avoiding bias in clinical trials is the practice of "blinding." A double-blind trial is one in which neither the subject, nor sponsor or staff involved in the clinical evaluation of the subjects are aware of the treatment received. This includes anyone determining subject eligibility, evaluating endpoints, or assessing compliance

with the protocol. This level of blinding must be maintained throughout the trial until all data sets are locked so that site staff, sponsors and participants are not aware of the treatment other patients are receiving. Blinding prevents conscious or unconscious bias in the ways that clinical site staff recruits participants, how patients are treated, the assessment of endpoints (detection bias) and how data is excluded from analysis. Any intentional or unintentional breaking of the blind should be reported and explained at the end of the trial, irrespective of the reason for its occurrence.

75. Accordingly, to draw any meaningful conclusions about Nava's prospects for FDA approval as a treatment for patients with moderate to severe MDD, it was critical that Neumora (1) power its Phase 2 clinical trial so that it included sufficient numbers of male and female patients with moderate to severe MDD who were actually treated with Nava to ensure any findings were statistically significant and not due to false positives or chance; (2) in assuming oversight of BlackThorn's ongoing Phase 2a trial and before finalizing any "prespecified" SAP for a study subgroup, give due consideration to known differences in Nava's mechanism of action and effects between the sexes; and (3) ensure the study, including any subgroups analyzed, was conducted on a double-blind basis until its conclusion and data was locked for analysis. As discussed below, Nava's Phase 2 trial was severely deficient in each of these three basic respects, and the Offering Documents misrepresented or failed to disclose the deficiencies.

**C. Neumora's Phase 2 Clinical Trial For Nava**

76. As discussed above, BlackThorn had already begun a Phase 2a clinical trial of Nava when it was acquired by Neumora, which Neumora took over. The Phase 2a trial was a double-blinded, randomized, and placebo-controlled study to test Nava as a monotherapy for the treatment of MDD. Participants in the Phase 2 trial were randomly assigned to receive either Nava at a dose of 80 mg once daily, or a placebo, for 8 weeks. The study was conducted at or by approximately 31 sites in the United States between December 2019 and June 2022. The primary measure or

endpoint for determining efficacy was to track changes in the participants' Hamilton Depression Rating Scale or "HAMD-17 score"[4] from the start of the study to the end, comparing changes in the treatment group to changes in the placebo group against a patient's baseline HAMD-17 score.

77. The Phase 2 trial consisted of a total of 204 patients. Exactly half of the participants (102) received Nava, and exactly half of the patients (102) received placebo. At the conclusion of the Phase 2 trial, all participants were included in the safety group, but only 171 of the participants were included in the efficacy group. Within the efficacy group, the Offering Documents segregated and focused on a subgroup of patients with moderate to severe MDD, which was to be the exclusive type of MDD patients studied in the forthcoming Phase 3 trials and included in any eventual new drug application with the FDA. This "pivotal" subgroup of patients with moderate to severe MDD consisted of 100 individuals, with 53 receiving Nava and 47 receiving placebo.

78. Demonstrating Nava's effectiveness during the Phase 2 trial and advancing to Phase 3 trials was no easy feat. The FDA estimates that only one-third of experimental drugs progress to Phase 3 following Phase 2 clinical trials. Without data clearly demonstrating Nava's efficacy in the target population of males and females with moderate to severe MDD, Nava would not have a path to Phase 3 trials and any eventual FDA approval, Neumora's clinical program would suffer a major setback, and the Company would continue to lack any marketable products, and would soon likely be without sufficient funds to continue operations.

79. Beyond the typical high hurdles to securing FDA approval for a new drug, Neumora faced significant difficulty recruiting and maintaining a sufficient number of trial participants after taking over BlackThorn's Phase 2a trial. Recruiting candidates for clinical trials of drugs intended

[4] The Hamilton Depression Rating Scale (HAM-D) is a clinical interview assessment tool used to determine the severity of depression. The HAMD-17 instrument, in particular, consists of 17 items, each scored on a 3 or 5-point scale, with the total score providing an indication of the severity of depression. Clinical researchers use HAMD-17 to assesses symptoms of depression and monitor treatment progress.

to treat mental illness is generally more challenging than with other physical illnesses. For example, patients with depression often have greater difficulty initiating treatment, show less clear signs of improvement relative to numerous common side effects, and must attend a greater number of clinic visits—resulting in low participation rates that typically decline over the course of a study.

80. Further pressuring Nava's clinical program, when Neumora acquired BlackThorn and took over its Phase 2a study for Nava, the Company was already playing catch up to much larger pharmaceutical companies that were also seeking approval of KOR antidepressants with a different pathway than SSRIs and were further along in their clinical trials. As a result of the challenges discussed above, Neumora was forced to significantly expand the number of treatment sites, rapidly enrolling patients in the ongoing Phase 2a trial—which it recast in the Offering Documents as simply a "Phase 2" trial—and sought to complete the trial as close to the originally scheduled completion date. Moreover, instead of initiating a new Phase 2b study of greater size and greater statistical power in both males and females in the pivotal moderate to severe subgroup, Neumora pulled the plug on Phase 2b development plans that had been under consideration by its clinical team for months and decided to proceed directly to Phase 3. This allowed Neumora to move to Phase 3 trials as fast as possible for the most promising drug candidate in its small clinical pipeline and proceed with the Company's public listing.

**D. Neumora Conducts An IPO To Fund Its Phase 3 Nava Trials**

81. On July 18, 2023, Neumora announced the Phase 2 trial was successful and that it was commencing a Phase 3 clinical program for Nava. In the press release, Neumora stated that it had completed its "End-of-Phase 2" meeting with the FDA in June 2023, enabling the advancement of Nava into Phase 3 studies. The press release stated that the Phase 3 trial was supported by the results of a "robust Phase 2 study with navacaprant" and that "[t]he data from our Phase 2 study with navacaprant demonstrates its potential as a differentiated antidepressant that

may help to manage anhedonia in addition to other core symptoms of depression with a favorable safety profile."

82. Six weeks later, on August 25, 2023, Neumora filed a registration statement with the SEC, announcing the IPO. Following amendment on September 11, 2023, the registration statement was declared effective by the SEC on September 14, 2023 (together, the "Registration Statement"). Neumora filed its final prospectus, which forms part of the Registration Statement, on Form 424(b)(4) on September 18, 2023 (the "Prospectus" and, together with the Registration Statement, the "Offering Documents").

83. On or about September 15, 2023, Neumora conducted its IPO, in which the Company sold 14,710,000 shares of common stock at a price of $17.00 per share. The IPO generated over $250 million in gross proceeds for Neumora, while the Underwriter Defendants collected over $17 million in fees. Because the IPO was successful, Neumora would be able to use the proceeds from the IPO to fund the Phase 3 trials, as well as other clinical and preclinical trials, operating expenses, and general corporate purposes.

84. The Offering Documents touted the Phase 2 trial as a success. In particular, the Offering Documents directed investors to focus on the trial results for the 100 participants in a "pivotal" subgroup who were diagnosed with moderate to severe MDD. According to Defendants, it was key for investors to focus on the trial results in this subgroup because this was the patient population that Neumora "intend[ed] to evaluate in [its] pivotal Phase 3 program" and was "more typically studied in MDD clinical trials." The Offering Documents represented that the Phase 2 trial in this "pivotal" subgroup was a success, with Nava demonstrating both safety and efficacy at both the 4-week midpoint and 8-week endpoint with statistical significance when measured under a specified change in HAMD-17 score against baseline, *i.e.*, the primary efficacy endpoint,

as well as a range of other key secondary endpoints and exploratory measures of efficacy, which successful results were broken out in detailed tables and charts.

85. Specifically, the Offering Documents represented the results of the Phase 2 study for Nava in the moderate to severe patient subgroup as follows:

> The final efficacy population for the pre-specified analysis of moderate to severe MDD (baseline HAMD-17 total score ≥ 22) included 100 adult subjects. ***In this moderate to severe MDD patient population, once daily dosing with 80 mg of navacaprant resulted in statistically significant*** (meaning that the results of the study are unlikely to have occurred by chance) ***treatment differences compared to placebo in depression, as measured by the HAMD-17 total score, and anhedonia, as measured by the SHAPS[.]***
>
> ***In addition, navacaprant demonstrated statistically significant treatment differences compared to placebo on a range of other key secondary and exploratory measures of depression (HAMD-17 response and remission rates, HAMD-6, CGI-I and CGI-S), anxiety (HAM-A) and function (SDS) in the moderate to severe MDD population[.]***

86. After detailing the purportedly widespread successful results of the Phase 2 trial in the critical moderate to severe subgroup across over a half dozen efficacy measures, the Offering Documents summarized the full trial results. The Offering Documents similarly portrayed the full trial results as a success, stating that Nava "also demonstrated positive results across the total patient population," including statistically significant improvements for MDD under the HAMD-17 test at the four-week trial midpoint, and statistically significant improvements for anhedonia under the SHAPS test at both the midpoint and endpoint of the study.

