UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ANNIE CHANG, Individually and on Behalf of All Others Similarly Situated,<br><br>    Plaintiff,<br><br>    v.<br><br>NEUMORA THERAPEUTICS, INC., HENRY O. GOSEBRUCH, JOSHUA PINTO, MICHAEL MILLIGAN, PAUL L. BERNS, KRISTINA BUROW, MATTHEW FUST, ALAA HALAWA, MAYKIN HO, DAVID PIACQUAD, J.P. MORGAN SECURITIES LLC, BOFA SECURITIES, INC., STIFEL, NICOLAUS & COMPANY, INCORPORATED, GUGGENHEIM SECURITIES, LLC, RBC CAPITAL MARKETS, LLC, and WILLIAM BLAIR & COMPANY, L.L.C.,<br><br>    Defendants. | Case No. 1:25-cv-01072-JPC-JW<br><br>**ORAL ARGUMENT REQUESTED** |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS'
MOTION TO DISMISS THE AMENDED CLASS ACTION COMPLAINT**

**TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT ..............................................................................................1

BACKGROUND ................................................................................................................2

    A.    Neumora Develops Novel Therapies for Challenging Diseases..................2

    B.    FDA Requires Three Phases of Clinical Trials for New Drug
Approval ...................................................................................................3

    C.    Neumora Acquires BlackThorn and Assumes Nava's Phase 2(a)
Trial..........................................................................................................4

    D.    Neumora Goes Public and Discloses Phase 2(a) Results and Risks............5

    E.    Neumora Discloses Additional Information about Nava's Phase
2(a) Trial ..................................................................................................7

    F.    Months after the IPO and the End-of-Phase-2 FDA Meeting,
Neumora Begins a Phase 3 Trial.................................................................7

    G.    Procedural History .....................................................................................8

LEGAL STANDARD.........................................................................................................9

ARGUMENT...................................................................................................................10

    I.    Plaintiff Lacks Statutory Standing ............................................................10

    A.    Plaintiff Profited from his Purported IPO Shares ......................................10

    B.    Plaintiff also Lacks Section 12(a)(2) Standing ..........................................11

    II.    Plaintiff Has not Adequately Pled a Material Misstatement................................11

    A.    The Challenged Statements Are Nonactionable Opinions.........................13

    B.    Plaintiff Fails to Adequately Allege Facts Establishing that any
Challenged Statement Was False or Misleading .......................................15

    C.    Plaintiff Cannot Challenge Statements Protected by the Bespeaks
Caution Doctrine......................................................................................20

    D.    The Alleged Omissions Are Immaterial ....................................................20

III.    Plaintiff's Allegations Demonstrate No Alleged Losses Were Caused by
the Revelation of any Previously Concealed Information ....................................23

IV.    Plaintiff Fails to State a Section 15 Claim ............................................................26

V.    Conclusory Underwriter Allegations Fail ..............................................................27

CONCLUSION ...............................................................................................................................27

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Abely v. Aeterna Zentaris Inc.*,
2013 WL 2399869 (S.D.N.Y. May 29, 2013) ............................................................17

*Amorosa v. Ernst & Young*,
682 F. Supp. 2d 351 (S.D.N.Y. 2010)......................................................................24

*Ark. Pub. Emps. Ret. Sys. v. Bristol-Myers Squibb Co.*,
28 F.4th 343 (2d Cir. 2022) .......................................................................................14

*Bazzelle v. Novocure Ltd.*,
2025 WL 843668 (S.D.N.Y. Mar. 18, 2025)......................................................13, 17

*Brown v. Ambow Educ. Holding Ltd.*,
2014 WL 523166 (C.D. Cal. Feb. 6, 2014)................................................................24

*City of Pontiac Policemen's & Firemen's Ret. Sys.*,
752 F.3d 173 (2d Cir. 2014)........................................................................................9

*Fernandes v. Centessa Pharm. PLC*,
2024 WL 3638254 (S.D.N.Y. Aug. 2, 2024)..............................................................20

*Ganino v. Citizens Util. Co.*,
228 F.3d 154 (2d Cir. 2000)........................................................................................21

*Ho v. Duoyuan Glob. Water, Inc.*,
887 F. Supp. 2d 547 (S.D.N.Y. 2012).........................................................................11

*Hoang v. ContextLogic, Inc.*,
2024 WL 4471316 (N.D. Cal. Aug. 22, 2024) ...........................................................24

*Huey v. Anavex Life Scis. Corp.*,
2025 WL 1707581 (S.D.N.Y. June 18, 2025) .............................................................25

*In re Am. Int'l Grp., Inc. 2008 Sec. Litig.*,
2013 WL 1787567 (S.D.N.Y. Apr. 26, 2013).............................................................15

*In re AOL Time Warner, Inc. Sec. & "ERISA" Litig.*,
381 F. Supp. 2d 192 (S.D.N.Y. 2004).........................................................................10

*In re AT&T/DirecTV Now Sec. Litig.*,
480 F. Supp. 3d 507 (S.D.N.Y. 2020)..........................................................................23

iii

*In re BioAge Labs, Inc., Sec. Litig.*,
  2026 WL 578816 (N.D. Cal. Mar. 2, 2026)................................................................18

*In re BofI Holding, Inc. Sec. Litig.*,
  977 F.3d 781 (9th Cir. 2020) ..................................................................................26

*In re Britannia Bulk Holdings Inc. Sec. Litig.*,
  665 F. Supp. 2d 404 (S.D.N.Y. 2009).....................................................................26

*In re Cosi, Inc. Sec. Litig.*,
  379 F. Supp. 2d 580 (S.D.N.Y. 2005)......................................................................11

*In re eSpeed, Inc. Sec. Litig.*,
  457 F. Supp. 2d 266 (S.D.N.Y. 2006).....................................................................26

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*,
  308 F. Supp. 2d 249 (S.D.N.Y. 2004)......................................................................27

*In re Fuwei Films Sec. Litig.*,
  634 F. Supp. 2d 419 (S.D.N.Y. 2009)........................................................................9

*In re Glob. Crossing, Ltd. Sec. Litig.*,
  313 F. Supp. 2d 189 (S.D.N.Y. 2003)................................................................10, 11

*In re Merrill Lynch & Co., Inc. Rsch. Reps. Sec. Litig.*,
  272 F. Supp. 2d 243 (S.D.N.Y. 2003)......................................................................25

*In re Morgan Stanley Info. Fund. Sec. Litig.*,
  592 F.3d 347 (2d Cir. 2010).................................................................10, 11, 26, 27

*In re Neurotrope, Inc. Sec. Litig.*,
  315 F. Supp. 3d 721 (S.D.N.Y. 2018)......................................................................15

*In re Norfolk S. Corp. Bond/Note Sec. Litig.*,
  2026 WL 555420 (2d Cir. Feb. 27, 2026)................................................................12

*In re Omnicom Grp., Inc. Sec. Litig.*,
  597 F.3d 501 (2d Cir. 2010).....................................................................................26

*In re Philip Morris Int'l Inc. Sec. Litig.*,
  2021 WL 4135059 (S.D.N.Y. Sept. 10, 2021).........................................................12

*In re Philip Morris Int'l Inc. Sec. Litig.*,
  89 F.4th 408 (2d Cir. 2023) ........................................................................13, 14, 15

*In re ProShares Tr. Sec. Litig.*,
  728 F.3d 96 (2d Cir. 2013)................................................................................12, 21

iv

*In re Sanofi Sec. Litig.*,
 87 F. Supp. 3d 510 (S.D.N.Y. 2015)..................................................................12, 14

*In re Sec. Cap. Assurance Ltd. Sec. Litig.*,
 729 F. Supp. 2d 569 (S.D.N.Y. 2010)......................................................................25

*In re Shoretel Inc. Sec. Litig.*,
 2009 WL 248326 (N.D. Cal. Feb. 2, 2009) ............................................................24

*In re State St. Bank & Tr. Co. Fixed Income Funds Inv. Litig.*,
 774 F. Supp. 2d 584 (S.D.N.Y. 2011)................................................................23, 24

*In re Worldcom, Inc. Sec. Litig.*,
 2005 WL 375314 (S.D.N.Y. Feb. 17, 2005)............................................................24

*Kleinman v. Elan Corp.*,
 706 F.3d 145 (2d Cir. 2013)....................................................................................13

*Lau v. Opera Ltd.*,
 527 F. Supp. 3d 537 (S.D.N.Y. 2021)......................................................................10

*Long Miao v. Fanhua, Inc.*,
 442 F. Supp. 3d 774 (S.D.N.Y. 2020)......................................................................19

*Lozada v. TaskUs, Inc.*,
 710 F. Supp. 3d 283 (S.D.N.Y. 2024)......................................................................11

*Matrixx Initiatives, Inc. v. Siracusano*,
 563 U.S. 27 (2011)....................................................................................................9

