**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ANNIE CHANG, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>vs.<br><br>NEUMORA THERAPEUTICS, INC., HENRY O. GOSEBRUCH, JOSHUA PINTO, MICHAEL MILLIGAN, PAUL L. BERNS, KRISTINA BUROW, MATTHEW FUST, ALAA HALAWA, MAYKIN HO, DAVID PIACQUAD, J.P. MORGAN SECURITIES LLC, BOFA SECURITIES, INC., STIFEL, NICOLAUS & COMPANY, INCORPORATED, GUGGENHEIM SECURITIES, LLC, RBC CAPITAL MARKETS, LLC, and WILLIAM BLAIR & COMPANY, L.L.C.,<br><br>Defendants. | No. 1:25-cv-01072-JPC-JW |

**LEAD PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE AMENDED CLASS ACTION COMPLAINT**

**TABLE OF CONTENTS**

I.     PRELIMINARY STATEMENT.................................................................................... 1

II.    STATEMENT OF FACTS .......................................................................................... 3

    A.    Neumora's Prospects Depended On The Approval Of A Single Drug, Nava......... 3

    B.    The Phase 2 Clinical Trials For Nava ..................................................................... 4

    C.    Neumora Announces Nava's Phase 2 Trial Was A Success And Conducts A $250 Million IPO To Fund Phase 3 Trials ............................................................. 5

    D.    The Offering Documents Misrepresented The Phase 2 Trial Results And Nava's Prospects For Approval.................................................................................. 6

    E.    The Truth Is Revealed ............................................................................................ 7

III.    LEGAL STANDARD ................................................................................................ 8

IV.    ARGUMENT ............................................................................................................. 10

    A.    The Complaint Adequately Pleads Standing Under Sections 11 and 15 .............. 10

    B.    The Complaint Adequately Pleads Material Misstatements And Omissions In The Offering Documents .....................................................................................11

        1.    The Offering Documents Misrepresented The Phase 2 Trial As A Success By Omitting That It Included Virtually No Successfully Treated Males ....................................................................................... 12

        2.    The Offering Documents Misrepresented The Phase 2 Trial Results By Omitting Post-Hoc Manipulations ...................................................... 14

        3.    The Offering Documents Misrepresented That The Trial Had To Be Amended To Include Moderate-To-Severe MDD Patients...................... 16

        4.    Defendants' Arguments Against Actionability Fail ................................. 18

            a.    The Statements Are Not Inactionable "Opinions"........................ 18

            b.    The Statements And Omissions Were Material ............................ 20

            c.    The "Forward-Looking" Safe Harbor And Bespeaks Caution Doctrine Do Not Apply ................................................................. 23

    C.    Defendants' Negative Loss Causation Defense Fails ........................................... 24

    D.    The Complaint Pleads Control Person Claims....................................................... 27

    E.    The Complaint Pleads Claims Against The Underwriter Defendants.................... 27

V.    CONCLUSION.......................................................................................................... 28

i

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Amorosa v. AOL Time Warner*,
409 F. App'x 412 (2d Cir. 2011) ................................................................................. 25

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ..................................................................................................... 8

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ..................................................................................................... 8

*Brown v. Ambow Educ. Holding Ltd.*,
2014 WL 523166 (C.D. Cal. Feb. 6, 2014) ................................................................. 25

*Chechele v. Laubies*,
527 F. Supp. 3d 526 (S.D.N.Y. 2021) ......................................................................... 9

*City of Omaha Police & Fire Ret. Sys. v. Evoqua Water Techs. Corp.*,
450 F. Supp. 3d 379 (S.D.N.Y. 2020) ...................................................... 8, 10, 11, 28

*Cohen v. Kitov Pharms. Holdings, Ltd.*,
2018 WL 1406619 (S.D.N.Y. Mar. 20, 2018) ................................................ 15, 18, 19

*Courter v. CytoDyn, Inc.*,
788 F. Supp. 3d 1150 (D. Wash. 2025) ....................................................................... 15

*Dura Pharms., Inc. v. Broudo*,
544 U.S. 336 (2005) ..................................................................................................... 26

*E. Ohman J:or Fonder AB v. NVIDIA Corp.*,
81 F.4th 918 (9th Cir. 2023) ....................................................................................... 14

*Freudenberg v. E\*Trade Fin. Corp.*,
712 F. Supp. 2d 171 (S.D.N.Y. 2010) ......................................................................... 21

*Hao Wu v. Tokai Pharms., Inc.*,
2019 WL 938924 (Mass. Super. Jan. 9, 2019) ........................................................... 20

*Herman & MacLean v. Huddleston*,
459 U.S. 375 (1983) ..................................................................................................... 9

*Hoang v. ContextLogic, Inc.*,
2024 WL 4471316 (N.D. Cal. Aug. 22, 2024) ........................................................... 25

*Homyk v. ChemoCentryx, Inc.*,
  2023 WL 3579440 (N.D. Cal. Feb. 23, 2023).................................................................. 13, 16, 23

*In re ASML Holding N.V. Sec. Litig.*,
  2026 WL 851334 (S.D.N.Y. Mar. 27, 2026) ........................................................................ 14

*In re Bear Stearns Companies, Inc. Sec., Derivative, & ERISA Litig.*,
  763 F. Supp. 2d 423 (S.D.N.Y. 2011).............................................................................. 23, 24

*In re Britannia Bulk Holdings Inc. Sec. Litig.*,
  665 F. Supp. 2d 404 (S.D.N.Y. 2009) .................................................................................. 25

*In re Delcath Sys., Inc. Sec. Litig.*,
  36 F. Supp. 3d 320 (S.D.N.Y. 2014) .................................................................... 13, 19, 26

*In re FibroGen, Inc., Sec. Litig.*,
  2022 WL 2793032 (N.D. Cal. July 15, 2022).................................................................. 16, 23

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*,
  574 F.3d 29 (2d Cir. 2009) ................................................................................................... 24

*In re Giant Interactive Grp., Inc. Sec. Litig.*,
  643 F. Supp. 2d 562 (S.D.N.Y. 2009) .................................................................................. 25

*In re Grab Holdings Ltd. Sec. Litig.*,
  2024 WL 1076277 (S.D.N.Y. Mar. 12, 2024) .......................................................................11

*In re Hub Cyber Sec. Ltd.*,
  2025 WL 872078 (S.D.N.Y. Mar. 20, 2025) .................................................................. 10, 24

*In re Merrill Lynch & Co., Inc. Rsch. Reps. Sec. Litig.*,
  272 F. Supp. 2d 243 (S.D.N.Y. 2003) .................................................................................. 25

*In re Morgan Stanley Info. Fund Sec. Litig.*,
  592 F.3d 347 (2d Cir. 2010) ................................................................................................. 27

*In re Mylan N.V. Sec. Litig.*,
  2018 WL 1595985 (S.D.N.Y. Mar. 28, 2018) ...................................................................... 12

*In re Pareteum Sec. Litig.*,
  2021 WL 3540779 (S.D.N.Y. Aug. 11, 2021) ...................................................................... 10

*In re PTC Theraps., Inc. Sec. Litig.*,
  2017 WL 3705801 (D.N.J. Aug. 28, 2017)............................................................................ 15

*In re Regeneron Pharms., Inc.*,
  2005 WL 225288 (S.D.N.Y. Feb. 1, 2005) ........................................................................... 21

iii

*In re Sec. Cap. Assurance Ltd. Sec. Litig.*,
  729 F. Supp. 2d 569 (S.D.N.Y. 2010) .................................................................. 25

*In re Shoretel Inc. Sec. Litig.*,
  2009 WL 248326 (N.D. Cal. Feb. 2, 2009).......................................................... 25

*In re State St. Bank & Tr. Co. Fixed Income Funds Inv. Litig.*,
  774 F. Supp. 2d 584 (S.D.N.Y. 2011).................................................................. 25

*In re Tronox, Inc. Sec. Litig.*,
  769 F. Supp. 2d 202 (S.D.N.Y. 2011).................................................................. 27

*In re Vale S.A. Sec. Litig.*,
  2017 WL 1102666 (S.D.N.Y. Mar. 23, 2017) ..................................................... 27

*In re Vivendi, S.A. Sec. Litig.*,
  838 F.3d 223 (2d Cir. 2016) ..........................................................................11, 12