87. Specifically, the Offering Documents represented the results of the Phase 2 study for Nava in the full patient population as follows:

> ***Nacaprant also demonstrated positive results across the total population (n = 171)***, which included mildly depressed patients with baseline HAMD-17 scores as low as 14. ***Navacaprant demonstrated a statistically significant improvement in depression at Week 4 (HAMD-17 LSMD; -2.7, p = 0.003) and continued to demonstrate numerical improvements but did not achieve statistical significance***

> ***compared to placebo at Week 8*** (HAMD-17 LSMD; -1.7, p = 0.121), which was the primary endpoint of the original study designed by BlackThorn.
>
> ***Additionally, navacaprant demonstrated statistically significant improvements in anhedonia as assessed by the SHAPS at Week 4 (SHAPS LSMD; -2.8, p = 0.004) and Week 8 (SHAPS LSMD; -3.4, p = 0.002).***

88. While Defendants portrayed the Phase 2 trial as demonstrating across-the-board improvements among all MDD patients, they went to great lengths in underscoring the importance of focusing on the trial results in the moderate to severe subgroup. In addition to presenting the subgroup finding first and in significantly greater detail, the Offering Documents repeatedly emphasized that the "original trial design" for the Phase 2 study when initiated by BlackThorn "specified enrolling solely mild to moderate MDD patients," and after the Acquisition, the Company "amended the trial inclusion criteria to include patients with moderate to severe MDD … which is the patient population we intend to evaluate in our pivotal Phase 3 program and more … typically studied in MDD clinical trials." The Offering Documents further underscored the importance of focusing on the trial results in moderate to severe MDD patients by asserting that, after "amend[ing]" the trial inclusion criteria to allow moderate to severe MDD patients, Neumora "added a prespecified analysis to the Phase 2 statistical analysis plan focused on the moderate to severe MDD population."

89. Based on these purportedly positive results, the Offering Documents stated that Neumora was initiating "a pivotal Phase 3 program" for Nava monotherapy in patients with moderate to severe MDD. The Phase 3 program provided for three efficacy studies, "KOASTAL-1," "KOASTAL-2," and "KOASTAL-3." The first, KOASTAL-1, was to be conducted first and exclusively in the United States. The ensuing KOASTAL-2 and KOASTAL-3 studies were to be identical in design to KOASTAL-1 but conducted globally. All three of these Phase 3 efficacy studies were "designed to demonstrate that once-daily 80 mg navacaprant monotherapy improves

symptoms of depression in patients with moderate to severe MDD following 6 weeks of double-blind treatment." The primary endpoint for the Phase 3 studies was different than for the Phase 2 studies. Rather than applying the HAMD-17 measure used in Phase 2, the primary endpoint of the Phase 3 trials was "change from baseline on the Montgomery-Åsberg Depression Rating Scale (MADRS) at Week 6." However, the Offering Documents did not specify the level of change required to achieve the MADRS endpoint, nor whether Phase 3 trial participants would be required to have a greater degree of MDD severity (i.e., and thus a lower likelihood of placebo response) than patients in the "pivotal" Phase 2 subgroup. According to Defendants, Neumora "anticipate[d] releasing topline results for the KOASTAL-1 study in the second half of 2024." If successful, the Offering Documents stated that these Phase 3 studies "are expected to support the filing of a New Drug Application" for Nava in 2025.

90. While the Offering Documents disclosed the results of the trial, they omitted critical information concerning the demographics of the trial populations and liberties Neumora took in analyzing and excluding data that was necessary to understand the significance of the reported results. Significantly, and critically, the Offering Documents did not disclose how many of the trial participants were males and how many were females. The Offering Documents omitted this demographic for the Phase 2 study and all groups within the study, including the safety group, the efficacy group, and the "pivotal" moderate to severe subgroup. Indeed, the Offering Documents omitted any mention whatsoever of gender.

91. Likewise, the Offering Documents omitted any discussion of gender-based differences in Nava's mechanism of action and effects in treating symptoms associated with depression, despite the well-developed body of literature demonstrating differences in KOR activation on affective states between the sexes, including depression. As discussed below, only

after a more robust assessment of the "Phase 2a" results was published in June 2025—nearly two years after the IPO—did Neumora reveal that the critical moderate to severe subgroup of 100 patients included only 16 Nava-treated males, with no disclosure of whether any of these males responded to navacaprant. It was also not until June 2025 that Neumora disclosed the material post-hoc exclusion of an entire trial site after the data was "locked" and unblinded, in which four of five patients demonstrated placebo response.

92. Notably, after the IPO was completed, the Phase 3 trials—each of which were specifically designed to enroll upwards of 330 patients with roughly equivalent numbers of females (55%) and males (45%)—failed in stunning fashion, demonstrating that Nava was utterly ineffective in treating men. Indeed, the adequately powered and nearly gender balanced Phase 3 trials showed that men with moderate to severe MDD ***experienced worse outcomes on Nava and responded better when given a placebo.***

### E. Developments After The IPO

#### 1. Nava's Phase 3 Trial Shows Nava Is Completely Ineffective In Men, And Neumora's Stock Price Plummets 80%

93. On January 2, 2025, before the markets opened, Neumora issued a press release announcing the results from the Phase 3, KOASTAL-1 study of Nava in treating U.S. patients with moderate to severe MDD. The press release disclosed that the KOASTAL-1 study failed to demonstrate a statistically significant improvement in both the study's primary endpoint and key secondary endpoint. The KOASTAL-1 study found that Nava was such an ineffective treatment for MDD that male patients responded better when given a placebo.

94. Specifically, the January 2, 2025 press release disclosed that the KOASTAL-1 study failed to achieve its primary endpoint as well as the key secondary endpoint. Neumora's press release disclosed that by week 6, overall improvements in depressive symptoms were the same for

patients on Nava and those on placebo. In other words, of the 383 patients enrolled in the study, Nava did not fare any better at treating their depressive symptoms compared to a sugar pill. Even worse, among male participants, those on placebo actually demonstrated greater improvements in depressive symptoms than those on Nava, meaning males on Nava fared ***worse*** than those on placebo.

95. In the same press release, Neumora executives expressly acknowledged that even after three phases of clinical trials, there remained "a lot to investigate" concerning Nava's effectiveness in men. As Defendant Lenz stated in the press release, "There is a lot to investigate from this study, ***in particular the contrast in drug and placebo responses in depressed mood and anhedonia in female participants compared to male participants[.]"***

96. Analysts were stunned by the disappointing results of the KOASTAL-1 study and specifically reported on Nava's total failure to show efficacy in men. For example, on January 2, 2025, analysts at RBC Capital issued a scathing report stating that the "***readout represents a worst-case scenario for the program***, as there were no MADRS improvements at all between the treated and placebo arms." The same RBC Capital analysts underlined that "***male participants actually did worse on navacaprant***," which raised serious doubts whether there was "***a future path forward for the drug***."

97. Analysts at William Blair similarly expressed alarm at the disappointing KOASTAL-1 study results, and questioned NAVA's prospects as a treatment for MDD and its very mechanism of action. In a January 2, 2025 report, the William Blair analysts decried they were "obviously disappointed" in the KOASTAL-1 study's key findings of a "0-point placebo adjusted delta on the primary week 6 MADRS endpoint and lack of anhedonia improvements on SHAPS"—calling it a "***clear miss for Neumora***" that "***calls into significant question the KOR antagonism***

***mechanism of action and whether navacaprant is an active drug in MDD***." The William Blair analysts underscored that the study failed specifically because Nava was not effective in men, noting that, "[w]hile the signal of efficacy favoring navacaprant treatment in the female participants is intriguing, ***it is entirely offset by a signal favoring placebo in the male participants***." The same William Blair report noted that Neumora's shares "trade[d] down approximately 80% during market hours" following the disappointing results and alarming implications of the KOASTAL-1 study.

98. On January 14, 2025, Neumora explained that the KOASTAL-1 study included roughly equivalent numbers of male and female participants—a sharp divergence from Nava's Phase 2 trial. Presenting at the 43rd Annual J.P. Morgan Healthcare Conference, Lenz explained that 45% of the patient population of the KOASTAL-1 study were males, which he acknowledged was "certainly larger" than "what's been seen" in other recent MDD trials, including the under 30% male participant rate in Neumora's own Phase 2 trial. Lenz then addressed Nava's differing effects between the sexes, *i.e.*, that the drug did not work in males – "you did not see the same benefit" compared to placebo:

> ***One aspect of the trial that we did not anticipate at the beginning of the trial was, overall, we saw 45% of the population were males. That is certainly larger than as what's been seen in typical and recent MDD trials…***
>
> ***In a prespecified subgroup analysis by sex, we did see some interesting effects***, as Henry alluded to, I'll show those here. So this is showing the effects on the MADRS scale in the 2 subgroups of female on the left and male on the right. And you can see in the females that there was a consistent improvement relative to placebo across all time points that tended to increase through the duration of the study. ***However, in males, you did not see the same benefit in the active arm relative to placebo.***

99. At that same conference, a J.P. Morgan analyst peppered Defendant CEO Gosebruch about the "differential response between males and females," and the presence of such "differences in [the] Phase 2 study between the [two] genders." In response, Gosebruch

acknowledged that Neumora "obviously" considered the small number of males treated with Nava in the Phase 2 study, but the numbers were far too "small" to have any meaning. In the CEO's own words, this was a fundamental "***problem***" with the reported findings of the Phase 2 study: "Yes. So we did look at, obviously, in our Phase II study. ***When you start to dissect relatively small data sets, then you get into the problem of two small numbers***."