*May v. Barclays PLC*,
 2025 WL 887300 (S.D.N.Y. Mar. 21, 2025) .....................................................11, 12

*Nguyen v. MaxPoint Interactive, Inc*,
 234 F. Supp. 3d 540 (S.D.N.Y. 2017)......................................................................27

*Ohio Pub. Emps. Ret. Sys. v. Discovery, Inc.*,
 715 F. Supp. 3d 483 (S.D.N.Y. 2024)......................................................................12

*Olkey v. Hyperion 1999 Term Tr., Inc.*,
 98 F.3d 2 (2d Cir. 1996)..........................................................................................12

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
 575 U.S. 175 (2015).................................................................................9, 12, 13, 15

*P. Stolz Family P'ship L.P. v. Daum*,
 355 F.3d 92 (2d Cir. 2004)......................................................................................20

v

*Podany v. Robertson Stephens, Inc.*,
  318 F. Supp. 2d 146 (S.D.N.Y. 2004)...................................................................................1

*Rolon v. Henneman*,
  517 F.3d 140 (2d Cir. 2008).................................................................................................10

*Rombach v. Chang*,
  2002 WL 1396986 (E.D.N.Y. June 7, 2002) .......................................................................9

*Rombach v. Chang*,
  355 F.3d 164 (2d Cir. 2004)................................................................................................21

*Shnayder v. Allbirds, Inc.*,
  2025 WL 1745596 (N.D. Cal. June 23, 2025).....................................................................11

*Slack Techs., LLC v. Pirani*,
  598 U.S. 759 (2023).............................................................................................................10

*Steinberg v. Ericsson LM Tel. Co.*,
  2008 WL 5170640 (S.D.N.Y. Dec. 10, 2008) .....................................................................19

*Strezsak v. Ardelyx Inc.*,
  2024 WL 1160900 (N.D. Cal. Mar. 18, 2024)......................................................................14

*Teamsters Loc. 445 Freight Div. Pension Fund v. Bombardier Inc.*,
  546 F.3d 196 (2d Cir. 2008).................................................................................................23

*Thant v. Rain Oncology Inc.*,
  2025 WL 588994 (N.D. Cal. Feb. 24, 2025) ..................................................................13, 14

*Tongue v. Sanofi*,
  816 F.3d 199 (2d Cir. 2016)...........................................................................................13, 15, 22

*United States v. Martoma*,
  993 F. Supp. 2d 452 (S.D.N.Y. 2014)..................................................................................21

*Waters v. Gen. Elec. Co.*,
  2010 WL 3910303 (S.D.N.Y. Sept. 29, 2010)......................................................................25

## STATUTES

15 U.S.C.
  § 77k.................................................................................................................................9, 23
  § 77*l* ................................................................................................................................9, 23
  § 77o..................................................................................................................................26

**RULES**

Fed. R. Civ. P.
    8.................................................................................................................................9
    9(b)............................................................................................................................9

**REGULATIONS**

21 C.F.R.
    §§ 58.200-210 .......................................................................................................18
    § 312.21...................................................................................................................3
    § 312.47...................................................................................................................3

**OTHER AUTHORITIES**

FDA, *Regulations: Good Clinical Practice and Clinical Trials*,
    https://www.fda.gov/science-research/clinical-trials-and-human-subject-
    protection/regulations-good-clinical-practice-and-clinical-trials (last updated
    Jan. 21, 2021)..........................................................................................................5

**GLOSSARY OF TERMS USED**

| | |
|---|---|
| BlackThorn | BlackThorn Therapeutics, Inc. |
| Complaint | Plaintiff's Amended Complaint (Dkt. 61), cited as "¶ _" |
| CW | Confidential Witness |
| Defendants | Neumora Therapeutics, Inc., Henry O. Gosebruch, Joshua Pinto, Michael Milligan, Paul L. Berns, Kristina Burow, Matthew Fust, Alaa Halawa, Maykin Ho, David Piacquad, J.P. Morgan Securities LLC, BofA Securities, Inc., Stifel, Nicolaus & Company, Incorporated, Guggenheim Securities, LLC, RBC Capital Markets, LLC, and William Blair & Company, L.L.C. |
| FDA | Food and Drug Administration |
| GCP | Good Clinical Practice |
| HAMD-17 | Hamilton Depression Rating Scale |
| Individual Defendants | Henry O. Gosebruch, Joshua Pinto, Michael Milligan, Paul L. Berns, Kristina Burow, Matthew Fust, Alaa Halawa, Maykin Ho, and David Piacquad |
| IPO | Initial Public Offering |
| MDD | Major depressive disorder |
| Nava | Navacaprant |
| Neumora | Neumora Therapeutics, Inc. |
| Neumora Defendants | Neumora, Henry O. Gosebruch, Joshua Pinto, Michael Milligan, Paul L. Berns, Kristina Burow, Matthew Fust, Alaa Halawa, Maykin Ho, and David Piacquad |
| Offering Documents | Neumora's final prospectus and registration statement, filed September 18, 2023 |
| Plaintiff | Victor Otcheretko |
| Prospectus | Neumora's final prospectus, filed September 18, 2023 |
| SEC | U.S. Securities and Exchange Commission |
| Securities Act | Securities Act of 1933 |

| | |
|---|---|
| <u>Underwriter</u> <u>Defendants</u> | Defendants J.P. Morgan Securities LLC, BofA Securities, Inc., Stifel, Nicolaus & Company, Incorporated, Guggenheim Securities, LLC, RBC Capital Markets, LLC, and William Blair & Company, L.L.C. |

**PRELIMINARY STATEMENT**

Neumora creates novel drugs to treat neuropsychiatric diseases.  In connection with its September 2023 IPO, Neumora filed documents discussing its business and the status of its seven clinical and preclinical drug programs, including the results of an early-stage Phase 2(a) clinical trial for navacaprant ("Nava")—a novel investigational treatment for major depressive disorder, or MDD.  Neumora expressed belief in Nava's potential in moderate-to-severe MDD patients, despite the fact that this early trial did not meet its original goal or "primary endpoint" in the overall study population.  Meanwhile, Neumora warned investors that "[c]linical and preclinical drug development is a lengthy and expensive process, with an uncertain outcome," particularly when it comes to neuroscience drugs, a "field that has seen very limited success," is "extremely difficult[,] and is subject to a number of unique challenges."  Ex. 1 (Prospectus) at 6, 18.

Following the IPO, and after discussions with FDA, Neumora initiated a larger, costly Phase 3 program for Nava that it hoped would provide support for FDA approval.  On January 2, 2025, Neumora announced disappointing results from Nava's first Phase 3 trial, after which its stock price declined.  Seeking to capitalize on this decline, Plaintiff filed a lawsuit claiming Neumora misled investors in the IPO almost *two years* earlier.  Specifically, Plaintiff alleges that Neumora's discussion of the results from Nava's earlier *Phase 2(a)* trial in the Offering Documents was somehow misleading because Neumora omitted certain details that purportedly meant Nava was doomed to fail in a different *Phase 3* trial that had not even begun.  This sort of hindsight pleading is impermissible: "securities laws are not intended as investor insurance every time an investment strategy turns out to have been mistaken."  *Podany v. Robertson Stephens, Inc.*, 318 F. Supp. 2d 146, 156 (S.D.N.Y. 2004).

Plaintiff's claims should be dismissed in full for multiple, independent reasons:

1

*First*, Plaintiff lacks statutory standing. Plaintiff certified that while he initially purchased Neumora shares in December 2023, he sold all of those shares for a more-than-*50% profit* in February 2024. Plaintiff's only other purchases occurred *after* Neumora's post-IPO lockup period expired, meaning Plaintiff cannot trace any allegedly injured shares to the IPO.

*Second*, Plaintiff's allegations fail to establish falsity, a necessary element of his claims. Plaintiff challenges nonactionable opinions for which he alleges no facts showing subjective or objective falsity, nor that the purportedly omitted facts rendered any statement materially false or misleading at the time of the IPO.

*Third*, Plaintiff's allegations demonstrate negative causation because the stock price decline on which the Complaint relies is untethered to any statement made in the IPO. The announcement of results from the Phase 3 trial—which did not even begin until after the IPO— did not "correct" any statement about Nava's Phase 2(a) trial. Moreover, the purportedly "corrective" information was disclosed over a year *before* the alleged stock price decline, so it could not have been new information that caused Neumora's stock price to drop.

*Finally*, the Underwriter Defendants should additionally be dismissed because the generic, boilerplate pleadings do not identify any specific misconduct by the Underwriter Defendants.