*In re Wells Fargo & Co. Sec. Litig.*,
  2021 WL 4482102 (S.D.N.Y. Sept. 30, 2021) ................................................ 21, 22

*In re WorldCom, Inc. Securities Litigation*,
  388 F. Supp. 2d 319 (S.D.N.Y. 2005) .................................................................. 25

*Kendall v. Odonate Therapeutics, Inc.*,
  2021 WL 3406271 (S.D. Cal. Aug. 4, 2021)........................................................ 15

*Kleinman v. Elan Corp.*,
  706 F.3d 145 (2d Cir. 2013) ................................................................................ 19

*Li v. Aeterna Zentaris Inc.*,
  2016 WL 827256 (D.N.J. Mar. 2, 2016) .............................................................. 16

*Lian v. Tuya Inc.*,
  2024 WL 966263 (S.D.N.Y. Mar. 5, 2024) ............................................................ 9

*Litwin v. Blackstone Grp., L.P.,*
  634 F.3d 706 (2d Cir. 2011) ............................................................................. 9, 20

*Lozada v. TaskUs, Inc.*,
  710 F. Supp. 3d 283 (S.D.N.Y. 2024) .................................................................. 27

*Matrixx Initiatives, Inc. v. Siracusano*,
  563 U.S. 27 (2011)....................................................................... 13, 20, 21, 22

*May v. Barclays PLC*,
  2025 WL 887300 (S.D.N.Y. Mar. 21, 2025) ....................................................10, 11

iv

*Micholle v. Ophthotech Corp.*,
   2019 WL 4464802 (S.D.N.Y. Sept. 17, 2019) ................................................................. 20, 26

*Nayani v. Lifestance Health Grp., Inc.*,
   2023 WL 3260260 (S.D.N.Y. May 4, 2023) ................................................................. 21

*New Jersey Carpenters Health Fund v. Royal Bank of Scotland Grp., PLC*,
   709 F.3d 109 (2d Cir. 2013) ................................................................. 9

*New Orleans Emps. Ret. Sys. v. Celestica, Inc.*,
   455 F. App'x 10 (2d Cir. 2011) ................................................................. 21

*Novak v. Kasaks*,
   216 F.3d 300 (2d Cir. 2000) ................................................................. 18

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*,
   575 U.S. 175 (2015) ................................................................. 9, 19, 20

*Orient Plus Int'l Ltd. v. Baosheng Media Grp. Holdings Ltd.*,
   799 F. Supp. 3d 310 (S.D.N.Y. 2025) ................................................................. 24

*OSI Pharms., Inc. Sec. Litig.*,
   2007 WL 9672541 (S.D.N.Y. Mar. 31, 2007) ................................................................. 13

*Pappas v. Qutoutiao Inc.*,
   2024 WL 4588491 (2d Cir. Oct. 28, 2024) ................................................................. 9

*Pearlstein v. BlackBerry Ltd.*,
   2021 WL 253453 (S.D.N.Y. Jan. 26, 2021) ................................................................. 27

*Perry v. Duoyan Printing, Inc.*,
   2013 WL 4505199 (S.D.N.Y. Aug. 22, 2013) ................................................................. 10

*Schueneman v. Arena Pharm., Inc.*,
   840 F.3d 698 (9th Cir. 2016) ................................................................. 13

*Slack Techs., LLC v. Pirani*,
   598 U.S. 759 (2023) ................................................................. 10

*Special Situations Fund III QP, L.P. v. Marrone Bio Innovations, Inc.*,
   243 F. Supp. 3d 1109 (E.D. Cal. 2017) ................................................................. 25

*United States v. Space Hunters, Inc.*,
   429 F.3d 416 (2d Cir. 2005) ................................................................. 24

*Van Dongen v. CNinsure Inc.*,
   951 F. Supp. 2d 457 (S.D.N.Y. 2013) ................................................................. 17

v

## I.    PRELIMINARY STATEMENT

This case asserts straightforward strict liability claims based on misstatements and material omissions in the Offering Documents for Neumora's IPO.[1]

Neumora is a biotech company with no marketable products. As of the IPO, the Company's most advanced drug candidate was navacaprant or "Nava," which it sought to develop as a blockbuster antidepressant for both men and women. After completing a Phase 2 clinical trial, Neumora sought to raise cash from investors to fund Phase 3 trials for Nava, the final step in obtaining FDA approval and reaching a nearly $20 billion dollar market. Defendants hailed the Phase 2 trial as a success. In particular, the IPO Offering Documents emphasized that in the "pivotal" subgroup of patients with moderate-to-severe depression—*i.e.*, the population targeted for FDA approval—the trial met all efficacy endpoints. The IPO was successful, raising $250 million in gross proceeds and enabling Neumora to proceed with the Phase 3 trials. Unbeknownst to investors, the Phase 2 trials did not show any meaningful improvement in male patients, including in the "pivotal" subgroup which lacked virtually any successfully treated males.

In January 2025, the Company announced the Phase 3 trials were a flop, with Nava failing to show any efficacy in men. The Company's stock price plunged 80% and analysts questioned how Neumora could not have disclosed the dramatically different response between males and females in the prior Phase 2 trial. In response, Defendant Gosebruch, Neumora's CEO, acknowledged the Phase 2 trial lacked sufficient males, and said it was a "problem." Analysts reported that the Phase 3 results were a "worst-case scenario," underscoring that "male participants

---

[1] All terms not otherwise defined herein have the same meanings as in the Amended Complaint. "MTD" refers to the Defendants' motion to dismiss brief (ECF No. 68). "¶_" refers to paragraphs of Plaintiffs' operative amended complaint ("Complaint") (ECF No. 61). Unless otherwise noted, all emphasis is added, and internal citations and quotations are omitted.

1

actually did worse on navacaprant" and questioned "whether there was a future path forward for the drug."

In June 2025—nearly two years after the IPO—Neumora authorized the release of an article providing detailed information about the Phase 2 trial design and results, including its disparate gender demographics.  According to data in the article, Defendants' proclamations that the Phase 2 trial was successful and showed "statistically significant" improvements in the "pivotal" patient population targeted for FDA approval was based on only *four* successfully treated men—a miniscule amount devoid of any statistical or clinical significance. The publication also revealed a significant post-hoc exclusion—namely, the removal of an entire site from the efficacy analysis after "trial database lock," where 80% of the patients were placebo-responders. Multiple former employees of the Company ("FEs") confirm this manipulation skewed the trial results and that without it, the Phase 2 trial would have failed to show any efficacy.  In short, despite Defendants' statements portraying the Phase 2 trial as a success, Nava never demonstrated any statistically or clinically meaningful improvement in men compared to a sugar pill.

In response to these straightforward allegations laying bare the materially misleading IPO, Defendants proffer baseless arguments.  Defendants argue that Plaintiff lacks statutory standing, but the Complaint explicitly satisfies the pleading standard.  On the merits, Defendants' argument that the Offering Documents misrepresented nothing and misled no one simply ignores the Complaint's highly particularized facts, including that Nava's Phase 2 trial was so vastly underpowered for men that its results had no statistical or clinical significance, and that its findings were skewed by post-hoc manipulations. These facts easily meet the bar for pleading material misrepresentations.

Nonetheless, Defendants argue that the Complaint should be dismissed because the challenged statements are non-actionable "statements of opinion" or "forward-looking" statements accompanied by meaningful cautionary language. Nonsense. Statements concerning the results of a clinical trial are the opposite of opinion and are not forward looking. Further, one cannot warn of "risks" that have already occurred and Defendants' "robust cautionary language" nowhere disclosed that the entire justification for proceeding with Nava's clinical development program was a trial that lacked virtually any successfully treated men and whose misleading results were only achieved due to post-hoc manipulation. Finally, Defendants' last-ditch effort to establish negative loss causation flies in the face of settled law holding that this affirmative defense is generally reserved for summary judgment or trial. Regardless, the defense is baseless given the immediate 80% decline in Neumora's stock price when Defendants finally came clean and disclosed Nava was entirely ineffective in men.

The Complaint should be sustained.

## II.    STATEMENT OF FACTS

### A.    Neumora's Prospects Depended On The Approval Of A Single Drug, Nava

Neumora is a clinical-stage biopharmaceutical company founded in 2019. ¶54. Neumora has never had any approved drugs and has relied on outside funding to sustain its operations. *Id*. Neumora's most advanced drug candidate as of the IPO was Nava, a pill being developed to treat major depressive disorder or "MDD." ¶55.