100. In short, Neumora's own CEO was forced to concede, nearly sixteen months after the IPO and only after the adequately powered Phase 3 trials proved to be an unmitigated disaster, that the supposedly "pivotal" findings of the Phase 2 trial in reality had absolutely no statistical or clinical meaning, and were totally and completely worthless. Although Gosebruch tried to dance around the issue at the J.P. Morgan conference by claiming that the Company had not "expected" the "unique" performance of "males in the study relative to the females in the study and relative to what we would have expected based on the existent literature including from the kappa opioid receptor," Neumora was clearly aware of the "problem" at the time of the IPO because, among other things, the Company had specifically designed the Phase 3 trials to require roughly equal balancing of the sexes. The salient fact is that Neumora failed to disclose this admitted "problem" to investors in the IPO, and that "problem" ultimately doomed the Company's entire clinical development program for Nava as a treatment for MDD.

### 2. In June 2025, Neumora Reveals The "Pivotal" Phase 2 Trial Findings Of "Statistically Significant" Improvements Included Virtually No Male Patients And Involved Post-Hoc Manipulations

101. In June 2025, the *Journal of Clinical Psychopharmacology* published an article authored by Neumora consultants and employees that confirmed the IPO Offering Documents

included material misrepresentations and omissions concerning the Phase 2 trial and the prospects for a successful Phase 3 trial (the "Mathew Article").[5]

102. Titled *Navacaprant, a Novel and Highly Selective Kappa Opioid Receptor Antagonist, in Adults With Major Depressive Disorder*, the Mathew Article was the first publication after the IPO that provided any significant details on the Phase 2 trial's composition and findings. The article was authored by two consultants to Neumora on the Phase 2 trial, Sanjay J. Mathew, MD and Andrew J. Cutler, MD, and three employees of Neumora at the time of trial, and was reviewed by Neumora staff prior to its publication. As discussed above, the primary endpoint of improved depression scores by navacaprant was not met in this study. Only by restricting the analysis to more severely depressed patients, and excluding an entire trial site, could any benefit be discerned.

103. As to gender demographics, the Mathew Article revealed that for the total patient population, "[m]ost participants were female (70.2%)," and in the critical moderate to severe subgroup of 100 patients, there were only 28 males. The Mathew Article further revealed that of the 28 males in the critical moderate to severe subgroup, only 16 were treated with Nava and only 12 were treated with placebo.[6] As for efficacy, the "Supplemental Digital Content" hyperlinked in the Mathew Article disclosed that only 32% of the Nava-treated patients in the moderate to severe subgroup showed a favorable response to Nava, but more than 10% of placebo-treated patients demonstrated the same response. For the overall population, the data was even worse,

[5] Mathew et al., *Navacaprant, a Novel and Highly Selective Kappa Opioid Receptor Antagonist, in Adults With Major Depressive Disorder: A Randomized, Double-Blind Phase 2 Clinical Trial*, Volume 45, No. 3, *Journal of Clinical Psychopharmacology*, at 267-76 (May/June 2025), and Supplemental Digital Content, *available at* http://links.lww.com/JCP/A943.
[6] See Supplemental Digital Content, "Supplementary Table S3" at 10.

with nearly 20% of patients on placebo demonstrating a favorable response, compared to only 33% on Nava.

104. Notably, neither the primary publication in the *Journal of Clinical Psychopharmacology*, nor supplemental digital data hyperlinked in the article, specified precisely how many males in either the moderate to severe subgroup or overall population showed a beneficial response to Nava, despite the well-known sex differences in responses to opiates, and well-known issues with high placebo response in antidepressants among both men and women. However, based on the sex demographics and response rates provided in the Mathew Article and its supplemental digital content, no more than ***four males*** in the "pivotal" moderate to severe subgroup, and no more than ***six males*** in the overall patient population, demonstrated a beneficial response to Nava after controlling for placebo response.

105. First, applying the combined 32% response rate for male and female Nava-treated patients in the moderate to severe subgroup to the sixteen Nava-treated males in the subgroup, no more than five of the sixteen Nava-treated men would have met the study's primary efficacy endpoint.[7] Second, applying the 10% combined placebo response rate for male and female patients in the subgroup to the sixteen Nava-treated males in the subgroup, only one to two males in the subgroup would have beneficially responded to placebo (*i.e.*, achieved the primary efficacy endpoint). Third, after subtracting the one to two males in the subgroup whose responses can be

[7] This analysis utilizes the Company's reported data at the week-four trial midpoint rather than the week-eight endpoint because the week-four data is more reliable than the week-eight data. Unlike the week-eight results, the week-four data reflects the actual HAMD-17 scores reported by patients who completed the subject period. In contrast, the week-eight results are based on an assumed "last observation carried forward" ("LOCF") methodology which imputes week-four scores for the more than 20% of participants who failed to complete the eight-week study. Significantly, these estimates would be nearly identical even if the Company's assumed eight-week LOCF data were used. Specifically, using the week-eight data yields just four men in the subgroup who demonstrated a beneficial response to Nava after accounting for the 21% placebo rate. In deriving these figures, Lead Plaintiff, through Lead Counsel, retained an expert in the field of clinical trials and statistical analysis who agreed with Lead Plaintiff's methodology and independently verified the accuracy of Plaintiff's calculations.

explained by placebo effect from the approximately five males in the subgroup estimated to have had demonstrated a beneficial response to Nava, the result is a grand total of only three to four males in the subgroup that would have demonstrated a beneficial response to Nava after controlling for placebo effect. Accordingly, based on the gender demographics and response rates disclosed in the Mathew Article and its supplemental digital content, any conclusions about Nava's efficacy in men in the "pivotal" cohort of patients with moderate to severe MDD would have rested on no more than four men.

106. The same methodology can be used to estimate the remarkably low number of Nava-treated men who demonstrated a beneficial response in the overall Phase 2 efficacy population. The overall efficacy population in the Phase 2 trial consisted of 171 patients, with depressive symptoms ranging from mild to severe. According to the Mathew article, 51 of the 171 patients in this cohort were male, 26 were treated with Nava, and 25 received placebo. Using the methodology set forth above, no more than six Nava-treated males demonstrated a beneficial response in the overall efficacy population after controlling for placebo effect.[8] Accordingly, any conclusions about Nava's efficacy in men in the overall patient population, as with the subgroup, would have rested on no more than six Nava-treated men.

107. Notably, these calculations are necessary because neither the text of the Mathew Article nor its "supplementary digital content" break out Nava's efficacy in males. Nava's efficacy in males would have been a crucial detail for investors in the IPO given the known differences in opiate response between the sexes. Further, reporting drug effects by sex is standard, and imperative when there are known sex differences and high placebo rates across both sexes. The absence of that data from both the Offering Documents and the later released Mathew Article

---

[8] The results are essentially the same utilizing the Company's less reliable, assumed "LOCF" analysis at the 8-week endpoint. *See infra* at 36, n. 7.

strongly suggests that the Phase 2 trial showed no beneficial effect of Nava in males. That conclusion is further supported by Nava's complete and total failure during the Phase 3 KOASTAL-1 trial for precisely the same reason—Nava did not show a beneficial effect in men, who experienced better "treatment outcomes" when given a placebo.

108. As for post-hoc manipulations to the unblinded trial data, the Mathew Article revealed that an entire trial site, located in Oklahoma, was excluded from the efficacy population and efficacy analyses "after study database lock" purportedly due to "Good Clinical Practice violations." The site had five enrolled patients, four of whom were given placebo. Accordingly, the site represented approximately 5% of the moderate to severe subgroup, and over 8.5% of subgroup patients on placebo. Moreover, assuming all of the patients at this site were men, inferred from the accounts of numerous former Neumora employees (*see infra* ¶¶121-130) and the above analysis of gender demographics and efficacy data disclosed in Mathew article and its supplemental digital content (¶¶105-06), the site represented nearly 18% of males in the subgroup, and one-third of all subgroup males receiving placebo. Given the small size of the Phase 2 trial, the even smaller size of the subgroup, and the miniscule number of Nava-treated males in the subgroup, exclusion of the Oklahoma site enabled Neumora to substantially skew the trial results by eliminating a relatively large number of patients on placebo who responded to Nava under the trial's depression measure.

109. Indeed, because all the placebo patients at the excluded Oklahoma site self-reported a prespecified improvement using the HAMD-17 score, the Oklahoma site's exclusion changed the Phase 2 findings and provided a basis for Defendants' proclamations of "improvements" in the overall patient population and "statistically significant" improvements in the "pivotal" moderate to severe subgroup. The magnitude of the exclusion of the four placebo patients at the Oklahoma

site is highlighted by the above calculations demonstrating that Defendants' assertions about the significance of the Phase 2 trial results rested on no more than four men. Had the Oklahoma site not been discarded, the four male placebo responders at the Oklahoma site would have completely erased any beneficial response in Nava-treated males, and would have compromised the statistical significance of the Phase 2 trial as a whole. However, the post-hoc exclusion of 90% of the patients at the Oklahoma site who responded to placebo, and the resultant increased likelihood of a high placebo response in the very cohort of patients that was the focus of the Phase 3 trials and Neumora's clinical development program for Nava, was not disclosed to investors until about sixteen months ***after*** the IPO. This was a material omission in the Offering Documents.