## BACKGROUND

### A.    Neumora Develops Novel Therapies for Challenging Diseases

Neumora is a clinical-stage biopharmaceutical company that develops new therapies for neuropsychiatric and neurodegenerative diseases affecting billions of people. ¶¶ 1, 27, 56; Ex. 1 at 1. MDD, for example, affects over 21 million adults in the United States alone, the vast majority of whom are women. ¶ 59; Ex. 1 at 1; *See, e.g.*, Ex. 10 (Xu Article); Ex. 11 (Kuehner Article). Despite those numbers, the prevailing treatment is not effective for most patients and causes side effects that lead to poor patient adherence. ¶¶ 59-60.

2

In June 2020, Neumora acquired BlackThorn, a startup focused on mental-health therapeutics, including an investigational drug called Nava.  Ex. 1 at 123, F-57.[1]  Nava is a novel, once-daily pill that was being studied for treatment of MDD.  ¶ 56, 61; Ex. 1 at 1.

### B.    FDA Requires Three Phases of Clinical Trials for New Drug Approval

To obtain FDA approval, new treatments generally go through three phases of clinical trials.  ¶ 64.  Phase 1 is typically small (around 20-80 patients) and focuses on safety.  *Id.*; 21 C.F.R. § 312.21(a).  Phase 2 usually involves no more than a few hundred patients and evaluates efficacy and risk while exploring variables, including dosing.  ¶ 65; 21 C.F.R. § 312.21(b).  Phase 2 can include (a) and (b) subphases where the former serves as a "pilot or 'proof of concept' stud[y] focused on dosing requirements and safety ina limited number of patients, *i.e.*, to see if the [potential treatment] works as intended," ¶ 65, and the latter assesses "effectiveness, determine[s] the optimal dosage," and investigates the "safety profile in the specific population to be tested in a phase 3 trial." *Id.*

At the close of Phase 2, companies may meet with FDA for an "End-of-Phase 2" meeting to discuss whether the potential treatment should proceed to a Phase 3 clinical trial.  FDA evaluates the completed Phase 2 study, including its design and results, and provides feedback on the company's Phase 3 plans and protocols.  *See* 21 C.F.R. § 312.47(b).  Unlike Phases 1 and 2, Phase 3 is meant to provide the support needed for FDA approval.  *See* ¶ 66.  Phase 3 trials are expensive to run and typically involve hundreds to thousands of patients in the intended patient population. 21 C.F.R. § 312.21(c).

---

[1] Plaintiff alleges that BlackThorn was acquired in September 2020, ¶ 57, but the merger agreement was signed on June 1, 2020, Ex. 1 at F-21.

### C. Neumora Acquires BlackThorn and Assumes Nava's Phase 2(a) Trial

Before its acquisition, BlackThorn had initiated a Phase 2(a) clinical trial to test Nava's safety and efficacy. ¶¶ 58, 76, 77. Nava's Phase 2(a) protocol incorporated screening criteria to determine participant eligibility. *See* Ex. 6 (protocol) at Section 4.1.1 (explaining patients must meet "the blinded-rule list based on clinical scale criteria"). Among other things, participants had to receive an initial (or "baseline") HAMD-17 score[2] within a pre-specified range in order to participate in the study. BlackThorn initially set this range between 14 and 22. Ex. 7 (Oct. 2019 inclusion criteria). After the acquisition, Neumora "amended the trial inclusion criteria to include patients with moderate to severe MDD," specifically patients with HAMD-17 scores between 14 and 30. Ex. 1 at 124; Ex. 8 (June 2020 inclusion criteria). This change aligned with public FDA guidance recommending the inclusion of participants with moderate-to-severe depression when studying MDD drugs. Ex. 2 (Mathew Article) at 268; Ex. 12 (FDA Guidance). Neumora also made other changes, including adding a pre-specified analysis of Nava's effect on patients with moderate-to-severe MDD, increasing the trial's target enrollment, and increasing the number of participating trial sites. Ex. 2 at 268.

Nava's Phase 2(a) trial was ultimately conducted across 31 trial sites. ¶ 76. The trial enrolled 204 patients, with half receiving Nava and the other half receiving a placebo. ¶ 77. 171 patients completed the trial. ¶ 106; Ex. 1 at 124. This final efficacy population was approximately 70% female and 30% male, which mirrored the demographics of individuals suffering from MDD and the gender split observed in most MDD trials. Exs. 10-11; ¶ 98. At the conclusion of Nava's Phase 2(a) trial, Neumora excluded results from one site in Oklahoma (with just five participants)

---

[2] HAMD-17 is a clinical assessment tool used to determine the severity of depression. ¶ 76 n.4.

due to documented violations of generally-applicable Good Clinical Practice standards, which rendered those results scientifically unreliable.[3] ¶ 108.

### D.    Neumora Goes Public and Discloses Phase 2(a) Results and Risks

Neumora filed a registration statement announcing its IPO on August 25, 2023, and its prospectus on September 14, 2023. ¶ 82. Neumora officially became a public company on September 15, 2023. *Id.*

In the Offering Documents, Neumora discussed the status of each of its seven drug development programs. Ex. 1 at 2-4, 122-33. Neumora discussed Nava's Phase 2(a) trial, including its design, topline results, and future expectations. *Id.* at 122-27. Neumora disclosed that "[f]ollowing [its] acquisition of BlackThorn, [Neumora had] amended the trial inclusion criteria to include patients with moderate to severe MDD (baseline HAMD-17 total score ≥ 22), which is the patient population [Neumora] intend[ed] to evaluate in [its] pivotal Phase 3 program and more typically studied in MDD clinical trials." *Id.* at 124. Neumora also discussed that Nava "demonstrated positive results across the total population" of 171 patients in the Phase 2(a) trial. *Id.* at 125. But Neumora acknowledged that while Nava "demonstrated a statistically significant improvement in depression at Week 4," it "did not achieve statistical significance compared to placebo at Week 8" in the overall study population. *Id.*

Neumora also discussed results for other exploratory measures and pre-specified subgroups, including that Nava provided "statistically significant treatment differences compared

---

[3] GCPs are internationally accepted standards for clinical trials. FDA, *Regulations: Good Clinical Practice and Clinical Trials*, https://www.fda.gov/science-research/clinical-trials-and-human-subject-protection/regulations-good-clinical-practice-and-clinical-trials (last updated Jan. 21, 2021).

to placebo on a range of . . . key secondary and exploratory measures of depression . . . in the moderate to severe MDD population." *Id.*

The Offering Documents also included numerous warnings about risks associated with Neumora's business, including those related to Nava and its development and future prospects. *Id.* at 12-78.   Among other things, Neumora warned that "drug development is a lengthy and expensive process, with an uncertain outcome," particularly for neuroscience drugs, a "field that has seen very limited success" and is "extremely difficult and is subject to a number of unique challenges," with "only approximately 12% of all new therapies approved." *Id.* at 6, 18, 114. Neumora also warned:

- "[C]linical trials by their nature utilize a sample of the potential patient population," and therefore it is possible that new findings may arise after Neumora "test[s its] product candidates in larger, longer and more extensive clinical trials";

- The "[r]esults of preclinical studies or clinical trials or any product candidates may not be predictive of the results of future preclinical studies or clinical trials";

- "[S]uccess in . . . early clinical trials does not ensure that later . . . clinical trials will be successful.  A number of companies in the biotechnology and biopharmaceutical industries have suffered significant setbacks in clinical trials, even after positive results in earlier preclinical studies.";

- Meeting FDA requirements necessitates "conduct[ing] adequate and well-controlled clinical trials," which can be delayed due to factors including "clinical sites deviating from trial protocol or dropping out of a trial.";

- "The design of a clinical trial can determine whether its results will support approval of a product, and flaws in the design of a clinical trial may not become apparent until the clinical trial is well advanced"; and

- If Neumora "fail[s] to receive positive results in . . . clinical trials . . . [the company's] business and financial prospects, would be negatively impacted."

*Id.* at 15, 17, 26-30, 35.

Neumora's Offering Documents also noted that millions of shares in the hands of pre-IPO private shareholders would be "locked up"—meaning that these shares could not be sold right

6

away, and instead could only be traded beginning 180 days after the IPO—on March 12, 2024.  *Id.* at 197.

### E.    Neumora Discloses Additional Information about Nava's Phase 2(a) Trial

In December 2023, Neumora presented Nava's Phase 2(a) results to the American College of Neuropsychopharmacology.  Ex. 4 (Navacaprant summary); Ex. 9 (Psychiatric Times). Neumora discussed the Phase 2(a) trial in detail, noting that 70.5% of the efficacy population was female and that participants from one clinical site (with five participants) were excluded from the efficacy population (but included in the safety population) due to GCP violations.  Ex. 4; Ex. 9. Following this presentation, Neumora's stock price increased.  Ex. 5 (stock price chart).  Neumora reiterated this information in a June 2025 article in a peer-reviewed medical journal, the *Journal of Clinical Psychopharmacology* (the "Mathew Article").  *See* Ex. 2 at 269-70; ¶ 102.