Neumora acquired Nava in September 2020 through its acquisition of BlackThorn, another biotech startup. ¶57. After the acquisition, Neumora promoted Nava as a novel antidepressant for men and women with "the potential to provide significant advantages relative to the standard of care," SSRIs such as Zoloft and Prozac. ¶61. The market opportunity was massive. Driven by

COVID and other societal trends, the global antidepressant market was estimated at nearly $20 billion as of the IPO, and rapidly growing. ¶56.

Nava is a kappa opioid receptor ("KOR") antagonist, which, according to Defendants, had "the potential to be the first new mechanism of action [for depression] approved in decades." ¶¶61-62. KOR's mechanism of action had been studied for years, and extensive research before Nava's Phase 2 trial established differences in KOR function between the sexes. ¶72. Abundant literature also confirmed a high placebo response rate in clinical trials for antidepressants, typically higher in more mildly depressed patients. *Id.*

### B.    The Phase 2 Clinical Trials For Nava

After acquiring BlackThorn, Neumora took over its Phase 2a clinical trial for Nava. ¶76. The trial was a double-blinded, placebo-controlled study in which participants received either Nava or placebo once daily for eight weeks. *Id.* The trial's primary efficacy endpoint was a change in Hamilton Depression Rating Scale ("HAMD-17") score at Week 8. ¶76. The trial was completed in 2022 and its database was "locked" and unblinded in February 2023. ¶¶76, 122.

As multiple FEs reported in connection with Plaintiff's investigation, the results were underwhelming. FEs consistently described the initial readout as "nebulous," "unremarkable," and plainly inadequate to justify proceeding to Phase 3. ¶¶122, 126-28. Neumora's former Director of Clinical Operations stated that a third-party consultant engaged to conduct a statistical analysis of the unblinded trial data returned a "resoundingly negative finding." ¶127. The results were so poor that Neumora's clinical development team began drafting a protocol for a Phase 2b trial before any Phase 3 trial because the data they had "wasn't robust enough." ¶¶119-22.

However, rather than pursue a Phase 2b study, Neumora retained a second outside consultant, Tigermed, to reanalyze the data. ¶127. Multiple FEs described how, during this reanalysis, the data was reworked until a statistically significant signal could be manufactured. As

4

a former Senior Scientist stated, when the data collected "didn't give them a signal they wanted," Neumora "chopped it up 50 million ways until it looked good." ¶126. Other FEs described how Neumora was "slicing and dicing" the unblinded Phase 2 trial data—using "every remotely viable or murky way to chop up the data to make it look like there was a better signal." ¶¶14, 126-30.

Neumora's former Director of Clinical Operations reported that after the trial database was locked and Neumora had observed the results, Neumora launched a "for cause" investigation and ultimately excluded an entire trial site from the efficacy pool. ¶¶122-24. This site, based in Oklahoma, included five participants, four of whom reported significant improvements on placebo. *Id*. FEs confirmed Neumora was only able to show a "signal" for Nava after Tigermed "clean[ed]" the data and excluded the Oklahoma site. ¶¶124-28. As Neumora's former Director of Clinical Operations explained, removing the data from the Oklahoma site made Nava's results "more robust" and "enough to take it to Phase 3 for moderate-to-severe patients." ¶124. Neumora's Head of Pharmaceutical Development and Manufacturing corroborated that the Phase 2 trial results initially were not significant, but after Neumora re-analyzed the data and made exclusions, "all of a sudden" the data "look[ed] more convincing." *Id*.

C.   **Neumora Announces Nava's Phase 2 Trial Was A Success And Conducts A $250 Million IPO To Fund Phase 3 Trials**

In July 2023, Neumora announced that the Phase 2 trial was successful and that it was commencing Phase 3 trials for Nava. ¶81. Six weeks later, Neumora filed its IPO Registration Statement with the SEC. ¶82.

The Registration Statement presented the Phase 2 trial as a success and promoted Nava as a potential blockbuster antidepressant. ¶¶61, 84. In particular, the Offering Documents directed investors to the purportedly robust findings in a subgroup of patients with moderate-to-severe MDD, stating that after acquiring BlackThorn, Neumora "amended the trial inclusion criteria" to

include moderate-to-severe patients and "added a prespecified analysis" for this subgroup because it was the population Neumora "intended to evaluate in its pivotal Phase 3 program." ¶¶4, 84, 88. The Offering Documents represented that, in this "pivotal" subgroup, Nava demonstrated "statistically significant … treatment differences compared to placebo" for the primary efficacy endpoints and "a range of other key secondary and exploratory measures." ¶¶84-85. The Offering Documents further represented that Nava demonstrated "positive results across the total population" (*i.e.*, including patients with mild-to-moderate MDD), and that "[b]ased on the results from the Phase 2 clinical trial," Nava had "the potential to provide significant advantages relative to the standard of care"—supporting initiation of a "pivotal Phase 3 program." ¶¶86-87.

On September 15, 2023, Neumora conducted its IPO, selling 14.7 million shares of common stock at $17.00 per share and raising over $250 million in gross proceeds. ¶83.

### D.    The Offering Documents Misrepresented The Phase 2 Trial Results And Nava's Prospects For Approval

While the Offering Documents presented the Phase 2 trial as an unqualified success in the "pivotal" population targeted for FDA approval in the final Phase 3 trials, in truth, the Phase 2 trial was extremely underpowered for males, failed to show a statistically significant improvement in men, and its finding of efficacy relied on post-hoc manipulations. As a result, the reported favorable results were unreliable, lacked any statistical or clinical significance, and meaningless.

***First***, unbeknownst to investors, the Phase 2 trial was based on virtually no successfully treated men—particularly in the "pivotal" subgroup targeted for approval. ¶¶112-20. In its clinical trials and to gain FDA approval, Neumora was required to demonstrate Nava was a safe and effective treatment for both males and females. ¶146. However, according to data Neumora released nearly two years after the IPO, no more than ***four males*** in the subgroup, and no more

6

than **_six males_** in the overall patient population, demonstrated a beneficial response to Nava under the primary efficacy endpoint after accounting for placebo effect.  ¶¶102-07.

**_Second_**, the "statistically significant" results in the pivotal subgroup, and the "positive results" and "improvements" in the overall population, were achieved only as a result of post-hoc changes to the "locked" trial data.  ¶¶121-30, 150-51.  As the FEs explained, with the Oklahoma site included, the trial would have failed to demonstrate any statistically significant signal, but excluding all its patients "moved the needle" enough to proceed to Phase 3 for the subgroup.  ¶¶124-25.

**_Third_**, contrary to the Offering Documents, multiple senior FEs who worked on the Phase 2 trial confirmed that it was never limited to any particular MDD severity level, but rather enrolled patients regardless of severity—it was "meant for everyone." ¶¶131-34. These former employees confirm Neumora shifted focus to the moderate-to-severe subgroup only after unblinding the data and observing "no[] statistically significant signal" in the full population because Nava "entirely did not work" in mildly depressed patients.  *Id.*

### E.    The Truth Is Revealed

On January 2, 2025, Neumora announced the results of Nava's flagship Phase 3 study. ¶93. That study—which unlike the Phase 2 trial was adequately powered for both sexes with a roughly balanced male/female split (45%/55%)—was a disaster.  ¶¶93–98. Not only did Nava fail to meet the trial's primary or key secondary endpoints, but males treated with Nava performed **_worse_** than those on placebo. ¶94.  In the release, Neumora executives acknowledged that there remained "a lot to investigate," "in particular the drug and placebo responses … in female participants compared to male participants."  ¶95.  Neumora's stock price immediately plunged 80%. ¶97. Analysts described the results as a "worst-case scenario," noting that "male participants actually

7

did worse on navacaprant" which "call[ed] into significant question the KOR antagonism mechanism of action" and if there was "a future path forward for the drug." ¶¶96-97.

Two weeks later, at an investor conference, analysts pressed CEO Gosebruch whether Neumora had identified different gender responses in the Phase 2 data. ¶¶98-99. Gosebruch confirmed Neumora had examined the male patient data in Phase 2 but that the numbers were so small they were meaningless, and conceded the inadequate male sample was a "problem." ¶99.