110. Notably, the Mathew Article did not provide any reasoned explanation for why an entire site's worth of patient data, with a large number of patients on placebo, had been excluded from the study's efficacy analyses (but not its safety analysis) after the database was locked and the study was unblinded.[9]

### 3. High-Ranking Former Neumora Employees Confirm Nuemora's False And Materially Misleading IPO

111. In connection with Lead Counsel's independent investigation, Lead Plaintiff interviewed numerous former employees of Neumora who occupied senior positions at the Company and had direct knowledge of the Phase 2 Nava clinical trial data.[10] These former employees uniformly confirmed that, contrary to the Offering Documents: (i) no reliable

---

[9] Despite the ostensibly serious "Good Clinical Practice violations" at the Oklahoma site that justified its complete and total exclusion from the efficacy population, all five patients at the site were included in the Phase 2 trial's safety population. The Mathew Article did not provide any explanation for this divergence, nor any explanation of the purported "Good Clinical Practice" violations that occurred at the Oklahoma site. Nor did the Mathew article state whether Neumora's internal compliance personnel or external study monitors identified the "violations" during the course of the Phase 2 trial, and (i) if so, why the site was not excluded from the efficacy population when the violations were identified—*i.e.*, prior to database lock, and (ii) if not, why the violations were not discovered during the course of the study—again, prior to database lock.

[10] Former Neumora employees are referred to herein as Former Employee ("FE #") and are all referenced herein in the feminine form to maintain their confidentiality.

conclusions about Nava's efficacy in men could be drawn from the exceedingly small number of male patients treated with Nava in the moderate to severe subgroup, and the even smaller number of males that purportedly demonstrated efficacy in that subgroup; (ii) Nava's reported statistical significance in the moderate to severe subgroup was achieved only through post-hoc manipulation of the unblinded trial data; and (iii) the Phase 2 trial was never "amended" to include patients with moderate to severe MDD, but instead included such patients from the outset.

112. ***First***, numerous former employees confirmed that proceeding to a Phase 3 trial was not justified because no medically or scientifically reliable conclusions about Nava's effectiveness in men, or the likelihood of the Phase 3 trials being successful, could be drawn from data resting on approximately six or less male patients in the critical moderate to severe subgroup. There were so few males treated in the critical moderate to severe subgroup that any claims of efficacy were baseless. Advancing on this record rendered the Phase 3 trial a speculative gamble rather than a data-driven development step.

113. For instance, FE 1, a former Senior Scientist at Neumora,[11] reported that it was critically important, from a scientific standpoint, to treat more than sixteen male patients in the moderate to severe subgroup before proceeding to a $200 million Phase 3 trial focused on that same population. She emphasized the absurdity of such a small sample, remarking, "we ran more tests on animals." In fact, FE 1 pointed out that more male mice were tested for Nava than men in the Phase 2 trial for clinical efficacy. With such a tiny sample size, she explained, "you can't make the conclusion this drug works well in men," the population is simply "too small." Any attempt to draw conclusions about efficacy in men, she noted, would be "completely forfeit... The only thing

[11] FE 1 served as a Senior Scientist at Neumora from August 2020 until October 2022. FE 1 was recruited to Neumora by the Company's Chief Scientific Officer to help build Neumora's wet lab, recruit staff, and handle pre-clinical discovery matters. FE 1 reported to Neumora's Chief Research Officer, Nick Brandon ("Brandon"), until Brandon was promoted to Chief Scientific Officer in January 2022, and thereafter reported to Tarek Deeb, a Senior Director.

you can say is 'no comment.'" When FE 1 learned that approximately six of the sixteen Nava-treated male patients in the moderate to severe subgroup demonstrated a statistically significant positive response, she reiterated, "You cannot make the conclusion from this data that this drug works well in men."

114. FE 2, a Data Scientist II at Neumora,[12] likewise confirmed that no meaningful conclusions could be drawn from the Phase 2 results in the moderate to severe subgroup given the study's size and that only six or fewer men demonstrated a positive response to Nava, describing these numbers as "very, very low, especially in terms of efficacy." She added, "scientifically speaking, this is not a well powered study at all, the effects are not significant at all," and commented that Neumora should have run the study again with a larger sample size, particularly of men. FE 2 emphasized that knowing only six males demonstrated efficacy was "just too low" a number, and even for these six male patients, "the values are not indicative of a very large effect." Based on both the weak signal and small sample size, she concluded that no potentially significant conclusion regarding Nava's efficacy in men could be drawn from the results.

115. Also concerning, explained FE 2, the trial was not gender balanced or even close to it. FE 2 explained that there are gender differences with respect to responses for MDD patients which are a well-known phenomenon in the medical community. She confirmed that Neumora "knew that there were going to be gender differences" with Nava, emphasizing that gender differences in MDD responses are plainly reflected in public data and also well documented in academic literature. FE 2 added, "given the literature, [and] the disease itself, I don't think anyone

[12] FE 2 was a Data Scientist II at Neumora from September 2022 until February 2024. She was part of a nine member Data Science Team and reported to Neumora's Vice President, Head of Data Sciences, Andrew Jaffe. FE 2 personally assisted with various aspects of the Phase 2 trial, including conducting data analysis for the Phase 2 trial and determining whether Neumora could find patterns showing a favorable signal from Kappa drugs by utilizing publicly available data. FE 2 attended regular group meetings of the Data Sciences Team where the trial was discussed, including the progress of the trial, trial timelines, review of the data, and movement of the trial from one team to another as the trial progressed. These meetings were first held weekly and by the time of the IPO, biweekly.

would be surprised" by "differences in efficacy based on gender." Given these known gender differences, FE 2 stated that the fact the study was not gender balanced would be another "red flag."

116. FE 3, Neumora's former Vice President, Technical Operations,[13] and FE 4, former Senior Director, Head of Pharmaceutical Development and Manufacturing at Neumora,[14] similarly expressed concern about the size of the study and small number of responding males. FE 3 described the number of males in the moderate to severe subgroup as "astonishingly small" and, when asked whether the results justified moving to Phase 3, responded, "that's almost Phase 1 size." FE 3 advised that the data was plainly insufficient to support a Phase 3 trial. FE 3 further confirmed that the trial not being gender balanced was problematic, stating that the trial should have a "representative population," with roughly even sized numbers of males and females, "otherwise, it would be like running a pediatric study with no kids." FE 4 similarly confirmed that the number of treated males in the critical moderate to severe subgroup was "low," particularly if sex differences were known to be an issue. Addressing the extreme inadequacy of the male sample size, FE 4 advised that she had never been involved in, or even heard of, any clinical trial where only sixteen male patients were treated.

117. Multiple former employees confirmed that the small number of males in the "pivotal" moderate to severe subgroup—and the even smaller number of statistically significant positive male responses—were material facts that investors would have considered important had they been told. For instance, FE 1 stated that these facts would have "absolutely" been important

[13] FE 3 served as Neumora's Vice President, Technical Operations from January 2018 until late 2024. She started with BlackThorn in January 2018 as Head of Chemistry, Manufacturing, and Controls, until she was promoted to VP, Technical Operations. She retained the same title at Neumora after the Acquisition.

[14] FE 4 served as a Senior Director, Head of Pharmaceutical Development and Manufacturing at Neumora from 2021 until 2023. FE 4 was responsible for manufacturing the tablet for the Phase 2b trials for Nava. FE 4 reported to FE 3.

to potential investors in the IPO, explaining that the level of detail later revealed in the Mathew Article and its Supplemental Digital Content demonstrated that the Phase 2 study was "way underpowered" and "opens windows" where the number of responding male patients was so small that "it's just stupid." From FE 1's perspective, the extremely small number of male responders in the critical moderate to severe subgroup would have been a serious "red flag." As she explained, "If Neumora gave a sales pitch where they said they gave the drug to 50 people and five of them were dudes and it kind of works and we are going to do a massive trial of thousands of people based on this data, who would give them money? Not many." FE 1 characterized Neumora's failure to disclose the extremely small male response rate as an "incomplete report of relevant information."

118. Other former employees of Neumora likewise confirmed that the extremely small number of treated males in the critical moderate to severe subgroup—and the fact that no more than six males demonstrated efficacy—were material facts that investors would have considered important and that should have been disclosed in the IPO offering documents. FE 3 advised that in light of known sex differences in responding to KOR therapeutics, it would "absolutely" be important for investors to know how many males were treated and be able to confirm that the number of treated males in the targeted subgroup was "not insignificant." FE 2 similarly characterized these facts as "critical" information that investors would want to know, particularly given that Neumora "didn't find a big effect, even in those six people." FE 4 likewise commented that given known efficacy differences between the sexes, had she known how few men were treated with Nava in the Phase 2 trials, she "would have sold [her] stock."