### F.    Months after the IPO and the End-of-Phase-2 FDA Meeting, Neumora Begins a Phase 3 Trial

After the Phase 2(a) trial concluded, Neumora had a critical End-of-Phase-2 meeting with FDA to obtain feedback and guidance as to whether Nava could proceed to Phase 3 based on the Phase 2(a) study.  *See* ¶ 81, Ex. 1 at 3.  Following the meeting, Neumora announced that it would begin its Phase 3 program.  *Id.*; ¶ 81.  Phase 3 tested Nava on patients with moderate-to-severe MDD and differed meaningfully from the Phase 2(a) trial.  ¶ 89; Ex. 1 at 126.  Among other things, it studied a different primary endpoint; while Phase 2(a) used HAMD-17, Phase 3 used a "change from baseline on the Montgomery-Åsberg Depression Rating Scale (MADRS) at Week 6," a different depression rating scale.  ¶ 89; Ex. 1 at 126.

On January 2, 2025, promptly after receiving the results, Neumora announced that the first Phase 3 study did not result in a statistically significant improvement in the overall reduction of depression symptoms in a sufficient number of participants, meaning that the study did not achieve

7

its goal.  ¶ 93.  While female Nava patients generally improved, male patients generally did not.  ¶¶ 93-98.  Following this announcement, Neumora's stock price declined.  ¶¶ 93, 97.

### G.    Procedural History

One month after Neumora announced Nava's Phase 3 results, on February 6, 2025, Annie Chang filed a putative securities class action against Neumora, the Individual Defendants, and the Underwriter Defendants.  Dkt. 1.  Plaintiff later filed an unopposed motion for appointment as Lead Plaintiff.  Dkts. 50, 51.  Plaintiff certified he purchased Neumora shares on December 4, 2023, almost three months after the IPO.  Dkt. 30-1.  Plaintiff then sold all of those shares on February 7, 2024 for a nearly 52% gain.  *Id.*  On March 12, 2024, the 180-day IPO lockup expired, allowing millions of Neumora shares untethered to the Offering Documents to be publicly traded.  On March 13, 2024, one day after the lockup expired and months after Neumora's public presentation of the Phase 2(a) demographics and site exclusion information, Plaintiff purchased additional Neumora shares.  *Id.*; Ex. 1 at 197.

Plaintiff filed his Amended Complaint on January 14, 2026.  Dkt. 61.  He alleges Neumora's Offering Documents contained material misstatements in violation of Sections 11, 12(a)(2), and 15 of the Securities Act.  ¶¶ 172-94.  Specifically, Plaintiff alleges statements pertaining to Nava's Phase 2(a) trial were materially misleading because:

> (i) Neumora omitted the trial's gender demographics;
>
> (ii) Neumora omitted that one trial site was excluded for GCP violations; and
>
> (iii) Neumora falsely stated it amended the Phase 2(a) trial protocol.  ¶¶ 138-55.

Plaintiff claims the "truth" about these purported misstatements was "revealed" in the January 2025 disclosure of Nava's Phase 3 results and the June 2025 Mathew Article (which was published months after the complaint was originally filed in this action).  ¶¶ 7, 10, 101-03; *see* Dkt. 1.

## LEGAL STANDARD

To state a Section 11 or Section 12(a)(2) claim, Plaintiff must allege facts demonstrating that an offering document either "contained an untrue statement of a material fact or omitted to state a material fact . . . necessary to make the statements therein not misleading[.]"  15 U.S.C. § 77k(a); 15 U.S.C. § 77*l*.  As to omissions, there is no "general disclosure requirement"; rather, these statutes afford "a cause of action only when an issuer's failure to include a material fact has rendered a published statement misleading."  *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 194 (2015).[4]  An omitted fact is material only where "a reasonable investor would have viewed the nondisclosed information as having significantly altered the total mix of the information made available."  *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 44 (2011).

Where, as here, a plaintiff's claims "sound in fraud," the complaint must meet the heightened pleading requirements of Rule 9(b), which require the plaintiff to state with particularity the circumstances constituting fraud by setting forth what is false or misleading about the challenged statement, and why it is false.  Fed. R. Civ. P. 9(b); *see, e.g.*, *Rombach v. Chang*, 2002 WL 1396986, at *2 (E.D.N.Y. June 7, 2002), *aff'd and remanded*, 355 F.3d 164 (2d Cir. 2004); *City of Pontiac Policemen's & Firemen's Ret. Sys.*, 752 F.3d 173, 183 & n.42 (2d Cir. 2014).  Because the gravamen of Plaintiff's claims is alleged fraud—*i.e.*, that Defendants lied about amending the Phase 2(a) protocol, manipulated trial data, and knowingly omitted information, *see* ¶¶ 111, 121-122, 131, 136, 152-55—Rule 9(b) applies despite Plaintiff's nominal efforts to disclaim fraud, ¶¶ 173, 183, 191.  *In re Fuwei Films Sec. Litig.*, 634 F. Supp. 2d 419, 436 (S.D.N.Y. 2009).  In any event, even under Rule 8, courts "are not bound to accept conclusory

---

[4] All internal quotation marks have been omitted and all emphasis is added unless otherwise noted.

allegations or legal conclusions masquerading as factual conclusions." *Rolon v. Henneman*, 517 F.3d 140, 149 (2d Cir. 2008).

**ARGUMENT**

## I.   PLAINTIFF LACKS STATUTORY STANDING

To have standing, Plaintiff must have purchased Neumora stock "traceable to" the IPO (for Section 11), or *in* the IPO (for Section 12(a)(2)), and have suffered losses on those shares due to the alleged misrepresentations in the Offering Documents. *Lau v. Opera Ltd.*, 527 F. Supp. 3d 537, 561 (S.D.N.Y. 2021); *In re Morgan Stanley Info. Fund. Sec. Litig.*, 592 F.3d 347, 359 (2d Cir. 2010). Plaintiff has not met these requirements.

### A.   Plaintiff Profited from his Purported IPO Shares

Plaintiff lacks standing because he concedes he was not harmed—and indeed, profited—from any shares allegedly traceable to Neumora's IPO. Plaintiff alleges he purchased shares on December 4, 2023, but then sold *all* of those shares on February 7, 2024 for an over 50% *profit*. Dkt. 30-1; ¶ 7. Plaintiff was therefore not harmed and cannot bring a claim based on those shares. *In re AOL Time Warner, Inc. Sec. & "ERISA" Litig.*, 381 F. Supp. 2d 192, 245-46 (S.D.N.Y. 2004) (finding no standing where the securities purchased by plaintiffs increased in value).

While Plaintiff alleges he purchased new Neumora shares on March 13, 2024, Dkt. 30-1, he has not alleged any fact demonstrating that these shares are traceable to the IPO Offering Documents, as required. To state a Section 11 claim, a plaintiff must be able to "trace" his shares to the allegedly defective registration statement. *Slack Techs., LLC v. Pirani*, 598 U.S. 759, 769-70 (2023); *In re Glob. Crossing, Ltd. Sec. Litig.*, 313 F. Supp. 2d 189, 207 (S.D.N.Y. 2003) ("Only those who purchase securities that are subject to [the] allegedly false registration statement, and not those who buy identical stocks already being traded, can sue under section 11."). To do so, a plaintiff must allege (1) "a direct chain of title from the original offering to the plaintiff," or (2)

10

that he "bought . . . shares in a market containing *only* shares issued pursuant to the allegedly defective registration statement." *May v. Barclays PLC*, 2025 WL 887300, at *18 (S.D.N.Y. Mar. 21, 2025). Plaintiff alleges neither. Neumora's 180-day lockup expired on March 12, 2024, the day *before* Plaintiff purchased his allegedly damaged shares. Ex. 1 at 197; Dkt. 30-1. *Millions* of unregistered shares became eligible for public trading as of March 12, 2024. Ex. 1 at 197. As a result, without particularized allegations tracing his shares to the IPO, Plaintiff cannot satisfy his burden to plead standing. *See, e.g.*, *Glob.*, 313 F. Supp. 2d at 208. And Plaintiff's conclusory assertion that his shares were "traceable to" the registration statement, ¶ 25, is no substitute for well-pled *facts* establishing standing. *Ho v. Duoyuan Glob. Water, Inc.*, 887 F. Supp. 2d 547, 561 (S.D.N.Y. 2012) (finding bare allegations of traceability insufficient); *Shnayder v. Allbirds, Inc.*, 2025 WL 1745596, at *9 (N.D. Cal. June 23, 2025) (same).

### B.    Plaintiff also Lacks Section 12(a)(2) Standing

Plaintiff's Section 12(a)(2) claim likewise fails because Plaintiff has not alleged he purchased his shares "in" the IPO. A Section 12(a)(2) claim "may only be maintained by a purchaser who purchased stock in the public offering at issue rather than in a secondary market transaction." *In re Cosi, Inc. Sec. Litig.*, 379 F. Supp. 2d 580, 589 (S.D.N.Y. 2005); *Lozada v. TaskUs, Inc.*, 710 F. Supp. 3d 283, 311-12 (S.D.N.Y. 2024). Plaintiff does not plead that his claim is based on shares he purchased directly "in" Neumora's IPO. Indeed, his PSLRA certification discloses he purchased shares months *after* the IPO. Dkt. 30-1; ¶ 3.