In June 2025, nearly two years after the IPO, Neumora authorized the release of the Phase 2 trial gender demographics. ¶101. The data, published in the *Journal of Clinical Psychopharmacology* ("Mathew Article"), confirmed the Phase 2 trial was wholly underpowered for men. Based on the Company's own Phase 2 trial data, the "pivotal" subgroup: (i) included only 16 Nava-treated males, (ii) only 6 experienced improvements that met the subgroup's primary endpoint, and (iii) the results of 2 were attributable to placebo effect. ¶¶101-07. Additionally, the Mathew Article confirmed the exclusion of the Oklahoma site "after study database lock." ¶108.

## III.    LEGAL STANDARD

To survive a motion to dismiss, a plaintiff need only allege sufficient facts to "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). In assessing whether the plaintiff has stated a plausible claim, courts must "accept[ ] all factual allegations in the complaint as true[ ] and draw[ ] all reasonable inferences in the plaintiff's favor." *City of Omaha Police & Fire Ret. Sys. v. Evoqua Water Techs. Corp.*, 450 F. Supp. 3d 379, 395 (S.D.N.Y. 2020).

Section 11 is "designed to assure compliance with the disclosure provisions of the [Securities] Act by imposing a stringent standard of liability on the parties who play a direct role

8

in a registered offering." *Herman & MacLean v. Huddleston*, 459 U.S. 375, 381-82 (1983). Issuers of securities and signatories of a registration statement are strictly liable for any misstatement or omission, and all others are held to a negligence standard. *Lian v. Tuya Inc.*, 2024 WL 966263, at *5 (S.D.N.Y. Mar. 5, 2024). To meet the "relatively minimal burden" for stating a Section 11 claim, a plaintiff need only "plausibly allege that [the registrant] omitted material information that it was required to disclose or made material misstatements in its offering documents." *Litwin v. Blackstone Grp., L.P.,* 634 F.3d 706, 716-18 (2d Cir. 2011).

Ordinary Rule 8 notice pleading standards apply. *New Jersey Carpenters Health Fund v. Royal Bank of Scotland Grp., PLC*, 709 F.3d 109, 120 (2d Cir. 2013). "Fraud is not an element" of a Section 11 claim, *Litwin*, 634 F.3d at 715, and thus the Complaint need only plead "a short and plain statement of the claim." Fed. R. Civ. P. 8(a)(2). Contrary to Defendants' contention (MTD 9), the Complaint does not sound in fraud. The Complaint explicitly disclaims such allegations (¶¶173, 183, 191) and those disclaimers should be credited. *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 186 (2015) (applying Rule 8 where complaint specifically "exclude[d] and disclaim[ed] any allegation sounding in fraud or deception"); *see Pappas v. Qutoutiao Inc.*, 2024 WL 4588491, at *2-3 (2d Cir. Oct. 28, 2024) (Rule 9(b) inapplicable because "although the underlying conduct was alleged to have been intentional, Plaintiff does not allege that the failure to disclose that conduct was either intentional or reckless").[2]

---

[2] Even if Rule 9(b) were to apply, Plaintiff's Securities Act claims satisfy Rule 9(b), providing the "who, what, when, where, and how" for each alleged misstatement, as set forth below. *Chechele v. Laubies*, 527 F. Supp. 3d 526, 536 (S.D.N.Y. 2021).

IV.     **ARGUMENT**

  A. **The Complaint Adequately Pleads Standing Under Sections 11 and 15**

  "[T]he pleading requirement for Section 11 standing is satisfied by general allegations that plaintiff purchased pursuant to or traceable to [a] false registration statement." *Evoqua*, 450 F. Supp. 3d at 403.  "[T]he pleading requirement is not elaborate." *Perry v. Duoyan Printing, Inc.*, 2013 WL 4505199, at *10 (S.D.N.Y. Aug. 22, 2013).  "At the motion-to-dismiss stage, [p]laintiffs need only assert that they purchased shares issued pursuant to, or traceable to the public offerings." *In re Hub Cyber Sec. Ltd.*, 2025 WL 872078, at *8 (S.D.N.Y. Mar. 20, 2025). That is precisely what Plaintiff alleges here.  ¶25. Nothing more is required.

  The sufficiency of Plaintiff's standing allegations is supported by Defendants' concession that Plaintiff's purchases during the 180-day "lock-up period" are traceable to the IPO, and that he incurred losses on purchases first day after the lock-up expired.  MTD 8, 10-11. Defendants' argument that Plaintiff suffered harm only on his post-lockup purchases raises a fact issue for discovery, particularly given Plaintiff's allegations that such purchases are traceable to the Registration Statement. *In re Pareteum Sec. Litig.*, 2021 WL 3540779, at *20 (S.D.N.Y. Aug. 11, 2021) (traceability of purchases in aftermarket containing shares issued in multiple offerings was a fact issue for discovery); *Evoqua*, 450 F. Supp. 3d at 403; (same); *Perry*, 2013 WL 4505199, at *10-11 (traceability for purchases after lock-up expired was an issue for discovery).

  Defendants' cases (MTD 10-11) are outdated, off-point, and inconsistent with the majority view in this District.[3]  While "Section 11 plaintiffs are not required to explain how their shares can

---

[3] In *Slack Techs., LLC v. Pirani*, 598 U.S. 759 (2023), the Supreme Court addressed the opposite question—whether Section 11 covers purchases in direct listings undisputedly ***not*** traceable to the subject registration statement—and reaffirmed that Section 11 standing ***is*** pled by allegations that plaintiff "purchased shares traceable" to the defective registration statement.  *Id.* at 768, 770.  In *May v. Barclays PLC*, 2025 WL 887300 (S.D.N.Y. Mar. 21, 2025), plaintiffs did not allege that

be traced at this stage," *Evoqua*, 450 F. Supp. 3d at 403, prior case law discussing the difficulties of tracing securities purchased in the aftermarket rest on outdated assumptions, as changes in technology and regulations make it increasingly feasible to trace the purchase of securities to a specific registration statement. Pursuant to SEC Rule 613, there is now a massive government-mandated database tracking the lifecycle of every transaction in listed securities. 17 CFR § 242.613. The Consolidated Audit Trail is designed to capture the trading activity of nearly every person or institution that buys or sells securities in the U.S. by requiring national securities exchanges and their members to provide detailed information to a central repository regarding each quote and order for a listed security, and each reportable event with respect to each quote and order, such as origination, modification, cancellation, routing, and execution. *Id.* Such records are available in discovery to trace Plaintiff's losing purchases to the IPO, including purchases made the first day after the lock-up expired.

B.    **The Complaint Adequately Pleads Material Misstatements And Omissions In The Offering Documents**

Under the federal securities laws, "once a company speaks on an issue or topic, there is a duty to tell the whole truth." *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 258 (2d Cir. 2016). This obligation to "tell the whole truth" applies "[e]ven when there is no existing independent duty to disclose [such] information." *Id.* Even literally true statements can, through their "context and manner of presentation," mislead investors. *In re Grab Holdings Ltd. Sec. Litig.*, 2024 WL 1076277, at *12 (S.D.N.Y. Mar. 12, 2024).

---

they "purchased" the shares at issue, but rather acquired them from a reverse split of their complex synthetic notes—and, again, the court reaffirmed that Section 11 standing *is* pled by allegations that plaintiffs "purchased shares issued pursuant to, or traceable to the public offerings." *Id.* at *17-18 (citing *Evoqua*, 450 F. Supp. 3d at 403).

1.    **The Offering Documents Misrepresented The Phase 2 Trial As A Success By Omitting That It Included Virtually No Successfully Treated Males**

The Offering Documents provided a materially misleading portrayal of the Phase 2 trial results and Nava's prospects for FDA approval by failing to disclose that the purportedly successful Phase 2 trial results were based on ***virtually no successfully treated men***—particularly in the "pivotal" patient population that Neumora targeted for FDA-approval.  ¶¶139-48.

The Complaint challenges multiple statements that fall within this category:

- **Successful results in the subgroup of patients with moderate-to-severe MDD**: The Offering Documents misrepresented that in the "pivotal" moderate-to-severe subgroup targeted for approval, the Phase 2 trial demonstrated "statistically significant treatment differences compared to placebo" as measured by the primary efficacy endpoints and "a range of other key secondary and exploratory measures." ¶¶84-85.