119. According to multiple former employees, Neumora recognized internally that the Phase 2 trial was not sufficiently powered. FE 5, who served as Neumora's Director of Clinical

Operations from February 2021 until February 2025,[15] stated that it was internally understood that a Phase 2b study was necessary before moving on to Phase 3 because the Phase 2 trial had such a "small pool of patients," it wouldn't be "strong enough to show results." She recalled that her team, the Vice President of Clinical Development, and the Vice President of Clinical Studies, repeatedly discussed moving on to a Phase 2b study instead of moving directly to Phase 3 and reported that everyone was in agreement that a Phase 2b study was necessary. In fact, the clinical development team began drafting a Phase 2b protocol because they believed the Company was "going to need a Phase 2b" before any Phase 3 trial could be justified because the data they had "wasn't robust enough." FE 5 stated that while there was "a general sense that [the data] was not robust," it was nevertheless "full throttle ahead."

120. FE 3, Neumora's former Vice President of Operations who was in the same role at BlackThorn prior to the Acquisition, confirmed that while a Phase 2b study was contemplated, it never materialized. As FE 3 explained, while a "Phase 2b study was always on the books," and she had been tasked with planning that study, it was eventually scrapped, even though it was "the logical thing to do."

121. ***Second,*** former Neumora employees described how statistical significance was achieved in the "pivotal" moderate to severe subgroup only as the result of post-hoc manipulations in analyzing the unblinded trial data, including the highly-material exclusion of an entire trial site

[15] FE 5 served as Neumora's Director of Clinical Operations from February 2021 until February 2025. She was part of a very small cross functional team that oversaw the Nava Phase 2 clinical trial. The group included her and two others. As Director of Clinical Operations, FE 5 was responsible for overseeing the Phase 2 study, and was actively involved in a number of functions with respect to the study, including overseeing patient recruitment as well as 19 vendors, ensuring all elements of the SAP were finalized before study lock, working on the briefing materials submitted by Neumora in connection with its End of Phase 2 ("EOP2") meetings with the FDA, and protocol amendments. She was also involved in the preparation of the Clinical Study Report ("CSR"), which was a key part of the briefing materials Neumora submitted to the FDA in advance of the EOP2 meetings, and facilitated the completion of that report. She emphasized that she was "intimately involved" in the Phase 2 study. FE 5 reported to Brian York, the VP of Clinical Operations and also worked closely with the Clinical Development Director, as well as the Director who oversaw the Clinical Research Organization.

from the efficacy population without which the alleged statistically significant "improvements" would not have been achieved.

122. FE 5, Neumora's former Director of Clinical Operations, who was responsible for overseeing the clinical development of Nava, advised that she was "intimately involved" in the Phase 2 clinical trial. FE 5 recounted that when Neumora first analyzed the data, shortly after the Phase 2 study was completed and the data was locked and unblinded in February 2023, the results were "nebulous" and "unremarkable." As she explained, "if you gave it a color it was an amber. It was not a green thumbs up." As a result of these weak findings, FE 5 recalled that the data was heavily scrutinized and that there were "a lot of conversations" among her former colleagues that the results were not robust enough to demonstrate efficacy and were insufficient to justify proceeding to Phase 3 trials.

123. FE 5 reported that after the Phase 2 study was completed and data was locked and unblinded, the Company decided to launch a "for cause" investigation and ultimately exclude an entire trial site. FE 5 stated that the site excluded was Sooner Clinical Research located in Oklahoma and run by Dr. Veronique Sebastian. FE 5 recounted that the site had a disproportionate number of patients on placebo (4 of 5), all patients were in the moderate to severe subgroup, and the site's data showed stronger numbers in all placebo patients. After conducting an audit of the Oklahoma site, Neumora proceeded to run two analyses, one which included data from the Oklahoma site and one that did not.

124. FE 5 confirmed that Neumora removed the Oklahoma site during its post-hoc analysis of the unblinded Phase 2 data. FE 5 stated that once the Oklahoma site was removed, the results appeared more favorable in the Company's target population. FE 5 explained that removing the site where four of five patients were on a placebo, each of whom reported significant

improvements, would make the results appear more favorable because there would be less of a response from the placebo arm. As FE 5 explained, "taking that data out made it more robust and it moved the needle, so that the robustness was enough to take it to Phase 3 for moderate to severe patients." FE 5 further recalled that post-hoc analysis took over six months, far longer than the typical six-to-eight-week timeline for a Clinical Study Report ("CSR"), and repeatedly delayed the CSR's release. She described this as "very odd," emphasizing that in her 26 years of experience in the field and having worked on approximately 50 clinical trials, she had never seen a company take so long to report study results or hire two outside vendors. According to FE 5, the logical conclusion from the extended timeline and reanalysis is that a post-hoc reanalysis was done and, as part of that reanalysis, the Oklahoma site was excluded from the efficacy results, which made the results look better because there was less of a response in patients on placebo.

125. FE 5 described the exclusion of the Oklahoma site as a "vital piece of information" that should have been disclosed to investors. FE 5 explained that because the exclusion of this site "had enough impact to move the needle in a favorable direction," it was "pivotal" to the analysis and the decision to conduct a Phase 3 trial. In these circumstances, FE 5 advised, it was critical that Neumora "show all the data," including the results without the exclusion.

126. Multiple other former Neumora employees confirmed that statistical significance was only achieved in the moderate to severe subgroup as the result of post-hoc manipulations of the unblinded trial data. For instance, FE 1 reported that once Neumora collected the Phase 2 trial data, the data was sliced and diced until a statistically significant signal could be manufactured. According to FE 1, "the reason they took so long to publish [the data] wasn't just strategic," it was because the data they had collected "didn't give them a signal that they wanted" and they were trying to "find a signal in the noise." When the overall results failed to show a "huge signal," she

explained, Neumora "chopped it up 50 million ways until it looked good." She added, "they hemmed and hawed and used every remotely viable or murky way to chop up the data to make it look like there was a better signal or some signal that was meaningful."

127. FE 6, Neumora's former Senior Director of Clinical Operations,[16] recalled that following the completion of the Phase 2 trial, a third-party company, Precision for Medicine, conducted a statistical analysis of the unblinded trial data that resulted in a "resoundingly negative finding." After Neumora reviewed the Phase 2 results, FE 6 recalled he was contacted by his supervisor, Brian York, Neumora's former Vice President of Clinical Operations, who instructed her to retain a second, independent statistical analysis firm to "slice and dice" the data. Mr. York indicated to FE 6 that this directive came directly from his own supervisors in Neumora's upper management. FE 6 advised that the third-party the Company ultimately brought in for the reanalysis of the unblinded trial data was Tigermed, adding that Neumora "urgently wanted me to rush a contract through so they could get Tigermed to do additional analysis." FE 6 was responsible for paying Tigermed's invoices and recalled that after the study was closed, Tigermed spent approximately a year conducting a secondary analysis of the Phase 2 results.

128. FE 4, a former Senior Director, Head of Pharmaceutical Development and Manufacturing at Neumora, corroborated that the Phase 2 trial results initially were not highly significant, but appeared stronger after Neumora re-analyzed the data and excluded certain groups. She stated that "all of a sudden" the exclusions "made the data look more convincing." FE 4 confirmed that these exclusions, which produced a statistically significant result, were made in early 2023 during a post-hoc analysis of the trial data.

[16] FE 6 worked for Neumora in various positions for approximately four years until mid-2024. FE 6's most recent position with the Company was Senior Director of Clinical Operations. FE 6 reported to Neumora's Vice President of Clinical Operations, Brian York.

129. Other former senior employees similarly commented on the unusually long period of time Neumora spent analyzing the Phase 2 data, which suggested something was amiss. FE 3, former Vice President, Technical Operations at Neumora explained that the point of a Phase 2 study is to look for a signal, and typically the data analysts will "provide the read and be done." However, for the Nava Phase 2 trials, FE 3 recalled, the team "kept looking and looking at the data," and the period of time that Neumora took to analyze the Phase 2 data was uncommonly long. FE 3 emphasized that, under normal circumstances, a company reports Phase 2 results promptly, adding that "the data is the data, the statistical analysis plan is the plan." That, however, was not what occurred with the data from Nava's Phase 2 trial.

130. FE 3 further recalled that although the Phase 2 trials were completed in 2022, it took a significant amount of time before the Company proceeded with the IPO. When asked about the analyses of Phase 2 trial data during that extended time period, FE 3 stated that she had heard from former colleagues that Neumora was taking steps "in order to clean the data." In describing the cleaning up of the data, FE 3 advised that the Company's message was that the data can be "sliced in many different ways," adding that there could be "many different cuts" of the data, and Neumora was focused on "how to position it."

131. ***Third***, Multiple former Neumora employees confirmed that, directly contrary to the Offering Documents' assertion that the original Phase 2 trial initiated by BlackThorn, "specified enrolling solely mild to moderate MDD patients," and that Neumora later "amended" the inclusion criteria to add patients with moderate to severe MDD, the trial was never designed to evaluate patients at any particular severity level. From inception, the study included patients across the full spectrum of MDD severity. Accordingly, Neumora's claimed "addition" of a moderate to severe

subgroup was not a bona fide amendment, but yet another post hoc recharacterization intended to minimize and obscure the trial's failure to demonstrate efficacy in the overall patient population.