### II.    PLAINTIFF HAS NOT ADEQUATELY PLED A MATERIAL MISSTATEMENT

Plaintiff's Complaint should also be dismissed because he has not adequately pled that anything in the Offering Documents was false or misleading at the time of the IPO. *See Morgan Stanley*, 592 F.3d at 358-59. "Because Sections 11 and 12(a)(2) are 'Securities Act siblings with

roughly parallel elements,' courts typically analyze the two claims together." *May*, 2025 WL 887300, at *16.

Plaintiff must plead facts showing that the challenged statements were false at the time of the offering and "would have misl[ed] a reasonable investor about the nature of the [securities]." *Olkey v. Hyperion 1999 Term Tr., Inc.*, 98 F.3d 2, 5 (2d Cir. 1996). "A plaintiff may not plead a Securities Act claim with the benefit of 20/20 hindsight or base the claim on a backward-looking assessment of the statement." *Ohio Pub. Emps. Ret. Sys. v. Discovery, Inc.*, 715 F. Supp. 3d 483, 495 (S.D.N.Y. 2024).

To plead falsity based on a purported omission, Plaintiff must allege "an issuer's failure to include a material fact has rendered a published statement misleading." *Omnicare*, 575 U.S. at 194. "It is not sufficient to allege that the investor might have considered the misrepresentation or omission important." *In re ProShares Tr. Sec. Litig.*, 728 F.3d 96, 102 (2d Cir. 2013); *In re Norfolk S. Corp. Bond/Note Sec. Litig.*, 2026 WL 555420, at *2 (2d Cir. Feb. 27, 2026) ("The mere fact that investors would have benefitted from knowing that information does not suffice."). Rather, it is only where the omitted fact "both concern[s] the topic referenced in [the challenged] statement and contradict[s] representations in that statement," that the omission will render the statement misleading. *In re Philip Morris Int'l Inc. Sec. Litig.*, 2021 WL 4135059, at *11 (S.D.N.Y. Sept. 10, 2021), *aff'd,* 89 F.4th 408 (2d Cir. 2023).

Even more stringent standards apply to pleading falsity for certain types of challenged statements. To plead the falsity of an opinion, Plaintiff must allege with particularity both subjective *and* objective falsity—*i.e.*, that the "defendant's opinions were both false and not honestly believed when they were made." *In re Sanofi Sec. Litig.*, 87 F. Supp. 3d 510, 528 (S.D.N.Y. 2015), *aff'd* 816 F.3d 199 (2d Cir. 2016). For opinions alleged to be misleading by

12

omission, Plaintiff must further "identify particular (and material) facts going to the basis for the issuer's opinion—facts about the inquiry the issuer did or did not conduct or the knowledge it did or did not have—whose omission makes the opinion statement at issue misleading to a reasonable person reading the statement fairly and in context." *Omnicare*, 575 U.S. at 194.

Here, all of the statements Plaintiff challenges contain opinions. Yet, Plaintiff alleges no fact demonstrating that any such opinion was objectively *or* subjectively false—let alone both. And to the extent Plaintiff challenges these statements as misleading by omission, he fails entirely to show that the omitted facts undermine the basis for Defendants' inquiry into whether Nava's Phase 2(a) trial produced the results reported in Neumora's Offering Documents.

### A.    The Challenged Statements Are Nonactionable Opinions

Plaintiff challenges Neumora's opinions about the Phase 2(a) trial results. Where a defendant speaks about the results of a clinical trial and expresses views about the implications of that trial data, the defendant's statements are statements of opinion subject to the heightened falsity standard set forth in *Omnicare*. *See In re Philip Morris Int'l Inc. Sec. Litig.*, 89 F.4th 408, 422 (2d Cir. 2023); *see also Tongue v. Sanofi*, 816 F.3d 199, 214 (2d Cir. 2016); *Bazzelle v. Novocure Ltd.*, 2025 WL 843668, at *9 (S.D.N.Y. Mar. 18, 2025); *Thant v. Rain Oncology Inc.*, 2025 WL 588994, at *4 (N.D. Cal. Feb. 24, 2025) (collecting cases). Courts routinely reject challenges to statements related to clinical trials and results where the "defendant's competing analysis or interpretation of data is itself reasonable." *Kleinman v. Elan Corp.*, 706 F.3d 145, 154 (2d Cir. 2013). It is not enough for the plaintiff to point to a competing, more negative interpretation of the data or "some fact cutting the other way." *Omnicare*, 575 U.S. at 189; *see also Philip Morris*, 89 F.4th at 424-25 (finding defendants' interpretation of aerosol study data reasonable, even where investors presented contrary conclusions about the data); *Bazzelle*, 2025 WL 843668, at *12 (noting that Defendants are not "required to design the [drug] trial in accordance with Plaintiff's view").

13

The challenged statements here are all nonactionable opinions because they are interpretations of Phase 2(a) clinical trial results for which Plaintiff does not allege objective or subjective falsity, or omissions that go to the basis of Defendants' inquiry. *See* App. A (listing challenged statements). Specifically, Plaintiff challenges Neumora's discussion of Nava's topline efficacy results from the Phase 2 trial in the Offering Documents (Statements 1-4), including that Nava "resulted in statistically significant . . . treatment differences compared to placebo" and "positive results across the total population." Plaintiff also challenges statements about Neumora's assessment of what that the data implied for Nava's future (Statements 4-5), including Neumora's belief that Nava "has the potential to provide significant advantages relative to the standard of care, if approved" and that its belief that moderate-to-severe MDD patients were the "intend[ed]" patient population "more typically studied in MDD clinical trials."

Courts have repeatedly held that statements about trial results and interpretations of the impact of such results—like the challenged statements here—are opinions subject to *Omnicare*. *See Philip Morris*, 89 F.4th at 420 (statements about what "could be inferred from the totality of the evidence" are opinions); *Ark. Pub. Emps. Ret. Sys. v. Bristol-Myers Squibb Co.*, 28 F.4th 343, 355 (2d Cir. 2022) (finding defendant's statement that "the [drug] trial was strongly designed" to be opinion); *Sanofi*, 87 F. Supp. 3d at 538, 543 (finding statement regarding the drug's "strong and robust treatment effect on the relapse rate" to be opinion); *Thant*, 2025 WL 588994, at *4 ("statements that the Phase 1 data validated a dosing schedule are opinion statements"); *Strezsak v. Ardelyx Inc.*, 2024 WL 1160900, at *5 (N.D. Cal. Mar. 18, 2024) (finding defendants' "description of the successful clinical trials" to constitute opinion).

To adequately allege falsity for these opinions, Plaintiff must plead facts demonstrating that the challenged statements were both objectively false *and* that they were not actually believed

14

by Defendants.  Plaintiff makes no effort to do so.  As an initial matter, Plaintiff affirmatively

*disclaims* allegations of fraud, ¶¶ 173, 183, 191, meaning, by definition, he has disclaimed any

allegation that Defendants subjectively knew their opinions were false when expressed.  *See In re*

*Am. Int'l Grp., Inc. 2008 Sec. Litig.*, 2013 WL 1787567, at \*4 (S.D.N.Y. Apr. 26, 2013).  And

indeed, Plaintiff alleges no facts whatsoever about any Defendant's knowledge or subjective

beliefs.

Plaintiff likewise does not identify any omitted fact that calls into question the basis of

Neumora's inquiry into whether Nava's Phase 2(a) trial produced the results Neumora reported in

its Offering Documents.  Instead, Plaintiff alleges his own belief that Defendants omitted

additional details about Nava's Phase 2(a) trial that (in Plaintiff's view) undercut the force of those

reported results.  But it is not enough to allege "some fact cutting the other way." *Omnicare,* 575

U.S. at 189.  As such, the omission of details about how many men participated or which data was

removed as unreliable does not establish that Neumora's opinions about and interpretations of

Nava's Phase 2(a) data were materially misleading.  *See, e.g.*, *Tongue*, 816 F.3d at 214; *Philip*

*Morris*, 89 F.4th at 423; *In re Neurotrope, Inc. Sec. Litig.*, 315 F. Supp. 3d 721, 731-33 (S.D.N.Y.

2018) (finding company's failure to disclose specific methodology used in Phase 2(b) study and

the results of higher dose study were not material omissions).