- **Successful results in the overall patient population**:  The Offering Documents also misrepresented the Phase 2 trial as "demonstrat[ing] positive results across the total population"—*i.e.*, including patients with mild-to-moderate MDD—with "statistically significant improvement in depression at Week 4" as well as "numerical improvements" at Week 8. ¶¶86-87.

- **Statements about the meaning and consequence of the successful trial**: Next, the Offering Documents misrepresented that "[b]ased on the results from the Phase 2 clinical trial," Nava had "the potential to provide significant advantages relative to the standard of care," and that Neumora was "initiating a pivotal Phase 3 program for navacaprant monotherapy in patients with moderate-to-severe MDD."  ¶143.

Here, upon choosing to tout the purportedly successful Phase 2 trial results, Defendants were required to "speak truthfully about material issues," including that the trial was so vastly underpowered for men that it included virtually no successfully treated males.  *See Vivendi*, 838 F.3d at 258.  Instead, the Offering Documents disclosed nothing about gender, including that only female patients met the study endpoint.  *In re Mylan N.V. Sec. Litig.*, 2018 WL 1595985, at *4 (S.D.N.Y. Mar. 28, 2018) ("half-truths" are actionable).   The omission of this critical adverse fact rendered Defendants' positive statements about the clinical trial results materially misleading. *See*

12

*Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 47, 49 (2011) (statements that drug's "safety and efficacy" were "well established" actionably misleading for omitting reported safety risk); *In re Delcath Sys., Inc. Sec. Litig.,* 36 F. Supp. 3d 320, 331-32 (S.D.N.Y. 2014) (disclosing serious adverse events in drug treatment group, while omitting lower incidence in control group, was materially misleading); *Homyk v. ChemoCentryx, Inc.*, 2023 WL 3579440, at *9 (N.D. Cal. Feb. 23, 2023) (statements that drug "met" the primary endpoint were misleading where omissions of negative information made the results appear "far stronger and more meaningful").

In response to these well-pled allegations, Defendants ignore and distort the facts. First, Defendants' contention that Plaintiff "does not actually allege that any of these endpoints [for the subgroup] were not met" ignores the Complaint's explicit allegation that the study did ***not*** demonstrate "statistically significant" improvements in male patients in the subgroup. ¶146. Moreover, even if Defendants' assertions regarding the trial results were technically true for female patients, the statements would still be misleading for omitting that a statistically significant number of male patients did not meet the endpoints. *See OSI Pharms., Inc. Sec. Litig.*, 2007 WL 9672541, at *8 (S.D.N.Y. Mar. 31, 2007) (omission that drug did not have a "statistically significant impact" on particular class of patients misleading because the company did not "adequately convey to the public the limitations of [the drug] that were discovered during the Clinical Study"); *Schueneman v. Arena Pharm., Inc.*, 840 F.3d 698, 707-08 (9th Cir. 2016) (blanket positive statement about "animal studies" misleading where omitted "Rat Study" results were negative).

Next, Defendants distort Plaintiff's falsity allegations as simply a failure to disclose that the "Phase 2(a) trial enrolled more women than men," that "Defendants should have designed [the trial] differently," or that "the trial *should have* included more men." MTD 16-17 (emphasis in original). Again, Defendants ignore both the Complaint's repeated and explicit allegations that the

13

trial was so "vastly," "extremely," and "wholly" underpowered for men that it was bereft of statistical or clinical significance—as well as CEO Gosebruch's concession, after the Phase 3 trial failed, that the extremely "small data sets" during the Phase 2 trial were a "problem" when trying to determine Nava's impact on men.[4]  ¶99.

Finally, Defendants baselessly argue that Plaintiff's "speculative guessing" is "unsupported by any particularized fact."  MTD 17.  Nothing could be further from the truth.  Plaintiff's calculations are based on Neumora's *own* Phase 2 trial data. ¶¶101-03.  Nor are Plaintiff's calculations based on an "ill-explained methodology" and "non-scientific say so."  MTD 17.  The Complaint provides a step-by-step explanation of the methodology utilizing the exact gender demographics and response rates that Defendants authorized for publication (¶¶104-06) and confirms that the methodology and accuracy of these calculations were independently verified by an expert in the field of clinical trials and statistical analysis.  ¶105, n.7; *see E. Ohman J:or Fonder AB v. NVIDIA Corp.*, 81 F.4th 918, 941–43 (9th Cir. 2023) (plaintiffs may use expert analysis, including information disclosed by the "Defendants themselves," to allege falsity under the federal securities laws), 604 U.S. 20 (2024) (dismissing *certiorari* as improvidently granted).

### 2. The Offering Documents Misrepresented The Phase 2 Trial Results By Omitting Post-Hoc Manipulations

The Offering Documents further misled investors by failing to disclose that the "statistically significant" results in the pivotal moderate-to-severe subgroup, and the "positive results" and "improvements" in the overall patient population, were achieved only as a result of

---

[4] Specifically, after accounting for placebo effect, no more than *four males* in the subgroup, and no more than *six males* in the overall patient population, demonstrated a beneficial response to Nava under the study endpoints.  ¶¶102-07.  Accordingly, it does not matter, that "the majority of MDD trials enrolled more women than men" or that Nava's "intended patient population contained more women than men." MTD 16-17; *see also* RJN 5-6; *In re ASML Holding N.V. Sec. Litig.,* 2026 WL 851334, at *7 (S.D.N.Y. Mar. 27, 2026) (use of extrinsic documents to resolve competing theories improper on a motion to dismiss).

post-hoc manipulations to the "locked" trial data. ¶¶121-28, 150-51; *see Cohen v. Kitov Pharms. Holdings, Ltd.*, 2018 WL 1406619, at *5-6 (S.D.N.Y. Mar. 20, 2018) (failure to disclose post-hoc alteration of trial data resulting in "statistically significant evidence of efficacy" was an "actionable omission").

The removal of the Oklahoma site after "study database lock," and the resultant "statistically significant" outcomes in the subgroup, are undisputed. ¶108; MTD 4-5. Yet, neither the fact of the post-hoc exclusion, nor its consequential impact, were disclosed in the IPO. These omissions rendered Defendants' "top line" statements about the trial results materially false and misleading. *See Courter v. CytoDyn, Inc.*, 788 F. Supp. 3d 1150, 1166-67 (D. Wash. 2025) (falsity where company stated trial demonstrated drug's efficacy but omitted "the fact it was using post-hoc analysis"); *In re PTC Theraps., Inc. Sec. Litig.*, 2017 WL 3705801, at *13-15 (D.N.J. Aug. 28, 2017) (falsity where company stated trial demonstrated efficacy where there was no statistically significant effect in full population and it used post-hoc analysis to find statistical significance in subgroup).

Tellingly, Defendants offer no meaningful response to FE accounts detailing how post-hoc manipulations changed the trial results. ¶¶122-30; *see Kendall v. Odonate Therapeutics, Inc.*, 2021 WL 3406271, at *2, 5-6 (S.D. Cal. Aug. 4, 2021) (statements characterizing "top-line results" from trial as "'positive'" were materially misleading for omitting company had made a protocol change after side effects made patients drop out of the trial, as reported by numerous FEs). Defendants' suggestion that the exclusion was proper (MTD 18) simply raises a fact issue for discovery. *Cohen*, 2018 WL 1406619, at *6 (rejecting defendants' argument that trial results "were not falsified" as "premature on a motion to dismiss").

15

Faced with these damning facts, Defendants argue that investors were "well informed" that the reported efficacy results did not include every participant and "specifically told" that the trial needed to be "well controlled" and there were "risks" if a clinical site deviated from protocol or dropped out of the trial. MTD 17-18. These generic disclosures did not inform investors that the Oklahoma site had *already* been excluded, and that the trial's purported success *hinged* on its post-hoc removal. *Homyk*, 2023 WL 3579440, at *9 (materially misleading to state that drug "met" the primary endpoint while omitting deviations from trial protocol that resulted in the "statistically significant[]" results); *In re FibroGen, Inc., Sec. Litig.*, 2022 WL 2793032, at *4, 10-12 (N.D. Cal. July 15, 2022) (falsity where statements touting drug's efficacy and "statistically significant advantage" in critical patient group was based on undisclosed "post-hoc changes" and "manipulations"); *Li v. Aeterna Zentaris Inc.*, 2016 WL 827256, at *1, 3-4 (D.N.J. Mar. 2, 2016) (statements about "favorable top-line results" actionable where achieved through protocol "breaches").