132. FE 1, a Senior Scientist at Neumora from August 2020 until October 2022, recalled that BlackThorn never excluded patients based upon gender, age, or severity of depression, but instead "tried the drug on as many people as they could get their hands on to see if they found any signal at all." According to FE 1, Nava "entirely did not work" in patients with mild MDD. She explained that the Phase 2 study was originally broad, but when Neumora failed to observe the efficacy it expected, management shifted the focus to patients who scored higher on depression severity surveys—those with moderate to severe MDD. FE 1 emphasized that the "only reason" for the purported "addition" of moderate to severe patients was that management initially believed the drug would work in a broader population and, when it did not, they "needed to backtrack with a reasonable explanation that did not make them look stupid." She further explained that "the whole concept of changing the narrative" presented to investors—that Neumora was expanding or refocusing the Phase 2 study to include moderate to severe MDD patients—was driven by the drug's failure, or lack of convincing efficacy, in mild cases. Neumora relied on "a limited subset of information" suggesting the drug had a higher chance of working in more severely depressed patients, and retroactively reframed the study around that subgroup after the broader trial failed.

133. FE 5, Neumora's former Director of Clinical Operations, confirmed that the original Phase 2 trial initiated by BlackThorn was not limited to mild to moderate patients, but instead, included "all" MDD patients with the objective of "seeing what type of patient would generate the greatest results." FE 5 reiterated that the study evaluated "both classes… mild to moderate and moderate to severe. It wasn't just one." FE 5 further explained that there was only a push to focus more on the severe category because "we could show more of a difference" in that group,

confirming that the emphasis on moderate to severe patients was a results-driven shift rather than a pre-specified trial design.

134. FE 2, a former Data Scientist II at Neumora, likewise confirmed that the original BlackThorn Phase 2 trial contained no limitations based on MDD severity, but was in fact, "meant for everyone." She recalled that three of her nine-person Data Sciences Team—Kevin Anderson, Karen Knudson, and Tathagata Banerjee—worked on the blinded Nava trial data, and repeatedly noted that "there's no signal there," or "there's not a statistically significant signal." Around the spring or summer of 2023, after the Phase 2 data was unblinded and it became clear that the overall results were not statistically significant, Neumora shifted its focus to patients with moderate to severe MDD. FE 2 described internal discussions aimed at identifying subgroups—based on symptom severity or other clinical measures—with stronger apparent signals. According to FE 2, the purpose of these efforts was to isolate patients who appeared to respond more favorably, through revised analyses and alternative trial-design approaches, and reframe the study around those subsets.

135. Lead Counsel's review of government databases and press reports available as of the filing of this Complaint further corroborate that the original Phase 2 trial design, when initiated by BlackThorn, did ***not*** specify enrolling solely mild to moderate MDD patients.

136. For example, the National Library of Medicine's online clinical trial database, ClinicalTrials.gov, contains a comprehensive history of records for all versions of the Phase 2 trial.[17] Arranged in chronological order, the database contains records for 20 versions of the Phase

[17] According to its website, ClinicalTrials.gov is an online database of clinical research trials and information about their results, which relies on trial sponsors or investigators to submit and update information about studies, including as required by law. *See* About ClinicalTrials.gov | ClinicalTrials.gov (last viewed Jan. 7, 2026) (noting that "[t]he U.S. has laws, regulations, policies requiring sponsors and investigators to submit certain types of clinical trials to ClinicalTrials.gov.").

2 trial, beginning with very first version of the trial submitted January 7, 2020, with BlackThorn listed as the trial sponsor, and ending with study updates submitted by Neumora on May 12, 2025.[18] Not a single version of the trial with BlackThorn listed as the sponsor reveals a shred of evidence, or even remotely suggests, that the trial ever specified enrolling solely mild to moderate MDD patients. To the contrary, every version of the trial with BlackThorn listed as the sponsor provides eligibility inclusion criteria that does not contain any limitation based on a degree of MDD severity. So too for eligibility exclusion criteria. Further proof that the original Phase 2 trial was not limited to patients with only mild to moderate severity is found in the primary outcome measure for every study with BlackThorn listed as the sponsor, which expressly describes measurement of changes in HAMD-17 score using "Minimum 0, Maximum 52," i.e., including the moderate to severe group (baseline HAMD-17 total score $\geq$ 22) specified in Neumora's "amended" trial inclusion criteria and "added" prespecified statistical analysis plan.

137. Finally, press releases issued by BlackThorn itself regarding the advancement of Nava into Phase 2 clinical development and the commencement of its Phase 2a study in patients with MDD do not specify enrolling solely mild to moderate MDD patients.

**F. Materially False And Misleading Statements And Omissions In The Offering Documents**

138. The Offering Documents issued in connection with the IPO contained untrue statements of material fact, omitted to state other facts necessary to make the statements made not misleading, and were not reasonably prepared in accordance with SEC rules and regulations governing their preparation. As detailed below, the Offering Documents included three sets of statements that materially misrepresented and concealed significant deficiencies in the design,

[18] *See* Record History | ver. 1: 2020-01-07 | NCT04221230 | ClinicalTrials.gov (last viewed Jan. 7, 2026).

composition, and findings of the Phase 2 trial, concealed post-hoc manipulations to the unblinded trial data, and provided a materially misleading portrayal of Nava's prospects for FDA approval.

### 1. The Offering Documents Misrepresented The Phase 2 Trial As A Success While Omitting That Its Findings Of A "Range" Of "Statistically Significant Treatment Differences Compared To Placebo" Were Based On Virtually No Male Patients

139. The Offering Documents provided a materially misleading portrayal of the Phase 2 trial results and Nava's prospects for FDA approval in connection with its upcoming Phase 3 trials by failing to disclose that the Phase 2 trial was vastly underpowered for males.

140. First, the Offering Documents represented that the Phase 2 trial successfully demonstrated "statistically significant" "treatment differences" in the "pivotal" subgroup of patients diagnosed with moderate to severe MDD—*i.e.*, the population targeted for FDA approval—while omitting that the subgroup included virtually ***no*** treated males with statistically significant improvements that could not be explained by placebo effect using the trial's primary efficacy endpoints.

141. Specifically, the Offering Documents stated that: "The final efficacy population for the pre-specified analysis of moderate to severe MDD (baseline HAMD-17 total score ≥ 22) included 100 adult subjects. In this moderate to severe MDD patient population, once daily dosing with 80 mg of navacaprant resulted in statistically significant (meaning that the results of the study are unlikely to have occurred by chance) treatment differences compared to placebo in depression, as measured by the HAMD-17 total score, and anhedonia, as measured by the SHAPS[.]"

142. Second, the Offering Documents similarly represented that the Phase 2 trial demonstrated a "statistically significant" "treatment differences" for patients in the pivotal moderate to severe subgroup on a "range" of other key measures of effectiveness. Specifically, the Offering Documents stated that: "In addition, navacaprant demonstrated statistically significant

treatment differences compared to placebo on a range of other key secondary and exploratory measures of depression (HAMD-17 response and remission rates, HAMD-6, CGI-I and CGI-S), anxiety (HAM-A) and function (SDS) in the moderate to severe MDD population[.]" Again, however, the Offering Documents failed to disclose that the subgroup included virtually ***no*** treated males with statistically significant improvements compared to placebo using the trial's other "key" efficacy endpoints.

143. Third, the Offering Documents asserted that based on the purportedly successful results of the Phase 3 trial, Nava had the potential to provide significant advantages to SSRIs and a basis to proceed to the final, Phase 3 trials in patients with moderate to severe MDD. Specifically, the Offering Documents stated that "[b]ased on the results from the Phase 2 clinical trial," "navacaprant has the potential to provide significant advantages relative to the standard of care," and based on the results of the Phase 2 trial, Neumora was "initiating a pivotal Phase 3 program for navacaprant monotherapy in patients with moderate to severe MDD."

144. Fourth, the Offering Documents also characterized the Phase 2 trial as demonstrating "positive results" and "improvements" in the overall patient population studied—*i.e.*, including patients with mild to moderate MDD. Specifically, the Offering Documents asserted that "Navacaprant also demonstrated positive results across the total population (n = 171), which included mildly depressed patients with baseline HAMD-17 scores as low as 14. Navacaprant demonstrated a statistically significant improvement in depression at Week 4 (HAMD-17 LSMD; -2.7, p = 0.003) and continued to demonstrate numerical improvements but did not achieve statistical significance compared to placebo at Week 8 (HAMD-17 LSMD; -1.7, p = 0.121), which was the primary endpoint of the original study designed by BlackThorn."

145. The statements set forth above in ¶¶140-44 were untrue statements of material fact and omitted to state other facts necessary to make the statements not misleading.

146. The statements that Nava demonstrated "statistically significant" "treatment differences" in both the subgroup of patients with moderate to severe MDD and the overall patient population were false because Nava did ***not*** demonstrate statistically improvements in males. In its clinical trials and to gain FDA approval, Neumora was required to demonstrate that Nava was a safe and effective treatment for both males and females. However, the Phase 2 study included ***virtually no treated males*** who demonstrated statistically significant improvement after accounting for placebo effect, particularly in the "pivotal" moderate to severe subgroup, when measured under the study's own primary endpoints and other "key" secondary and exploratory endpoints. Indeed, according to gender demographics released in June 2025, nearly two years after the IPO, and conservative assumptions based on efficacy statistics also released in June 2025, ***no more than four males in the subgroup, and no more than six males in the overall patient population, demonstrated a beneficial response to Nava after accounting for placebo effect***. Thus, it was false and materially misleading to represent that the Phase 2 trials demonstrated "statistically significant" treatment outcomes—which, based on Phase 2 trial's design and purpose, necessarily included men.