**B.      Plaintiff Fails to Adequately Allege Facts Establishing that any Challenged
Statement Was False or Misleading**

Even were the challenged statements not opinions, Plaintiff has also not alleged any

particularized fact suggesting they were false or misleading when made.  Plaintiff argues that four

of the five statements (Statements 1-4, the "Topline Result Statements") were false because

Neumora did not disclose in the Offering Documents that (1) the Phase 2(a) study enrolled more

women than men; and (2) Neumora excluded one clinical trial site (with just five patients) from

15

the study's final efficacy population.  ¶¶ 140-51.  Plaintiff also claims that a fifth statement, indicating that Neumora had amended the trial's inclusion criteria (the "Inclusion Criteria Statement") was false because there was no amendment and because "severe" MDD patients were already included in the Phase 2(a) study.  ¶¶ 152-55.

*Topline Result Statements*.  Plaintiff alleges that Neumora's disclosure of the Phase 2(a) trial's topline efficacy results—*i.e.*, statements that the drug "resulted in statistically significant . . . treatment differences compared to placebo in depression, as measured by the HAMD-17 total score, and anhedonia, as measured by the SHAPS," ¶ 141, and "on a range of . . . key secondary and exploratory measures of depression" in the moderate-to-severe patient subgroup, ¶ 142—were false and misleading.  Notably, Plaintiff does not actually allege that any of these endpoints were not met (aside from the one Neumora openly told investors was not met, ¶¶ 87, 144; *see also* Ex. 1 at 123-25).  Instead, Plaintiff claims that these otherwise accurate statements were misleading because Neumora failed to add that Nava's Phase 2(a) trial enrolled more women than men, ¶¶ 145-49, and excluded results from a trial site that violated GCP and comprised just five participants in a 204-participant trial, ¶¶ 150-51.

But Plaintiff's alleged omissions do not undermine Neumora's concededly accurate statements about the Phase 2(a) trial's topline results.  The challenged statements did not say anything about the trial's gender breakdown or whether the results included a single clinical trial site that had committed GCP violations impacting the reliability of that site's data.  Moreover, as Plaintiff acknowledges, the *majority* of MDD trials enrolled more women than men, ¶ 98, because (as the market was aware) MDD affects more women than men, *see* Exs. 10-11.

Plaintiff nevertheless claims these statements were misleading because the trial *should have* included more men and because, according to Plaintiff, results for men were likely to be

16

worse than for women. ¶¶ 70-72 & n.3, 75. But neither of these claims renders any challenged statement false. *First*, Plaintiff's subjective belief "that Defendants should have designed [the trial] differently to enroll a [different] patient population" is not sufficient to allege falsity. *Bazzelle*, 2025 WL 843668, at *11-12; *Abely v. Aeterna Zentaris Inc.*, 2013 WL 2399869, at *11 (S.D.N.Y. May 29, 2013). And it is irreconcilable with the publicly known fact that the Nava's intended patient population contained more women than men. Exs. 10-11. Indeed, Plaintiff himself points to FDA guidance suggesting studies should mirror the demographics of exactly this intent-to-treat population. ¶¶ 70-72 & n.3, 75.

*Second*, Plaintiff's admittedly speculative guessing about how men might have responded to Nava during the Phase 2(a) trial is unsupported by any particularized fact and thus is insufficient to plead falsity. Plaintiff admits that Neumora has never reported "how many males . . . showed a beneficial response to Nava" using the HAMD-17 measurement in Nava's Phase 2(a) trial. ¶ 104. Nonetheless, Plaintiff claims to apply his own ill-explained methodology for guessing at those unreported results. ¶¶ 105-06 & n.7. But Plaintiff cannot undermine the results in the overall Phase 2(a) population or the moderate-to-severe subgroup population with nothing more than his non-scientific say-so about how those results would shake out if analyzed differently in a different patient population. Neumora's trial results were sufficient to have the FDA support a Phase 3 program after the End-of-Phase-2 meeting, as well as to be published in peer-reviewed journals. *See* ¶¶ 81, 101; Ex. 3; Ex. 2. Plaintiff's subjective beliefs about how Nava might have performed in men during the Phase 2(a) trial are not particularized facts sufficient to undermine Neumora's scientific conclusions about how Nava actually did perform on the trial's prespecified metrics.

Likewise, Plaintiff does not tie the exclusion of a trial site in violation of GCP to any particular challenged statement. ¶¶ 150-51. Neumora did not claim that every single patient at

every trial site was included in the announced results.  Just the opposite, Neumora disclosed that 204 patients were enrolled in the trial, and the efficacy results covered only 171 patients.  Ex. 1 at 124.  Investors were therefore well informed that the reported results did not include all 204 participants.  *See In re BioAge Labs, Inc., Sec. Litig.*, 2026 WL 578816, at *3 (N.D. Cal. Mar. 2, 2026) (finding that "a reasonable investor would have understood" from defendants' disclosures pertinent information that plaintiff alleged was omitted).

Plaintiff appears again to claim that the results *should have* included the trial site that violated GCP.  But the regulations applying to GCP make clear that including data from sites in violation of GCP risks jeopardizing the entire set of study results.  *See* 21 C.F.R. §§ 58.200-210 (reviewing grounds for disqualification of testing facilities and impact of disqualification on study).  And generic commentary from CWs indicating that Neumora was hoping to find a positive "signal" and spent "a long period of time" looking at the data, ¶¶ 122-30—which, as Neumora openly told investors, showed that Nava did *not* meet the study's primary endpoint—is both unremarkable and beside the point.  Moreover, Neumora specifically told investors in the Offering Documents that it needed to conduct "adequate and well-controlled clinical trials" and that there were risks associated with "clinical sites deviating from trial protocol or dropping out of a trial." Ex. 1 at 26-27.  The fact that Neumora excluded a trial site for GCP violations, as required, does not render Neumora's statements about the trial's topline efficacy results false or misleading.

***Inclusion Criteria Statement***.  Plaintiff lastly challenges one statement in the Offering Documents which asserts that Neumora amended the Phase 2(a) inclusion criteria to include patients with moderate-to-severe MDD.  ¶ 153.  According to Plaintiff, the clinical trial protocol summaries available on clinicaltrials.gov do not note this amendment.  ¶ 136.  But the fact that a summary of a clinical trial protocol does not include an amendment to inclusion criteria does not

mean it did not happen.  Indeed it did.  The protocol discloses that participants had to "[m]eet the blinded-rule list based on clinical scale criteria" in order to participate in the trial.  Ex. 6 at Section 4.1.1.  That rule-based criteria document—which is incorporated into the protocol that Plaintiff incorporates by reference into the Complaint—makes clear that the trial's inclusion criteria *were* amended to expand the range of eligible MDD scores from an original range of 14-22 to a final range of 14-30.  *Compare* Ex. 7, *with* Ex. 8.  This expansion meant that patients with more severe MDD were eligible for enrollment.

Other than pointing to summaries of the wrong document, Plaintiff's only purported support for their argument that Neumora did not amend the inclusion criteria comes in the form of irrelevant statements from ill-defined CWs.  At bottom, Plaintiff's CWs claim that the trial ultimately enrolled *both* mild-to-moderate *and* moderate-to-severe MDD patients and later emphasized the drug's success in the moderate-to-severe subgroup.  ¶¶ 132-34.  But that does not say anything about if (or when) the inclusion criteria were amended.  In any event, the CWs who purport to speak on this issue are not adequately described, and there are no facts to demonstrate they would have personal knowledge about BlackThorn's original screening criteria.  CWs 1, 2, and 5 all worked for Neumora, not BlackThorn (¶¶ 113 n.11, 114 n.12, 119 n.15), and none of them is alleged to have worked at Neumora in June 2020 when this change to the inclusion criteria was made, *see* Ex. 8.  Statements of CWs that lack personal knowledge cannot support falsity.  *See Long Miao v. Fanhua, Inc.*, 442 F. Supp. 3d 774, 799-800 (S.D.N.Y. 2020); *Steinberg v. Ericsson LM Tel. Co.*, 2008 WL 5170640, at *6 (S.D.N.Y. Dec. 10, 2008) (rejecting confidential witness allegations where "it is not plausible that they would have direct knowledge").

19

### C.    Plaintiff Cannot Challenge Statements Protected by the Bespeaks Caution Doctrine

Plaintiff's challenge to Statement 4 (¶ 143)—that Nava "has the potential to provide significant advantages relative to the standard of care" and that Neumora would initiate a Phase 3 trial for Nava—also fails under the "bespeaks caution" doctrine.  This doctrine protects an alleged misrepresentation that is "sufficiently balanced by cautionary language . . . such that no reasonable investor would be misled about the nature and risk of the offered security." *P. Stolz Family P'ship L.P. v. Daum*, 355 F.3d 92, 96 (2d Cir. 2004); *Fernandes v. Centessa Pharm. PLC*, 2024 WL 3638254, at *17 (S.D.N.Y. Aug. 2, 2024) ("A forward-looking statement accompanied by sufficient cautionary language is not actionable because no reasonable investor could have found the statement materially misleading.").