### 3. The Offering Documents Misrepresented That The Trial Had To Be Amended To Include Moderate-To-Severe MDD Patients

The Offering Documents also falsely represented that the Phase 2 trial originally "specified enrolling solely mild-to-moderate MDD patients," and that Neumora "amended the trial inclusion criteria to include patients with moderate-to-severe MDD" and "added a prespecified analysis" for that subgroup because it was "the patient population we intend to evaluate in our pivotal Phase 3 program and more typically studied in MDD clinical trials." ¶¶152-53. In reality, the trial was never limited by MDD severity.

Multiple former senior Neumora employees with direct personal knowledge of the Phase 2 trial confirmed that there was never such a restriction and that Neumora shifted focus to the moderate-to-severe MDD subgroup only after unblinding the data and discovering "there's not a

16

statistically significant signal" in the full population. ¶¶131-34. Their accounts are corroborated by a governmental clinical trial database that contains a comprehensive history of records for all versions of Nava's Phase 2 trial—20 versions in total—not one of which shows any MDD severity limitation in the trial inclusion criteria. ¶136. Nor does BlackThorn's release announcing the trial's commencement specify enrolling solely mild-to-moderate MDD patients. ¶137.

In response, Defendants improperly attempt to introduce a "rule-based criteria document" purportedly showing "that the trial's inclusion criteria *were* amended to expand the range of eligible MDD scores" (MTD 19, citing Exs. 7 & 8; emphasis in original). However, Defendants' contentions "tak[ing] issue with Lead Plaintiff's allegations … serve merely to confirm that material factual disputes exist that cannot be resolved on a motion to dismiss." *Van Dongen v. CNinsure Inc.*, 951 F. Supp. 2d 457, 470 (S.D.N.Y. 2013). Even if Defendants' extrinsic exhibits were properly considered, they still do not establish that the statements in the Offering Document are true. If anything, the reasonable inference from these internal BlackThorn documents dated *before* its acquisition is that Neumora did not amend the Phase 2 inclusion criteria—BlackThorn did. This inference is consistent with the FE accounts that Neumora did not amend the inclusion criteria, but rather pivoted to a smaller patient pool after unblinding the data and observing that Nava was entirely ineffective in the overall population. ¶¶131-34 (accounts of FEs 1, 2, 5).

Next, Defendants attack the FE accounts as merely asserting that the trial "ultimately enrolled *both* mild-to-moderate and moderate-to-severe MDD patients." MTD 19. However, three FEs specifically confirm that the Phase 2 trial was never limited by MDD severity. ¶¶132-34. These FEs explain that the Phase 2 trial originally included patients with "all" levels of MDD, and that Neumora "backtrack[ed]" to more severely depressed patients after unblinding the data and observing there was no "signal" in the full population. *Id.* Finally, Defendants' assertion that the

17

FEs could not have knowledge of BlackThorn's original screening criteria because they "all worked for Neumora, not BlackThorn" (MTD 19) is wrong. Each of these FEs personally worked on the Phase 2 trial and was in a position to know the characteristics of the participants, including those inherited from BlackThorn, and of prior changes to the trial inclusion criteria.[5] *See Novak v. Kasaks*, 216 F.3d 300, 314 (2d Cir. 2000) (confidential sources credited where "they are described in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged"); *Cohen*, 2018 WL 1406619, at *9 (crediting allegations from confidential witnesses identified only as "former consultants of [company] with knowledge of the clinical trial results").

### 4.    Defendants' Arguments Against Actionability Fail

Defendants' arguments that the alleged misstatements are non-actionable "opinions," forward-looking statements, or omitted nothing material, are easily rejected.

### a.    The Statements Are Not Inactionable "Opinions"

Defendants' argument that "all" of the alleged misstatements constitute inactionable "statements of opinion" (MTD 13-15) conflates facts with opinions, and ignores binding law governing when actual opinion statements are actionable.

***First***, the challenged statements concern objective, verifiable facts that are the antithesis of opinion. Defendants' descriptions of the Phase 2 results as demonstrating "statistically significant" "treatment differences" in the pivotal moderate-to-severe subgroup on the primary efficacy measures and a "range of other key secondary and exploratory measures of depression … anxiety

---

[5] For example, FE 5, Neumora's former Director of Clinical Operations, was responsible for overseeing and was "intimately involved" in the Phase 2 trial. ¶¶119 & n.15, 122. Similarly, FE 2, a former Data Scientist II, personally assisted with the trial and attended regular weekly and bi-weekly meetings where it was discussed. ¶113 n.12. And FE 1, a former Senior Scientist, joined Neumora a month *before* the BlackThorn acquisition closed. ¶132.

18

… and function" (¶¶140-42) are affirmative statements of objective fact based on actual trial data. The Offering Documents identified the specific efficacy measures, including the primary HAMD-17 endpoint, as well as six other "key" secondary endpoints and exploratory measures, and listed purportedly supporting trial data directly below the subject statements.[6] *E.g.*, ¶142. Factual data and assertions concerning the scientific and statistical results of a clinical trial are not "opinions." *Cohen*, 2018 WL 1406619, at *6 (statements pertaining to the results of clinical study are actionable "statements of historical fact").

***Second***, none of the challenged statements referred to or are even remotely framed as an opinion. For example, the Offering Documents did not couch Defendants' representations with language such as "we think" or "we believe" the trial results "were X," or any other language "conveying some lack of certainty" about the results. *See Omnicare*, 575 U.S. at 187 (2015). Defendants' argument that these statements are mere "interpretations of Phase 2(a) clinical trial results" (MTD 13-14) is wrong. Unlike *Kleinman v. Elan Corp.*, 706 F.3d 145, 154-55 (2d Cir. 2013), cited by Defendants, where the underlying data was disclosed, here Defendants concealed critical facts necessary to evaluate their statements about the Phase 2 trial results. As courts have emphasized, "[t]he allegations … do not involve differing interpretations of disclosed data, but rather data that was ***not*** disclosed." *Delcath*, 36 F. Supp. 3d at 333 (discussing *Kleinman*).[7] There is simply no debate about "interpretations" here.

---

[6] Likewise, Defendants' statement that the original BlackThorn trial "specified enrolling solely mild to moderate MDD patients" (¶153) is a historical factual assertion—it either happened or it did not.

[7] This crucial distinction applies to each of the cases relied on by Defendants—none involve omission of commercially damaging data conflicting with positive data disclosed by the company. MTD 13-14.

*Third*, even if properly characterized as opinions, all of the challenged statements are actionable. As the Supreme Court has instructed, an opinion statement is actionable, even if sincerely held, where the speaker "lacked the basis for making those statements that a reasonable investor would expect." *Omnicare*, 575 U.S. at 196. Here, an investor would reasonably expect that the Phase 2 trial included enough male participants to yield meaningful results. As of the IPO, the Phase 2 trial had concluded and anyone with access to the full data would have seen it was extremely underpowered for men and Neumora had no basis for proceeding to Phase 3. ¶¶112-20. Accordingly, the challenged statements did not "fairly align[]" with the information available to Defendants at the time of the IPO, and Defendants' attempt to trivialize the extremely low number of treated males in the Phase 2 trial as just "some fact cutting the other way" and simply Plaintiff's "own belief" (MTD 15) is absurd. Indeed, CEO Gosebruch himself admitted the lack of males was a serious "problem" with the study. ¶99; *see Micholle v. Ophthotech Corp.*, 2019 WL 4464802, at *12 (S.D.N.Y. Sept. 17, 2019) (opinions actionable because they did not "fairly align[] with the information in [Defendants'] possession' at the time their statements were made"); *Hao Wu v. Tokai Pharms., Inc.*, 2019 WL 938924, at *3 (Mass. Super. Jan. 9, 2019) (statements concerning "whether a Phase III trial was supported by the Phase II data and whether Phase III would … be successful" actionable because the company had "information which undercut those opinions").