147. In addition, the statements claiming Nava demonstrated "statistically significant" "treatment differences" in both the moderate to severe subgroup and the overall patient population were false and materially misleading because the Offering Documents omitted that the Phase 2 trial included an extraordinarily low number of men who were treated with Nava and demonstrated a positive response after accounting for placebo effect. Indeed, rather than being roughly balanced between the sexes as required by FDA clinical guidelines and Good Clinical Practices, particularly

given the established gender differences in KOR activation and effects, as well as the high placebo effect in antidepressant trials impacting both sexes, the Phase 2 trial was extremely underpowered for men. Specifically, the Offering Documents failed to disclose (1) the number of men and women, respectively, considered in the Phase 2 study, including the fact that the "pivotal" subgroup included only included 16 men treated with Nava; (2) that the Phase 2 study, and in particular the critical subgroup, did not have a sufficient number of males to be reliable, or for the Company to draw any conclusions as to statistical significance—as Defendant Lenz later admitted, the "small data sets" used in the Phase 2 study were a "problem" when trying to determine the Nava's impact on men; and (3) the subgroup included at most four treated males with statistically significant improvements that could not be explained by placebo, a number patently insufficient to determine statistical significance or clinical significance. ¶¶103-07, 112-20. These highly material facts were clearly available to Defendants at the time of the IPO, as Defendant Lenz admitted and as confirmed by the Mathew Article, but omitted from the Offering Documents.

148. For the same reasons, the remaining statements in ¶¶140-44 above concerning the purportedly "positive results" and "improvements" demonstrated by the Phase 2 trials, as well as Neumora's resultant decision to initiate "pivotal" Phase 3 trials to demonstrate Nava's "potential to provide significant advantages" relative to SSRIs, were materially false and misleading and omitted material facts.

149. Numerous facts demonstrate the materiality of the omitted information. First, Neumora's clinical program for Nava sought FDA approval for use in both males and females, and thus the Phase 2 trials were required to demonstrate a statistically and clinically meaning improvement under the SAP in both sexes. Second, medical and academic literature available to Defendants at the time of the IPO discussed well known and established sex-based differences in

mechanism of action and the effects of KOR activation on affective states, including in treating depression. Third, bedrock FDA guidelines and Good Clinical Practice standards dictate that where a drug is known to impact the sexes differently, clinical trials must be sufficiently powered for each sex in order to draw statistically sound conclusions. Fourth, it was imperative that the Phase 2 trials be sufficiently powered for men due to the established high likelihood of placebo response in antidepressant trials, for both men and women. Fifth, Nava's Phase 3 trials—which, unlike the Phase 2 trials, were adequately powered for males—found that Nava was utterly ineffective in treating men—in fact, male patients got ***worse*** when treated with Nava compared to placebo.

### 2. The Offering Documents Failed To Disclose Post-Hoc Manipulations To The Phase 2 Trial Data, Which Minimized The Likelihood Of A High Placebo Response

150. The Offering Documents were also materially misleading for negligently failing to disclose that the Phase 2 trial was only able to achieve "statistically significant" treatment outcomes in the "pivotal" moderate to severe MDD patient subgroup, and "positive results" "improvements" and certain "statistically significant" treatment outcomes in the overall patient population, as the result of post-hoc manipulations of the unblinded trial data.

151. As Neumora acknowledged in the Mathew Article published nearly two years after the IPO, an entire site was excluded from the efficacy population for unexplained "Good Clinical Practice violations." ¶¶108-10 & n.9. This site, based in Oklahoma, included five participants, four of whom received placebo. Former Neumora employees confirmed that all of the placebo patients at the excluded site: (i) were in the moderate to severe subgroup; (ii) reported favorable "treatment" outcomes; and (iii) had they not been excluded, the Phase 2 trial would have failed to demonstrate efficacy. ¶¶121-28. The Offering Documents failed to disclose this highly material post-hoc exclusion, which minimized the likelihood of a high placebo response—particularly in

the very cohort of patients that was the focus of the recently initiated Phase 3 trials and Neumora's clinical development program for Nava.

### 3. The Offering Documents Falsely Asserted That The Phase 2 Trial Had To Be Amended To Include Moderate To Severe MDD Patients

152. The Offering Documents asserted that the Phase 2 study for Nava, when originated by BlackThorn, was limited to patients with mild to moderate MDD, and that Neumora had to amend the study to include patients in the critical moderate to severe subgroup.

153. Specifically, the Offering Documents stated that: "The original trial design, when initiated by BlackThorn, specified enrolling solely mild to moderate MDD patients (baseline HAMD-17 total score ranging from 14-22)." The Offering Documents further stated that, "[f]ollowing [Neumora's] acquisition of BlackThorn, [Neumora] amended the trial inclusion criteria to include patients with moderate to severe MDD (baseline HAMD-17 total score ≥ 22)," as this is "the patient population we intend to evaluate in our pivotal Phase 3 program and more typically studied in MDD clinical trials." The Offering Documents also claimed that Neumora "added a prespecified analysis to the Phase 2 statistical analysis plan focused on the moderate to severe MDD population."

154. The statements set forth above in ¶153 were untrue statements of material fact and omitted to state other facts necessary to make the statements not misleading. The Phase 2 trial never limited participants based on their degree of MDD severity. Former employees of Neumora and BlackThorn, Phase 2 trial records presently available on the National Library of Medicine's online clinical trial database, and BlackThorn's own press release announcing the advancement of Nava's clinical development to Phase 2a, confirm that the Phase 2 trial was never limited to patients with a particular level of MDD severity. ¶¶131-37.

155. These misstatements were material to investors in the IPO. As former employees of Neumora explained, the Offering Documents' false assertion that Nava's Phase 2 trial needed to be "amended" to include patients with moderate to severe MDD and a "prespecified analysis" added to the trial's SAP created the false impression that Neumora had always intended to limit its Nava's clinical program for the treatment of MDD to patients with more severe symptoms. However, in reality the Phase 2 clinical program was meant for all MDD patients regardless of symptom severity, and Neumora only shifted its focus to patients with moderate to severe MDD after viewing the unblinded Phase 2 trial data and recognized there was "no statistically significant signal" in the full patient population and realizing the Company "could show more of a difference" in the more limited population with moderate to severe MDD. In other words, the decision to limit Nava's path to approval to vastly smaller market was a results-driven shift rather than an intentional strategy.

### G. The Role Of The Underwriter Defendants In Connection With The IPO

156. The IPO was a firm commitment offering conducted by and through the Underwriter Defendants. Defendants J.P. Morgan and BofA acted as representatives of the underwriters.

157. The Underwriter Defendants are liable under the Securities Act as detailed below.

158. The Underwriter Defendants are investment banking houses that, among other things, specialize in underwriting public offerings of securities. They served as the underwriters of the IPO and shared more than 17 million dollars in fees collectively for doing so.

159. The Underwriter Defendants also assisted Neumora in planning the IPO and had access to confidential corporate information concerning Neumora's operations and financial prospects, including information regarding the Phase 2 trial.

160. In addition to availing themselves of access to internal corporate documents, on information and belief, agents of the Underwriter Defendants met with Neumora's lawyers, management, and top executives in the month leading up to the IPO.

161. During these meetings, agreements were reached as to: (i) the strategy to best accomplish the IPO; (ii) the terms of the IPO, including the price at which Neumora common stock would be sold; (iii) the language to be used in the Offering Documents; (iv) what disclosures would be made in the Offering Documents; and (v) what responses would be made to the SEC in connection with its review of the Offering Documents.

162. As a result of those frequent contacts and communications between the Underwriter Defendants and the Neumora Defendants (as well as the Underwriter Defendants' direct involvement in material issues requiring disclosure, including Neumora's business performance and reported financial information), the Underwriter Defendants knew of, or in the exercise of reasonable care should have known of, the existing yet undisclosed conditions and material risks detailed herein, which were either misrepresented in or omitted from the Offering Documents.

163. At a minimum, the Underwriter Defendants were negligent in not knowing, and failing to disclose in connection with the IPO, the adverse information about the Phase 2 trial that was contrary to the disclosures in the Offering Documents, the omission of which rendered the Offering Documents false and misleading at the time it was made effective.

164. The Underwriter Defendants did not conduct adequate due diligence. Had the Underwriter Defendants done so, they would have known that the Offering Documents were materially false or misleading or omitted to state material information or information required to be disclosed.

165. The Underwriter Defendants helped cause the Offering Documents to be filed with the SEC and declared effective in connection with the offer and sale of the shares of Neumora common stock registered thereby, including those shares purchased by the Funds and other members of the Class.