Here, Neumora's subjective beliefs about Nava's *potential* "if approved" and Neumora's future initiation of a Phase 3 trial are classic forward-looking predictions about Neumora's and Nava's future potential.  This statement was also identified as forward-looking in the Offering Documents, *see* Ex. 1 at 79-80 (identifying types of forward-looking statements, including those speaking about "potential"), and it was accompanied by robust cautionary language, *id.* at 12-78, including warnings of the risks associated with early-stage clinical trials and the uncertainty inherent in new drug development, *id.* at 12, 17, 18, 28-29.  Defendants also specifically warned that positive results in early-stage clinical trials may not carry over into later-stage trials.  *See, e.g.*, *id.* at 28-29.  Courts routinely find similar statements with similar cautionary language to be inactionable.  *See, e.g.*, *Fernandes*, 2024 WL 3638254, at *21-22.

### D.    The Alleged Omissions Are Immaterial

Even if Plaintiff could establish falsity, which he cannot, his claims independently fail because he cannot show that these alleged misstatements were material.  An omitted fact is material

20

where "in light of the information already disclosed to investors," "there is a *substantial* likelihood that the disclosure of the omitted material would have been viewed by the *reasonable* investor as having *significantly* altered the total mix of information already made available." *ProShares*, 728 F.3d at 102 (emphasis in original). An omitted fact may be immaterial if it is "trivial," or "so basic that any investor could be expected to know it." *Ganino v. Citizens Util. Co.*, 228 F.3d 154, 162 (2d Cir. 2000). Materiality, though often decided on a full record, "remains a meaningful pleading obstacle," and "the Supreme Court has been careful not to set too low a standard of materiality, for fear that management would bury the shareholders in an avalanche of trivial information." *ProShares*, 728 F.3d at 102.[5]

None of what Plaintiff claims was withheld from investors in the challenged statements would have "*significantly* altered the total mix of information already made available" to investors here. *Id.* (emphasis in original). First, the immateriality of the gender demographics and exclusion of the Oklahoma trial site is self-evident because when these facts were disclosed to the public in December 2023, *see* Ex. 4, Neumora's stock price went *up*, not down. Ex. 5. Logically, a plaintiff cannot show materiality where the disclosure of allegedly omitted information has no negative impact on a stock's price. *See United States v. Martoma*, 993 F. Supp. 2d 452, 457 (S.D.N.Y. 2014) ("[I]n an efficient market the concept of materiality translates into information that alters the price of the firm's stock, if a company's disclosure of information has no effect on stock prices, it follows that the information disclosed . . . was immaterial.").

It was also well-known that MDD typically affects more women than men, Exs. 10-11, and that MDD studies enrolled more women than men, ¶ 98. *Cf. Tongue*, 816 F.3d at 211 (plaintiffs

---

[5] The standard for materiality is the same under Sections 11 and 12(a)(2) of the Securities Act and Section 10(b) of the Exchange Act. *Rombach v. Chang*, 355 F.3d 164,178 n.11 (2d Cir. 2004).

who are "sophisticated investors, well accustomed to the customs and practices of the relevant industry," may be expected to keep themselves informed as to industry-related issues). The market here would also have known that Phase 2(a) studies involve smaller populations than Phase 3 studies; that this particular study enrolled only 204 patients with 100 in the moderate-to-severe subgroup, Ex. 1 at 124; that Phase 2 studies do not guarantee the success of Phase 3 studies; and ultimately, that Phase 3 studies differ meaningfully from Phase 2 studies, even (unlike here) when they study the same endpoint. *See supra* at 7. Indeed, Plaintiff himself pleads these well-known facts throughout the Complaint. ¶¶ 65-66, 77-78.

Plaintiff also alleges no fact suggesting that whether or when Neumora amended the trial's inclusion criteria to add patients with moderate-to-severe MDD would have altered the total mix of information available to investors *at the time of the IPO*. Investors in the IPO knew—because Neumora told them—that Nava showed statistical significance in the Phase 2(a) trial only in the subgroup of patients with moderate-to-severe MDD, and not in the overall patient population. *See* Ex. 1 at 124-25; ¶¶ 84-85. Investors also knew that public FDA guidance, as of June 2018, recommended a focus on moderate-to-severe patients given that MDD trials enrolling less severe MDD patients "ha[d] not been successful." Ex. 12. Given investors were aware of the focus on the moderate-to-severe subgroup and that Neumora had included a pre-specified analysis of the results in this subgroup, Plaintiff cannot plausibly claim that the technical details of how those patients came to be included in the trial would have been material information.

Plaintiff relies on CWs to try and fill this void. *See* ¶¶ 117-18, 121. But Plaintiff pleads *no* facts to suggest that these CWs—allegedly former Neumora scientists and employees—would have knowledge about what is and is not legally material to sophisticated biotech IPO investors.

22

*See In re AT&T/DirecTV Now Sec. Litig.*, 480 F. Supp. 3d 507, 525 (S.D.N.Y. 2020), *aff'd* 2022 WL 17587853 (2d Cir. Dec. 13, 2022).

### III. PLAINTIFF'S ALLEGATIONS DEMONSTRATE NO ALLEGED LOSSES WERE CAUSED BY THE REVELATION OF ANY PREVIOUSLY CONCEALED INFORMATION

Plaintiff's own allegations establish that the January 6, 2025, decline in Neumora's stock price—which immediately post-dated the release of Nava's *Phase 3* trial results—was not caused by the correction of alleged misstatements in the Offering Documents about the *Phase 2* predecessor trial. Indeed, the challenged statements could not have caused the January 2025 decline because the supposedly "corrective" information about them was disclosed more than a year *before* that drop occurred, or (in the case of Neumora's supposed "failure to amend the protocol") never at all. In an efficient market—which Plaintiff alleges, ¶ 26—that information was immediately reflected in Neumora's stock price, and could not have caused a purported decline over a year later. *See Teamsters Loc. 445 Freight Div. Pension Fund v. Bombardier Inc.*, 546 F.3d 196, 204 (2d Cir. 2008) (stock prices "incorporate most public information rapidly.").

Under both Sections 11 and 12(a)(2), a plaintiff cannot recover for losses not "resulting from" the allegedly false or misleading statements they challenge. 15 U.S.C. § 77k(e); 15 U.S.C. § 77*l*(b). To establish that alleged misrepresentations caused investor losses, the facts must show "that the misstatement or omission [in question] concealed something from the market that, when disclosed, negatively affected the value of the security." *In re State St. Bank & Tr. Co. Fixed Income Funds Inv. Litig.*, 774 F. Supp. 2d 584, 590 (S.D.N.Y. 2011). This is referred to in the Securities Act context as "negative causation."[6] "[W]here it is clear, from the pleading[s] and

---

[6] The negative causation defense for Section 11 claims and the loss causation element in Section 10(b) are "mirror images"; courts therefore use Section 10(b) cases to assess negative causation in the Section 11 context. *See, e.g., In re Worldcom, Inc. Sec. Litig.*, 2005 WL 375314,

from facts that can be judicially noticed" that the alleged loss is *not* causally connected to the misrepresentations at issue, Section 11 and 12(a)(2) claims "can and should be dismissed at the pleading stage." *Amorosa v. Ernst & Young*, 682 F. Supp. 2d 351, 371 (S.D.N.Y. 2010); *State St.*, 774 F. Supp. 2d at 588; *see also Brown v. Ambow Educ. Holding Ltd.*, 2014 WL 523166, at *14 (C.D. Cal. Feb. 6, 2014); *In re Shoretel Inc. Sec. Litig.*, 2009 WL 248326, at *5 (N.D. Cal. Feb. 2, 2009); *Hoang v. ContextLogic, Inc.*, 2024 WL 4471316, at *8-13 (N.D. Cal. Aug. 22, 2024).

Here, Plaintiff identifies three pieces of information supposedly concealed from investors at the time of the IPO: (1) that Nava's Phase 2(a) trial did not enroll enough men, ¶¶ 139-49; (2) that Nava's Phase 2(a) trial omitted five results from a trial site in Oklahoma for GCP violations, ¶¶ 150-51; and (3) that Neumora never amended the Phase 2(a) protocol to include severe MDD patients, ¶¶ 152-55. The January 2025 disclosure did not "reveal" this information for the first time.

*__Gender Demographics and GCP Violations.__* Neumora disclosed the study's gender demographics and site exclusion in a December 2023 presentation—over a year *before* the January 6, 2025, stock decline. Neumora disclosed that approximately 70% of the Phase 2(a) efficacy population (*i.e.*, 120 of the 171 patients) were female. Ex. 4; Ex. 9.[7] And it disclosed that "[p]articipants from [one] clinical site"—four of five of whom received placebos—"that were otherwise eligible for inclusion in the efficacy population were excluded due to GCP violations." Ex. 4. Following these disclosures, Neumora's stock price went up, not down. Ex. 5.