### b.   The Statements And Omissions Were Material

Defendants' argument that none of the challenged statements are material lacks any merit. Materiality is satisfied if a reasonable investor "would have viewed the nondisclosed information as having significantly altered the 'total mix' of information made available." *Matrixx*, 563 U.S. at 38. Materiality is "an inherently fact-specific finding," *Litwin*, 634 F.3d at 716-17, and thus dismissal is only appropriate at the pleading stage "if *no reasonable investor* could have been

20

misled about the nature of the risk when he invested." *In re Wells Fargo & Co. Sec. Litig.*, 2021 WL 4482102, at *11 (S.D.N.Y. Sept. 30, 2021); *see Nayani v. Lifestance Health Grp., Inc.*, 2023 WL 3260260, at *3 (S.D.N.Y. May 4, 2023) ("materiality is rarely a basis for dismissal on the pleadings").

Defendants do not come close to meeting this test.  The statements concerned a critical clinical trial of the Company's most advanced drug candidate and the entire basis for the IPO.  It is difficult to conceive of more material omissions than the virtual absence of any successfully treated males in the "pivotal" population targeted for FDA-approval, and that purported "statistically significant" results hinged on post-hoc manipulations of trial data.  *See infra* §IV.B.1-2; *see also In re Regeneron Pharms., Inc.*, 2005 WL 225288, at *21 (S.D.N.Y. Feb. 1, 2005) ("In the context of a drug development program, courts have noted that [s]tatements regarding the overall efficacy of the drug . . . cannot be simply dismissed as immaterial").  The Supreme Court has found materiality under far less egregious facts.  *See Matrixx*, 563 U.S. at 38-40 (drug's potential side effect material to investors even if not statistically significant).

Materiality is reinforced by the market reaction to the Phase 3 trial results revealing that Nava was completely ineffective in men. The Company's stock price declined 80%, and analysts called the Phase 3 results a "worst-case scenario," and questioned why the Company had not previously disclosed the gender disparity.  Analysts underscored that "male participants actually did worse on navacaprant," questioned its method of action, and doubted whether there was "a future path forward for the drug."  ¶96; *see New Orleans Emps. Ret. Sys. v. Celestica, Inc.*, 455 F. App'x 10, 16 (2d Cir. 2011) (materiality exhibited by "the precipitous decrease in share price"); *Freudenberg v. E*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 203 (S.D.N.Y. 2010) (market reaction evidences prior concealment of material facts).

Materiality is also buttressed by the emphatic accounts of the Company's own FEs, who uniformly confirm that the extraordinarily small number of treated men in the critical subgroup—and the even less that demonstrated a statistically significant response—was "critical" information that would "absolutely" have been important to investors in the IPO because it undermined any claim of efficacy. ¶¶117-18.  Defendants' contention that Plaintiff has alleged no facts to suggest that the FEs "would have knowledge about what is and is not legally material to sophisticated biotech IPO investors" (MTD 22) is nonsense.  These three FEs occupied high level positions, had extensive experience in the field, and their views "suggesting a significant risk to the commercial viability of [Neumora's] leading product" would unquestionably be deemed significant by ***any*** reasonable investor.[8]  *See Matrixx*, 563 U.S. at 45-47.

Defendants' contrary arguments are easily dismissed.  Defendants argue that the increase in Neumora's stock price after the December 2023 ACNP presentation demonstrates the omissions were immaterial (MTD 21), however, the presentation disclosed only the gender ratio for the overall study and nothing about the extreme lack of data supporting Nava's efficacy in men.  Similarly, Defendants' argument that it was publicly known that MDD affects more women than men in society at large (MTD 21-22) does not come close to establishing that "no reasonable investor could have been misled" that the Phase 2 trial was underpowered for males—needless to say that the "statistically significant" results rested on only four successfully treated men.  *See Wells Fargo*, 2021 WL 4482102, at *11.

---

[8] The same is true for the FE accounts regarding Defendants' false assertion that Nava's Phase 2 trial needed to be "amended" to include patients with moderate-to-severe MDD and a "prespecified analysis." ¶¶131-34, 155.

c.     **The "Forward-Looking" Safe Harbor And Bespeaks Caution Doctrine Do Not Apply**

Defendants argue that Statement 4 is immunized under the safe harbor for certain "forward looking" statements and the "bespeaks caution" doctrine. MTD 20. Not so. The Offering Documents grounded Defendants' proclamations of Nava's "potential to provide significant advantages relative to the standard of care" and the Company's initiation of a "pivotal Phase 3 program" for Nava on the purportedly successful "results from the Phase 2 clinical trial." ¶¶89, 143. However, the Phase 2 trial had ***already*** been completed and Defendants failed to disclose that the results were (1) ***not*** successful, and (2) ***skewed*** by post-hoc manipulation. As such, the statements concern existing and historical facts, and are outside the safe harbor. *See In re Bear Stearns Companies, Inc. Sec., Derivative, & ERISA Litig.*, 763 F. Supp. 2d 423, 492–93 (S.D.N.Y. 2011) ("The safe harbor and related 'bespeaks caution' doctrines apply to 'forward-looking statements,' not to statements of existing or historical fact."); *Homyk*, 2023 WL 3579440, at *17-18 (statements that the results of a clinical trial indicate that drug has "the potential to change the treatment paradigm" not forward-looking); *FibroGen*, 2022 WL 2793032, at *7-8 (statements about drug's "potential approval" not forward-looking when "based on existing data").

Nor were the statements accompanied by meaningful cautionary language. None of Defendants' "robust cautionary language" mentions that the purportedly successful Phase 2 results included virtually no successfully treated men and were skewed by post-hoc manipulation. For example, Defendants' caution that "success in . . . early clinical trials does not ensure that later . . . clinical trials will be successful" (MTD 20, citing Ex. 1 at 28) did not disclose that the Phase 2 trial was a "success" only if male patients were ignored.[9] Defendants' failure to disclose these

---

[9] The other risk disclosures Defendants cite to (MTD 20) are even more generalized—*e.g.*, that Neumora may never achieve profitability or commercialize any products, that neuroscience drug

"hard facts critical to appreciating the magnitude of the risks described" renders their cautionary language ineffective. *Bear Stearns*, 763 F. Supp. 2d at 495; *see Hub*, 2025 WL 872078, at *15 (cautionary language in offering documents must address the "exact risk" to be effective).

### C.    Defendants' Negative Loss Causation Defense Fails

Last, Defendants prematurely attempt to cobble together a negative loss causation defense. MTD 23-26.  Defendants' loss causation argument is both premature and meritless.

Unlike securities fraud claims brought under the Exchange Act, loss causation is not an element of Plaintiff's Securities Act claims. *Winter*, 686 F. Supp. 3d at 310.  "The absence of loss causation—known as negative causation—is instead an affirmative defense that defendants bear the burden of proving, reflecting Congress's 'desire to allocate the risk of uncertainty to the defendants." *Id.* "To establish this defense, a defendant must 'prov[e] that the allegedly misleading representations did not cause the depreciation in the stock's value. … The Second Circuit has described this as a 'heavy burden,' and a defendant may prevail at the pleading stage only when 'facts supporting the defense appear on the face of the complaint, and it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief.'" *Orient Plus Int'l Ltd. v. Baosheng Media Grp. Holdings Ltd.*, 799 F. Supp. 3d 310, 352 (S.D.N.Y. 2025) (quoting *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 574 F.3d 29, 36 (2d Cir. 2009); and *United States v. Space Hunters, Inc.*, 429 F.3d 416, 426 (2d Cir. 2005)). Accordingly, "the affirmative defense of negative causation is generally not properly raised on a Rule 12(b)(6)

---

development is difficult and subject to unique challenges, and that developmental drugs may have potential adverse side effects.

motion." *In re Giant Interactive Grp., Inc. Sec. Litig.*, 643 F. Supp. 2d 562, 572 (S.D.N.Y. 2009) (collecting cases).[10]

Defendants do not come close to carrying their "heavy burden."   *First*, Defendants' argument (MTD 23, 26) that the failure of the Phase 3 trial cannot "correct" statements about the Phase 2 trial is wrong.   The "relevant truth" is that Defendants lacked meaningful data demonstrating Nava's effectiveness in men, a fact made clear when Defendants conceded the "small data sets" in the Phase 2 trial were a "problem" when trying to determine Nava's efficacy in men. In response, Neumora's stock price plunged 80% in a single day, and analysts noted that "male participants actually did worse on navacaprant," the findings raised  "significant" doubt about "the KOR antagonism mechanism of action and whether navacaprant is an active drug in MDD," and questioned whether there was any "future path forward for the drug." ¶¶96-97.  This