## V. CLASS ACTION ALLEGATIONS

166. Lead Plaintiff brings this action as a class action pursuant to Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of all persons and entities that purchased Neumora common stock pursuant, or traceable, or both, to the Offering Documents issued in connection with Neumora's IPO, which commenced on or about September 15, 2023, except those who are excluded below, against Defendants for violations of Sections 11, 12(a)(2), and 15 of the Securities Act. Excluded from the Class are Defendants, the officers and directors of Neumora at all relevant times, members of their immediate families, and their legal representatives, heirs, agents, affiliates, successors or assigns, Defendants' liability insurance carriers, and any affiliates or subsidiaries thereof, and any entity in which Defendants or their immediate families have or had a controlling interest.

167. The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Lead Plaintiff at this time, and can only be ascertained through appropriate discovery, Lead Plaintiff believes that there are at least thousands of members of the proposed Class. Record owners and other members of the Class may be identified from records maintained by the Company, or its transfer agent(s), and may be notified of this class action using a form of notice similar to that customarily used in securities class actions.

168. Lead Plaintiff's claims are typical of the claims of the other members of the Class as all members of the Class were similarly affected by Defendants' wrongful conduct in violation of federal law that has complained of herein.

169. Lead Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Lead Plaintiff has no interests that conflict with those of the Class.

170. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

a) whether Defendants violated the Securities Act by the acts and omissions as alleged herein;

b) whether Defendants omitted or misrepresented material facts, including whether the Offering Documents misrepresented and/or omitted material information in violation of the Securities Act;

c) whether Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and

d) the extent to which the members of the Class have sustained damages and the proper measure of damages. whether the market price of Neumora shares during the Class Period was artificially inflated due to the material misrepresentations and failures to correct the material misrepresentations complained of herein.

171. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this suit as a class action.

## VI. CLAIMS FOR RELIEF

### COUNT I

**For Violations of Section 11 of the Securities Act**
**Against All Defendants**

172. Lead Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

173. This Count is brought pursuant to Section 11 of the Securities Act, 15 U.S.C. § 77k, on behalf of the Class, against Defendant Neumora, each of the Individual Defendants, and each of the Underwriter Defendants. This Count does not allege, and does not intend to allege, fraud or fraudulent intent, which is not a required element of Section 11, and any implication of fraud or fraudulent intent is hereby expressly disclaimed.

174. The Offering Documents issued in connection with the IPO were inaccurate and misleading, contained inaccurate and misleading statements of material facts, omitted to state material facts necessary to render the statements therein not misleading, and omitted to state material facts required to be stated therein.

175. Neumora is the registrant and issuer of the common stock sold pursuant to Offering Documents. The Defendants named herein were responsible for the contents and dissemination of the Offering Documents. Each of the Individual Defendants signed or authorized the signing of

the Offering Documents on their own behalf. The Underwriter Defendants marketed and underwrote the IPO and sold the Neumora common stock issued in the IPO to the Class.

176. As the issuer of the shares of Neumora common stock sold pursuant to the Offering Documents, Neumora is strictly liable to the Class for the Offering Documents' material misstatements and omissions. Signatories of the Offering Documents, and possibly other Defendants, may also be strictly liable to the Class for such material misstatements and omissions.

177. None of the Defendants named herein made a reasonable investigation or possessed reasonable grounds to believe that the statements in the Offering Documents were true, complete, accurate, without omissions of any materials facts, or not misleading.

178. None of the untrue statements or omissions of material fact in the Offering Documents alleged herein were forward-looking statements. Rather, each such statement concerned existing facts. Moreover, the Offering Documents did not properly identify any of the untrue statements as forward-looking statements and did not disclose information that undermined the putative validity of those statements.

179. Less than one year has elapsed from the time that Plaintiff discovered, or reasonably could have discovered, the facts upon which these claims are based to the time that Plaintiff filed this action. Less than three years have elapsed between the time that the securities upon which this Count is brought were offered to the public and the time Plaintiff filed this action.

180. Plaintiff and the Class have sustained damages. The value of Neumora common stock has declined substantially subsequent to and due to violations by the Defendants named in this Count.

181. At the time of their purchases of Neumora common stock, Plaintiff and other members of the Class were without knowledge of the facts concerning the wrongful conduct

alleged herein and could not have reasonably discovered those facts prior to the disclosures alleged herein.

## COUNT II

### For Violations of Section 12(a)(2) of the Securities Act Against Neumora and the Underwriter Defendants

182. Lead Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

183. This Count is brought pursuant to Section 12(a)(2) of the Securities Act, 15 U.S.C. § 77l(a)(2), on behalf of the Class, against Defendant Neumora and the Underwriter Defendants. This Count does not allege, and does not intend to allege, fraud or fraudulent intent, which is not a required element of Section 12(a)(2), and any implication of fraud or fraudulent intent is hereby expressly disclaimed.

184. Each of the Defendants named in this Count were sellers, offerors, or solicitors of purchases of the Company's common stock pursuant to the defective Prospectus that respectively formed a relevant part of the Offering Documents. The actions of solicitation by these Defendants include participating in the preparation of the false and misleading Prospectus and marketing the common stock to investors, including members of the Class.

185. The Prospectus contained untrue statements of material fact, omitted to state other facts necessary to make statements made therein not misleading, and omitted to state material facts required to be stated therein.

186. Each of the Defendants named in this Count owed Plaintiff and other members of the Class that purchased Neumora common stock pursuant to the Prospectus a duty to make a reasonable and diligent investigation of the statements contained in the Prospectus to ensure that such statements were true and that there was no omission to state a material fact required to be

stated in order to make the statements contained therein not misleading. By virtue of each of the Defendants' failure to exercise reasonable care, the Prospectus contained misrepresentations of material fact and omissions of material fact necessary to make the statements therein not misleading.

187. Plaintiff and the members of the Class did not know, nor in the exercise of reasonable diligence could have known, of the untruths and omissions contained in the Prospectus issued in connection with the IPO at the time they purchased Neumora common stock.

188. By reason of the conduct alleged herein, the Defendants violated Section 12(a)(2) of the Securities Act. As a direct and proximate result of such violations, Plaintiff and the other members of the Class that purchased Neumora common stock pursuant to the Prospectus issued in connection with the Offering sustained substantial damages in connection therewith. Accordingly, Plaintiff and the other members of the Class that hold the common stock issued pursuant to the Prospectus issued in connection with the Offering have the right to rescind and recover the consideration paid for their shares with interest thereon or damages as allowed by law or in equity. Class members that have sold their Neumora common stock seek damages to the extent permitted by law.

189. Less than one year has elapsed from the time that Plaintiff discovered, or reasonably could have discovered, the facts upon which these claims are based to the time that Plaintiff filed this action. Less than three years have elapsed between the time that the securities upon which this Count is brought were offered to the public and the time Plaintiff filed this action.

## COUNT III

**For Violations of Section 15 of the Securities Act**
**Against the Individual Defendants**

190. Lead Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

191. This Count is brought pursuant to Section 15 of the Securities Act, 15 U.S.C. § 77o, on behalf of the Class, against each of the Individual Defendants. This Count does not allege, and does not intend to allege, fraud or fraudulent intent, which is not a required element of Section 15, and any implication of fraud or fraudulent intent is hereby expressly disclaimed.

192. As detailed above, the Individual Defendants named herein committed primary violations of the Securities Act by engaging in conduct in contravention of Section 11 of the Securities Act.

193. The Individual Defendants each were control persons of Neumora by virtue of their positions as directors, senior officers, and/or significant shareholders of Neumora. The Individual Defendants each had a series of direct and/or indirect business and/or personal relationships with other directors, officers, and/or significant shareholders of Neumora. Neumora also controlled the Individual Defendants, given the influence and control the Company possessed and exerted over the Individual Defendants and all its employees.

194. By reason of the conduct alleged herein, the Individual Defendants violated Section 15 of the Securities Act, and Plaintiff and other members of the Class have suffered harm as a result.

## VII. PRAYER FOR RELIEF

195. WHEREFORE, Lead Plaintiff prays for relief and judgment as follows:

a) Declaring this action to be a class action pursuant to Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the Class defined herein;

b) Awarding all damages and other remedies available under the Securities Act in favor of Lead Plaintiff and all other members of the Class against Defendants in an amount to be proven at trial, including interest thereon;

c) Awarding Lead Plaintiff and the other members of the Class their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees; and

d) Awarding such other and further relief as this Court deems appropriate.

## VIII. JURY DEMAND

196. Lead Plaintiff demands a trial by jury.

Dated: January 14, 2026

Respectfully submitted,

**SAXENA WHITE P.A.**

*/s/ Steven B. Singer*
Steven B. Singer
David J. Schwartz
10 Bank Street, Suite 882
White Plains, NY 10606
Tel.: (914) 437-8551
Fax: (888) 631-3611
ssinger@saxenawhite.com

-and-

David R. Kaplan (*pro hac vice*)
Emily Bishop (*pro hac vice*)
505 Lomas Santa Fe Drive, Suite 180
Solana Beach, CA 92075
Tel.: (858) 256-5302
Fax: (858) 997-0860
dkaplan@saxenawhite.com
ebishop@saxenawhite.com

*Counsel for Lead Plaintiff Victor Otcheretko and Lead Counsel for the Class*

**CERTIFICATE OF SERVICE**

I hereby certify that on January 14, 2026, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send a Notice of Electronic Filing to all counsel of record.

Respectfully submitted,

*/s/ Steven B. Singer*
Steven B. Singer