---

at *6 (S.D.N.Y. Feb. 17, 2005); *State St.*, 774 F. Supp. 2d 589-90 & n.4 (applying 10(b) cases to loss causation in Section 11 context).

[7] As the Mathew Article and Complaint explain, the gender demographics in the overall study population and the severe MDD subgroup were "similar." ¶ 103; Ex. 2 at 269 (identifying subgroup population as having "baseline characteristics . . . similar to the overall efficacy population").

The absence of *any* negative price impact upon release of this information shows that Plaintiff suffered *no* losses "resulting from" the omission of these details from Neumora's statements about Nava's topline Phase 2(a) results.  *See, e.g.*, *In re Sec. Cap. Assurance Ltd. Sec. Litig.*, 729 F. Supp. 2d 569, 599 (S.D.N.Y. 2010); *Huey v. Anavex Life Scis. Corp.*, 2025 WL 1707581, at *8 (S.D.N.Y. June 18, 2025); *see also Waters v. Gen. Elec. Co.*, 2010 WL 3910303, at *8 (S.D.N.Y. Sept. 29, 2010), *aff'd* 447 F. App'x 229 (2d Cir. 2011).

Plaintiff tries to avoid this very fundamental problem with his claims by alleging that the truth about the Phase 2(a) trial's powering and the excluded data associated with GCP violations was first revealed when Neumora published an article in June 2025.  ¶¶ 101-03.  As an initial matter, this allegation is nonsensical because the June 2025 article that supposedly first revealed these facts was published after the original complaint was filed in this case, which itself purports to have identified the relevant misstatements and "corrective disclosures."  So Plaintiff's late-breaking citation to the June 2025 article is irreconcilable with Plaintiff's own case.

Regardless, even if one looked to that later-in-time article as the proper corrective disclosure, the result would be the same.  A correction five months *after* an alleged stock loss cannot support loss causation because "price declines" that pre-date a corrective disclosure "may not be charged to Defendants under Section 11 or Section 12(a)(2)."  *In re Merrill Lynch & Co., Inc. Rsch. Reps. Sec. Litig.*, 272 F. Supp. 2d 243, 255 (S.D.N.Y. 2003).  Indeed, "it is axiomatic that [a] concealed fact cannot cause a decrease in the value of a stock before the concealment is made public."  *In re eSpeed, Inc. Sec. Litig.*, 457 F. Supp. 2d 266, 296 (S.D.N.Y. 2006); *see also In re Britannia Bulk Holdings Inc. Sec. Litig.*, 665 F. Supp. 2d 404, 419 (S.D.N.Y. 2009).

***Inclusion Criteria***.  Plaintiff also alleges no facts suggesting *any* "correction" of Neumora's supposedly false representation that it amended the trial's inclusion criteria.  Indeed,

25

this statement has no connection to the announcement of Nava's Phase 3 results, and the June 2025 article only reaffirms the *truth* of the statement, reiterating that Neumora *did* make this very change.  Ex. 2 at 268.  As noted (*supra* at 25-26) Neumora's January 2025 stock drop could not have been caused by information that supposedly remained concealed.

* * *

This absence of alleged facts showing negative causation is all the more apparent given that the January 2025 disclosure was about results from a different clinical trial with a different endpoint that *had not even begun* at the time of the IPO.  Plaintiff offers no explanation for how information about a clinical trial (about Phase 3) that post-dated the challenged statements (about Phase 2(a)) could have any bearing on those challenged statements.  *See In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 511-12 (2d Cir. 2010) (holding that post-dated media coverage and a director's resignation did not constitute a corrective disclosure or establish loss causation because they simply recharacterized information already known to the market); *In re BofI Holding, Inc. Sec. Litig.*, 977 F.3d 781, 789 (9th Cir. 2020) ("blog posts could not have revealed anything to the market because the information they disclosed was presumably already known to market").

## IV.    PLAINTIFF FAILS TO STATE A SECTION 15 CLAIM

Section 15 creates liability for defendants who "control" any person liable under Section 11 or 12.  *Morgan Stanley*, 592 F.3d at 358; 15 U.S.C. § 77o.  Plaintiff alleges no facts about any actual or perceived "control" any Defendant had over the speaker of any challenged statement.  Further, because Plaintiff has failed to adequately plead a Section 11 or 12(a)(2) claim, his derivative "control person" claim under Section 15—which requires an underlying violation of those provisions—must also be dismissed.  *Nguyen v. MaxPoint Interactive, Inc*, 234 F. Supp. 3d 540, 548 (S.D.N.Y. 2017); *Morgan Stanley*, 592 F.3d at 358.

## V.    CONCLUSORY UNDERWRITER ALLEGATIONS FAIL

Plaintiff's generic allegations regarding the Underwriter Defendants fare no better. Such boilerplate could be alleged in *any* complaint against *any* underwriter in *any* IPO. *See In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 308 F. Supp. 2d 249, 253-54 (S.D.N.Y. 2004) ("Allegations that are so conclusory that they fail to give notice of the basic events and circumstances . . . are insufficient as a matter of law.").

Plaintiff has not alleged the particular failures the Underwriter Defendants purportedly made in their diligence. Instead, Plaintiff conclusorily alleges that the Underwriter Defendants "had access" to information about the Phase 2 trial and "knew of" or "should have known of" the "adverse information about the Phase 2 trial." ¶¶ 156-65. But nowhere in the Complaint does Plaintiff identify any specific facts about the Phase 2(a) trial that any Underwriter Defendant discovered or should have discovered in the diligence process. Plaintiff simply speculates that "[h]ad the Underwriter Defendants" conducted adequate due diligence, they "would have known that the Offering Documents were materially false or misleading." ¶ 164. These allegations are unavailing.

## CONCLUSION

The Court should dismiss Plaintiff's Amended Complaint with prejudice.

Dated: March 11, 2026                              **LATHAM & WATKINS LLP**

                                                  */s/ Colleen C. Smith*
                                                  Colleen C. Smith (*pro hac vice*)
                                                  12670 High Bluff Drive
                                                  San Diego, CA 92130
                                                  Tel: (858) 523-5400
                                                  Fax: (858) 523-5450
                                                  Email: colleen.smith@lw.com

27

Leah Friedman
Emily Rose True *(pro hac vice)*
1271 Avenue of the Americas
New York, NY 10020
Tel:  (212) 906-1200
Fax:  (212) 751-4864
Email:  leah.friedman@lw.com
   emily.true@lw.com

Daniel R. Gherardi *(pro hac vice)*
140 Scott Drive
Menlo Park, CA 94025
Tel: (650) 328-4600
Fax: (650) 463-2600
Email:  daniel.gherardi@lw.com

Brittany M.J. Record *(pro hac vice)*
555 Eleventh Street, NW, Suite 1000
Washington, DC 20004
Tel: (202) 637-2200
Fax: (202) 637-2201
Email: brittany.record@lw.com

Celeste Hamre *(pro hac vice pending)*
200 Clarendon Street
Boston, MA 02116
Tel.: (617) 948-6000
Fax: (617) 948-6001
Email: celeste.hamre@lw.com

*Attorneys for Defendants Neumora
Therapeutics, Inc., Paul L. Berns, Kristina
Burow, Matthew Fust, Henry O. Gosebruch,
Alaa Halawa, Maykin Ho, Michael Milligan,
David Piacquad, and Joshua Pinto*

Dated: March 11, 2026

**SULLIVAN & CROMWELL LLP**[8]

*/s/ Sharon L. Nelles*
Sharon L. Nelles
Jonathan Sloan Carter

---

[8] Neumora Therapeutics, Inc., Paul L. Berns, Kristina Burow, Matthew Fust, Henry O. Gosebruch, Alaa Halawa, Maykin Ho, Michael Milligan, David Piacquad, and Joshua Pinto use electronic signatures with consent in accordance with Rule 8.5(b) of the Court's ECF Rules and Instructions.

125 Broad Street
New York, NY 10004
Tel:  (212) 558-3031
Fax:  (212) 291-9759
Email:  nelless@sullcrom.com
        carterjo@sullcrom.com

*Attorneys for Defendants J.P. Morgan Securities LLC, BofA Securities, Inc., Stifel, Nicolaus & Company, Incorporated, Guggenheim Securities, LLC, RBC Capital Markets, LLC, and William Blair & Company, L.L.C.*

## CERTIFICATION OF WORD COUNT

I certify that the foregoing memorandum of law complies with the formatting and word limit requirements set forth in Rule 2.B of the Court's Individual Rules and Practices for Civil Cases because it contains 8,557 words, excluding the cover page, table of contents, table of authorities, glossary, signature block, and certification of word count.

In preparing this certification, I relied on the word count of the Microsoft Word computer program used to prepare this memorandum of law.

Dated:  March 11, 2026                    _/s/ Colleen C. Smith_____
                                          Colleen C. Smith