---

[10] It is "unusual" for courts in this District to find negative loss causation at the pleading stage. *Winter*, 686 F. Supp. 3d at 310 (rejecting defense).  Not surprisingly, Defendants' cases involve atypical and highly distinguishable facts.  *See Amorosa v. AOL Time Warner*, 409 F. App'x 412, 416 (2d Cir. 2011) (correctives did not "address[] AOL's accounting practices"); *In re State St. Bank & Tr. Co. Fixed Income Funds Inv. Litig.*, 774 F. Supp. 2d 584, 590-91 (S.D.N.Y. 2011) (loss on mutual fund shares based on net asset value not "disclosure of hidden facts"); *In re Sec. Cap. Assurance Ltd. Sec. Litig.*, 729 F. Supp. 2d 569, 602 (S.D.N.Y. 2010) (loss causation allegations "select[ed] inconsistent date spreads and wide event windows that permit market noise"); *In re Britannia Bulk Holdings Inc. Sec. Litig.*, 665 F. Supp. 2d 404, 419 (S.D.N.Y. 2009) (90% decline before corrective); *In re WorldCom, Inc. Securities Litigation*, 388 F. Supp. 2d 319, 345 n.39 (S.D.N.Y. 2005) (negative loss causation in the context of settlement approval); *In re Merrill Lynch & Co., Inc. Rsch. Reps. Sec. Litig.*, 272 F. Supp. 2d 243, 255 (S.D.N.Y. 2003) (no loss causation where stock decline matched market decline); *Hoang v. ContextLogic, Inc.*, 2024 WL 4471316, at *10 (N.D. Cal. Aug. 22, 2024) (price increased after corrective); *Brown v. Ambow Educ. Holding Ltd.*, 2014 WL 523166, at *14-16 (C.D. Cal. Feb. 6, 2014) (correctives did "not reasonably reveal *anything* about the purported misrepresentations"); *In re Shoretel Inc. Sec. Litig.*, 2009 WL 248326, at *5 (N.D. Cal. Feb. 2, 2009) (similar). Defendants' remaining cases were brought under the Exchange Act and "therefore have limited applicability here." *Special Situations Fund III QP, L.P. v. Marrone Bio Innovations, Inc.*, 243 F. Supp. 3d 1109, 1122 (E.D. Cal. 2017).

is more than sufficient to provide "some indication of the loss and the causal connection that the plaintiff has in mind." *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 347 (2005).[11]

*Second*, Defendants incorrectly assert that all material facts were disclosed before Neumora's disastrous Phase 3 trial results were announced. MTD 24. Defendants cite a presentation that merely disclosed the top-line gender ratio for the overall Phase 2(a) efficacy population. Critically, the presentation did not disclose *any* gender demographics for the "pivotal" moderate-to-severe subgroup. In particular, the presentation did not identify the number of men in the subgroup (50), the number of men in the subgroup who received Nava (16), or the number of men who met the study's endpoint after controlling for placebo effect (less than 4). Nor did the presentation identify the number of males in the subgroup with "false positives," *i.e.*, greater improvement on placebo. Similarly, while the presentation disclosed the exclusion of a trial site, it did *not* disclose the gender of the patients at the excluded site; how patients performed at the site; that if the site had not been excluded, the Phase 2 trial would have failed; and that the site was excluded after the Phase 2 trial data was unblinded, thus calling into question the integrity of the exclusion and the entire Phase 2 study results. Ex. 4; Ex. 9.

*Third*, Defendants' argument that the Mathew Article cannot support loss causation (MTD 25) also misses the point. Plaintiff's theory of loss causation is not based on the Mathew Article. Rather, the article is a post-disclosure event that confirms there was no basis to proceed to Phase 3, because the Company never had any meaningful data supporting Nava's effectiveness in men.

---

[11] In securities fraud cases where loss causation *is* an element of plaintiff's claims, courts have found loss causation adequately alleged under similar facts. *E.g.*, *Micholle*, 2019 WL 4464802, at *20 (loss causation alleged where "Defendants' misrepresentations concealed an increased risk that the Phase 3 Trial would fail, followed by the actual failure of that trial"); *Delcath*, 36 F. Supp. 3d at 336 (loss causation alleged where company's share price fell on news that therapy group of clinical trial experienced more adverse events than control group).

*Fourth*, Defendants argue there has never been a "correction" of the misstatements concerning the Phase 2 trial inclusion criteria. MTD 25. However, "there is no requirement that the [corrective] disclosure" be a "mirror image tantamount to a confession." *In re Vale S.A. Sec. Litig.*, 2017 WL 1102666, at *29 (S.D.N.Y. Mar. 23, 2017). Instead, "the alleged disclosure need only "relate to," "concern," or be "linked" to an alleged misrepresentation." *Pearlstein v. BlackBerry Ltd.*, 2021 WL 253453, at *18 (S.D.N.Y. Jan. 26, 2021). Thus, Defendants' failure to specifically disclose that Neumora did not amend the Phase 2 inclusion criteria, and only focused on the subgroup after the Company and its consultants analyzed the unblinded data and observed no "statistically significant signal" in the full population, does not establish negative loss causation. *Pearlstein*, 2021 WL 253453, at *18 (corrective disclosure need not "take the form of a flashing neon light, with an explicit message stating that it is intended to cure an earlier fraudulent statement").

### D.    The Complaint Pleads Control Person Claims

Because the Complaint adequately pleads a primary violation of §11, the §15 control-person claim is not subject to dismissal. *Lozada v. TaskUs, Inc.*, 710 F. Supp. 3d 283, 328 (S.D.N.Y. 2024). Defendants are incorrect that control is not adequately alleged. MTD 26. The Complaint sufficiently alleges the Individual Defendants' control (¶¶28-39, 190-94), which "is a fact-intensive inquiry, and generally should not be resolved on a motion to dismiss." *In re Tronox, Inc. Sec. Litig.*, 769 F. Supp. 2d 202, 208 (S.D.N.Y. 2011).

### E.    The Complaint Pleads Claims Against The Underwriter Defendants

The Underwriters seek dismissal based on a fact-intensive due diligence defense (MTD 27), however this affirmative defense is not properly raised on a motion to dismiss. *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 360 n.7 (2d Cir. 2010) (due diligence defenses are "unavailing as a means of defeating a motion to dismiss pursuant to Rule 12(b)(6)"). Plaintiff's

27

allegations that the Underwriter Defendants participated in the promotion and sale of stock to investors, collected lucrative underwriting fees for their roles in the offerings, and disseminated the Offering Documents are sufficient to plead the Underwriter Defendants' liability as statutory sellers.  ¶¶156-65; *Evoqua*, 450 F. Supp. 3d at 404 (collecting cases).

## V.    CONCLUSION

Defendants' motion should be denied.

Dated: April 22, 2026                    Respectfully submitted,

**SAXENA WHITE P.A.**

By: */s/ Steven B. Singer*
Steven B. Singer
David J. Schwartz
10 Bank Street, Suite 882
White Plains, NY 10606
Tel.: (914) 437-8551
Fax: (888) 631-3611
ssinger@saxenawhite.com
dschwartz@saxenawhite.com

-and-

David R. Kaplan (*pro hac vice*)
Emily Bishop (*pro hac vice*)
505 Lomas Santa Fe Drive, Suite 180
Solana Beach, CA 92075
Tel.: (858) 256-5302
Fax: (858) 997-0860
dkaplan@saxenawhite.com
ebishop@saxenawhite.com

*Counsel for Lead Plaintiff Victor Otcheretko and Lead Counsel for the Class*

## CERTIFICATE OF SERVICE

I hereby certify that on April 22, 2026, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send a Notice of Electronic Filing to all counsel of record.

Respectfully submitted,

*/s/ Steven B. Singer*
Steven B. Singer

## CERTIFICATION OF WORD COUNT

I certify that the foregoing memorandum of law complies with the formatting and word limit requirements set forth in Rule 2.B of the Court's Individual Rules and Practices in Civil Cases, and Local Civil Rule 7.1, as it contains 8,744 words, excluding the cover page, table of contents, table of authorities, and signature block.

Dated: April 22, 2026

/s/ *Steven B. Singer*
Steven B. Singer